1

**LATHAM & WATKINS LLP**
    David J. Schindler (Bar No. 130490)
2        *david.schindler@lw.com*
    Julie R. F. Gerchik (Bar No. 237764)
3        *julie.gerchik@lw.com*
    Kristen M. Tuey (Bar No. 252565)
4        *kristen.tuey@lw.com*
    355 South Grand Avenue
5    Los Angeles, California  90071-1560
    Telephone:  (213) 485-1234
6    Facsimile:  (213) 891-8763

7    Attorneys for Plaintiff the City of Almaty

8

9                 UNITED STATES DISTRICT COURT

10              CENTRAL DISTRICT OF CALIFORNIA

11

| | |
|---|---|
| 12  CITY OF ALMATY, a foreign state, | Case No. |
| 13           Plaintiff, | Assigned To: |
| 14      v. | **COMPLAINT FOR DAMAGES, INJUNCTIVE RELIEF, AND OTHER EQUITABLE RELIEF FOR:** |
| 15  VIKTOR KHRAPUNOV, an individual; LEILA KHRAPUNOV, an individual; ILIYAS KHRAPUNOV, an individual; MADINA ABLYAZOVA a/k/a MADINA KHRAPUNOVA, an individual; and DOES 1 through 10, | |
| 16 | |
| 17 | 1) **Violations of RICO (18 U.S.C. §§ 1962(c), 1962(d), 1964);** |
| 18           Defendants. | 2) **Breach of Fiduciary Duty;** 3) **Conversion and Conspiracy to Commit Conversion;** |
| 19 | 4) **Fraud and Deceit and Conspiracy to Defraud; and** |
| 20 | 5) **An Accounting, and Imposition of a Constructive Trust and Equitable Lien.** |
| 21 | |
| 22 | **DEMAND FOR JURY TRIAL** |

23

24

25

26

27

28

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

DC\3806777.4

COMPLAINT FOR DAMAGES, INJUNCTIVE
RELIEF AND OTHER EQUITABLE RELIEF

1        Plaintiff the City of Almaty ("Almaty") hereby alleges the following claims

2  for relief against defendants Viktor Khrapunov ("Viktor"), Leila Khrapunov

3  ("Leila"), Iliyas Khrapunov ("Iliyas"), Madina Ablyazova a/k/a Madina

4  Khrapunova ("Madina"), and Does 1 – 10 (collectively referred to as

5  "Defendants").

6  **I.     NATURE OF THE ACTION**

7        1.     This is an action on behalf of the City of Almaty, the largest city in

8  the Republic of Kazakhstan, to recover funds that were stolen by its corrupt former

9  mayor, Viktor, and his co-conspirators, including his wife Leila, their children,

10  Iliyas and Elvira Khrapunov a/k/a Elvira Kudryashova a/k/a Elvira Balmadani

11  ("Elvira"), and the children's spouses, Madina and Dmitri Kudryashov ("Dmitri"),

12  through a scheme that involved two objectives:  (a) to steal and loot money from

13  Almaty; and (b) to transfer, launder, and hide that stolen money in the United

14  States where they believed it would be out of reach of Kazakh and other

15  governmental authorities (the "Khrapunov Racketeering Enterprise").

16        2.     From 1997 to 2004, Viktor, Leila, Iliyas, Elvira, and their co-

17  conspirators systematically stole and looted money from Almaty as a result of

18  Viktor's corrupt use of his political power.  In 2007, fearing discovery of their

19  fraud, Viktor and Leila fled to Switzerland, where Iliyas and Elvira resided at the

20  time, and attempted to launder and hide the stolen money in Switzerland.  The

21  Kazakh authorities nevertheless continued to investigate Viktor, Leila, Iliyas, and

22  Elvira, and sought the assistance of the Swiss authorities.  In May 2011, the

23  Kazakh authorities began bringing formal criminal charges against Viktor, Leila,

24  and Elvira, and in mid-2012 the Swiss authorities initiated an investigation of

25  Viktor and Leila on suspicion of money laundering.  In November 2012, the Swiss

26  authorities began freezing assets in Switzerland belonging to Viktor, Leila, Iliyas,

27  and Elvira.

28

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

DC\3806777.4

1

COMPLAINT FOR DAMAGES, INJUNCTIVE
RELIEF AND OTHER EQUITABLE RELIEF

3.      In or around 2010, understanding that they could not accomplish their fraud by keeping the stolen money in Switzerland, the Defendants and their co-conspirators engaged in racketeering activity to launder and hide the stolen money in the United States with Iliyas, Madina, Elvira, Dmitri, and various sham companies and disguised entities.  Upon information and belief, the Defendants and their co-conspirators selected the United States as the ideal location to launder the stolen proceeds because they believed it was out of reach of the Kazakh authorities.  The United States does not have a mutual legal assistance treaty or extradition treaty with Kazakhstan.

4.      The Defendants and their co-conspirators engaged in racketeering activities in the United States by engaging in money laundering with stolen funds in violation of 18 U.S.C. § 1956; transacting in property derived from unlawful activity in violation of 18 U.S.C. § 1957; transporting stolen property in violation of 18 U.S.C. § 2314; mail fraud in violation of 18 U.S.C. § 1341; and wire fraud in violation of 18 U.S.C. §1343.  They did so by acquiring property, including property in the Central District of California, and engaging in business transactions in the names of Iliyas, Madina, Elvira, Dmitri, and/or sham companies and disguised entities in order to hide the true identity of the source of the stolen funds and in order to avoid detection by Kazakh, Swiss and U.S. authorities.  The activities in the United States were essential to the success of the enterprise because without a perceived safe haven for the stolen funds, the Defendants and their co-conspirators would not have been able to complete their objective of ultimately using the stolen Almaty funds for their personal benefit.

5.      The Defendants and their co-conspirators violated United States law in order to accomplish their goal of being able to secure and use their stolen and ill-gotten gains.  The dual parts of the enterprise were necessarily conjoined – to steal large sums of money from Almaty, and to get away with it in the United States.  The Defendants and their co-conspirators are trying to use the United

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

DC\3806777.4

2

COMPLAINT FOR DAMAGES, INJUNCTIVE
RELIEF AND OTHER EQUITABLE RELIEF

States as a safe haven for international money laundering.  They are trying to do in the United States what they could not do in Switzerland – keep and use money stolen and looted from Almaty, and keep it out of the reach of the Kazakh authorities and the people of Almaty.

6. As set forth herein, Almaty seeks: (a) to hold Defendants, including Viktor, Leila, Iliyas, and Madina, liable for their laundering and transportation of stolen funds to and within the United States; (b) return of the monies stolen from Almaty and its people, or the return of substitute assets acquired with funds stolen from Almaty and its people, located in the United States; (c) injunctive relief to prevent Viktor, Leila, Iliyas, Madina, and their co-conspirators from engaging in any further laundering or other transactions in the United States in violation of federal law involving the proceeds of the looting scheme; (d) imposition of a constructive trust over all assets located within the United States that are traceable, either directly or indirectly, to Viktor and his co-conspirators' systematic looting of public assets rightfully belonging to Almaty and its people and ongoing conspiracy to launder and conceal stolen assets in the United States; and (e) treble and punitive damages for Defendants' myriad violations of the federal anti-racketeering statute, as well as state and federal common law.

## II.    THE PARTIES

7. Plaintiff Almaty is a foreign state pursuant to 28 U.S.C. § 1332(a)(4). Until 1997, Almaty was the capital of Kazakhstan, which is a sovereign state recognized by the Government of the United States of America.  Almaty remains a major commercial and cultural center of Kazakhstan and has the country's largest population.  Almaty has standing to bring this Complaint and sues: (a) in its own right, as the victim of Defendants' unlawful schemes, conspiracies, and acts of racketeering; and (b) in a *parens patriae* capacity as the representative of its people, who were victims of Defendants' conspiracies, fraudulent schemes, and

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES
DC\3806777.4
3
COMPLAINT FOR DAMAGES, INJUNCTIVE
RELIEF AND OTHER EQUITABLE RELIEF

1   acts of racketeering and who are the rightful owners of funds and assets unlawfully

2   held by the Defendants and their co-conspirators in the United States.

3        8.    Defendant Viktor was the mayor of Almaty from approximately June

4   16, 1997 until approximately December 2004.  In 2004, Viktor was nominated for

5   the position of governor of the Pavlodar province in northeast Kazakhstan, a

6   position he held until 2007, at which time he was appointed Minister of Emergency

7   Measures.  In late 2007, Viktor announced his retreat from all public functions and

8   his retirement, ostensibly for health reasons.

9        9.    Upon information and belief, in or about 1998, Viktor married

10   Defendant Leila.  Viktor and Leila are citizens of the Republic of Kazakhstan and,

11   upon information and belief, currently reside in Switzerland.

12        10.    Upon information and belief, Defendant Iliyas is the son of Leila, and

13   step-son of Viktor.  Upon information and belief, Iliyas is married to Defendant

14   Madina.  Upon information and belief, Iliyas and Madina are citizens of the

15   Republic of Kazakhstan and currently reside in Switzerland.

16        11.    Almaty is ignorant of the true names of defendants Does 1 through 10

17   (the "Doe Defendants"), inclusive, and therefore sues those defendants by such

18   fictitious names.  Almaty is informed and believes, and on that basis alleges, that

19   the Doe Defendants, inclusive, are responsible for the acts alleged in this

20   Complaint.  When the true names of such fictitious defendants are ascertained,

21   Almaty will seek leave of this Court to amend this Complaint to name those

22   individuals or entities.

23        12.    Almaty is informed and believes, and thereon alleges, that the

24   Defendants, including those named as Doe Defendants, were at all times relevant

25   herein the agents, servants, and/or employees of Defendants, and each of them, and

26   in doing the things herein alleged, were acting at least in part within the course and

27   scope of their authority as such agents, servants, and/or employees of Defendants,

28   and each of them.

III.    JURISDICTION AND VENUE

13.    This Court has subject matter jurisdiction under 28 U.S.C. § 1331(a) and 18 U.S.C. § 1964(c) over the First and Second Claims for Relief of this Complaint for violation of the federal Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961 *et seq.* and for conspiracy to violate RICO. The Third through Seventh Claims for Relief allege violations of state law and of federal common law. This Court has pendent jurisdiction over such claims pursuant to 28 U.S.C. § 1367(a) because those claims are joined with substantially related claims under RICO and because those claims are so related to the RICO claims in the action that they form part of the same case or controversy under Article III of the United States Constitution and arise from a common nucleus of operative facts.

14.    Venue is proper in this District and before this Court pursuant to 28 U.S.C. § 1391(b)(2) because events giving rise to Almaty's claims occurred in this District, including, among other things, Defendants' purchase, in violation of U.S. law, of real estate and other assets located in Beverly Hills and Studio City, California.

15.    This Court has personal jurisdiction over Defendants because each of them knowingly committed acts that form the basis of this Complaint in this District, directed or conspired with others to commit acts in this District, and purposely availed themselves of the privileges of doing business in this District, as fully set forth herein.

IV.    FACTUAL ALLEGATIONS

   A.    Overview of the Khrapunov Racketeering Enterprise and Conspiracy

16.    In 1991, Kazakhstan declared its independence from the former Soviet Union and initiated the process of becoming a free society. Rather than assist their country in embracing this move towards freedom, Viktor and his co-conspirators

LATHAM&WATKINS<sup>LLP</sup>
ATTORNEYS AT LAW
LOS ANGELES

DC\3806777.4

5

COMPLAINT FOR DAMAGES, INJUNCTIVE
RELIEF AND OTHER EQUITABLE RELIEF

1    exploited Viktor's position of trust and authority, stole hundreds of millions of

2    dollars from the people of Almaty and tried to launder, hide and spend this money

3    in the United States.

4          17.    The Khrapunov Racketeering Enterprise comprised of two interrelated

5    parts.  First, the Defendants, along with Elvira and Dmitri, conspired together to

6    have Viktor abuse his position of trust as mayor of Almaty to steal from the people

7    of Almaty various state-owned assets cumulatively valued at over $300 million.

8    Second, the Defendants, along with Elvira and Dmitri, conspired together to

9    transport and to launder those stolen assets out of Kazakhstan and to the United

10   States, among other places, in order to escape the reach of the Kazakh authorities.

11   The transportation and laundering of the stolen assets was essential to the success

12   of the enterprise because it would enable the Defendants and their co-conspirators

13   to use the assets that had been stolen for their own personal benefit.

14         18.    Viktor became mayor of Almaty on or about June 16, 1997, and

15   remained in that position until approximately December 2004.  Before Viktor

16   assumed the office of the mayor of Almaty, he took an oath of office to strictly

17   obey the Constitution and laws of the Republic of Kazakhstan.  Among other

18   things, Viktor expressly and impliedly promised and represented that he would

19   fulfill his fiduciary duties to the people of Almaty, would honor his obligation to

20   provide honest services, and would not convert money, property, or assets

21   belonging to Almaty for his own use or that of his family, friends, or associates.

22         19.    In fact, over the span of more than six years, Viktor repeatedly and

23   systematically violated those promises and abused his position of power and

24   authority to steal millions of dollars of real property and assets from the people of

25   Almaty and to launder and conceal that money in the United States and elsewhere

26   in the hopes of escaping prosecution.  Aided and abetted by his wife, children,

27   associates, accomplices, and other co-conspirators, Viktor plundered the city's

28   wealth and industry to enrich himself, his family, and his co-conspirators, at the

LATHAM&WATKINS�LLP
ATTORNEYS AT LAW
LOS ANGELES
DC\3806777.4
6
COMPLAINT FOR DAMAGES, INJUNCTIVE
RELIEF AND OTHER EQUITABLE RELIEF

1  expense of Almaty and its people, and Defendants and their co-conspirators now
2  seek to conceal and enjoy their ill-gotten gains in the United States.

3      20.    Defendants and their co-conspirators carried out the scheme through
4  various means, including: (a) secretly acquiring property owned by Almaty
5  through fictitious and sham entities for a fraction of what the property was worth,
6  then selling the property for tens of millions of dollars in illicit profits; (b)
7  acquiring property without even paying for it through sham transactions; and (c)
8  secretly acquiring property at a discount then taking illicit government action that
9  vastly increased the value of the property solely to benefit Viktor and his co-
10  conspirators.

11     21.    As mayor, Viktor was entrusted with the right to cause state-owned
12  real estate to be sold to private parties at auction pursuant to established legal
13  procedures, the right to cause privately-owned real estate to be taken for purported
14  state use, and the right to control who could do business in Almaty through the
15  granting of licenses, concessions, and permits.

16     22.    In his capacity as mayor of Almaty, Viktor caused certain state-owned
17  real estate parcels to be put up for auction. However, in violation of Kazakh law,
18  and in violation of his duties to the people of Almaty, Viktor, aided and abetted by
19  others involved in the Khrapunov Racketeering Enterprise, corrupted those
20  auctions by: (a) improperly influencing and directing the actions of the individuals
21  responsible for administering the auctions; and (b) improperly causing confidential
22  bid information to be disclosed to entities controlled by his co-conspirator Leila to
23  allow these entities to adjust their bids.

24     23.    Through these corrupt activities, Viktor and Leila succeeded in
25  purchasing real estate and other assets put up for auction by Almaty, often at
26  artificially suppressed prices. In some instances, Viktor thereafter caused
27  development permits to be issued in connection with the purchased sites, vastly
28  increasing the market value of the real estate, which Viktor, Leila, and/or their co-

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

DC\3806777.4

7

COMPLAINT FOR DAMAGES, INJUNCTIVE
RELIEF AND OTHER EQUITABLE RELIEF

conspirators then re-sold at a significant profit.  In other instances, entities controlled by Leila simply ignored restrictions placed on parcels sold at auction in order to resell the parcels at a significant profit.  In addition, in some instances, entities controlled directly or indirectly by Viktor and Leila simply failed to pay for the assets they acquired and subsequently re-sold.

24.     Viktor thus conspired with the other Defendants and co-conspirators to use his position of power and authority to convert and cause to be converted, to his use and that of his family, friends and associates, money, funds and property rightfully belonging to Almaty and its people.

25.     After wrongfully appropriating assets belonging to Almaty and its people, Viktor, Leila, Elvira, and Iliyas, along with their families, friends, associates, and accomplices in the Khrapunov Racketeering Enterprise, devised and executed schemes to systematically and secretly transfer their ill-gotten gains out of Kazakhstan in an effort to escape the reach of the Kazakh authorities.  To that end, the Defendants and their co-conspirators ultimately transferred millions of dollars of stolen funds into the United States in violation of U.S. law through accounts, sham companies, and disguised entities owned or ultimately controlled by Elvira, Dmitri, Iliyas, and/or Madina.

26.     The Defendants and their co-conspirators first transferred the stolen funds to Switzerland, where Iliyas and Elvira were residing, using accounts and sham entities owned or ultimately controlled by Leila, Iliyas, Elvira, and/or their co-conspirators.  Leila, Iliyas, and Elvira received in Switzerland hundreds of millions of dollars transferred out of Kazakhstan by Viktor and Leila and laundered through various offshore holding companies to appear legitimate.

27.     Shortly thereafter, Leila, Iliyas, and Elvira began transferring portions of the ill-gotten proceeds out of Switzerland.  They again laundered stolen funds through various offshore holding companies, and ultimately transferred those stolen funds into the United States in violation of U.S. law via accounts and

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

DC\3806777.4

8

COMPLAINT FOR DAMAGES, INJUNCTIVE
RELIEF AND OTHER EQUITABLE RELIEF

entities owned or ultimately controlled by Elvira, Dmitri, Iliyas, and/or Madina. Iliyas, Madina, Elvira, and Dmitri conspired with the other Defendants to use the stolen funds they brought to the United States to purchase real estate and assets in California and New York, to fund U.S. holding companies owned or controlled by Leila, Iliyas, Madina, Elvira, and/or Dmitri, and to invest in United States businesses.  Upon information and belief, the Defendants and their co-conspirators increased their efforts to transfer stolen funds to the United States following the Swiss authorities' investigation of Viktor and Leila in 2012, which led to the Swiss authorities freezing Swiss bank accounts held by the Defendants and their co-conspirators.

28.     Viktor and Leila took numerous steps to conceal their looting for years from Almaty and the Kazakh authorities.  Among other things, Viktor and Leila each filed false annual tax returns with the Tax Committee of the Ministry of Finance of Kazakhstan, Kazakhstan's taxation authority, which concealed the millions of dollars in monies, properties, and assets acquired through the Khrapunov Racketeering Enterprise. According to their 2007 tax returns, which required Viktor and Leila to list their entire net worth accumulated through all sources as of December 31, 2007, Viktor and Leila reported a combined net worth of approximately $113,298 (13,671,665 T̄), in addition to three vehicles, five modest pieces of real estate, and two parking stalls.

29.     Despite claiming to have a total net worth of less than $120,000, by systematically looting and plundering assets belonging to the people of Almaty, Viktor and Leila amassed a fortune that reportedly exceeds $300 million.  Indeed, according to public news reports, in 2009 Viktor was one of the richest people in Switzerland with a fortune of over $300 million.  Similarly, in 2012 Viktor was among Switzerland's 300 richest people with a fortune of approximately $324 – $432 million (300 – 400 million Swiss francs).

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

DC\3806777.4

9

COMPLAINT FOR DAMAGES, INJUNCTIVE
RELIEF AND OTHER EQUITABLE RELIEF

**B.     Pending Investigations:  The Kazakh and Swiss Authorities Are Proceeding Against the Defendants and Their Co-Conspirators for Crimes Committed in Those Countries**

30.     In approximately late 2007, Viktor became aware that the Kazakh government had begun investigating him and his family, friends, and associates for criminal violations.  On or about November 9, 2007, Viktor and Leila fled Kazakhstan via private jet to Switzerland, where Iliyas and Elvira resided at the time.

31.     On or about May 27, 2011, the Investigation Department of the Agency for Economic and Corruption-Related Crimes of Kazakhstan (the "Financial Police") filed two criminal cases against Viktor on suspicion of abuse of power and fraudulent acts.  On or about July 21, 2011, the Financial Police obtained a court-ordered arrest warrant for Viktor.  In 2011 and 2012, additional charges were brought in Kazakhstan against Viktor, Leila, Iliyas, and Elvira stemming from the theft of public property and the ultimate laundering of funds.

32.     On or about February 20, 2012 and September 14, 2012, the Financial Police applied to the Federal Office of Justice in Switzerland for legal assistance in connection with the effort to prosecute Viktor, Leila, Iliyas, and Elvira for their crimes in Switzerland and Kazakhstan against Almaty and its people.  In or about mid-2012, the Public Prosecutor of Geneva opened an investigation into Viktor, Leila, Iliyas, and Elvira on suspicion of money laundering in violation of Swiss law.  In or about November 2012, the Public Prosecutor of Geneva ordered Swiss accounts and assets belonging to Viktor, Leila, Iliyas, and Elvira frozen, including accounts held at Swiss banks Sarasin & Co. Ltd., Credit Suisse, and Schroeder & Co.  The investigation by the Swiss authorities is ongoing.

33.     There currently are 24 criminal cases pending against Viktor in Kazakhstan for embezzlement, fraud, money laundering, establishing and directing an organized criminal group for criminal purposes, abuse of power, and bribery.

1    There currently are five criminal cases pending against Leila in Kazakhstan for

2    money laundering and establishing and directing an organized criminal group for

3    criminal purposes.  There also currently is a criminal case pending against Elvira in

4    Kazakhstan for money laundering.

5          C.    **The Theft of Property:  The Defendants and Their Co-**
                 **Conspirators Unlawfully Converted Almaty Property and**
6                **Ultimately Sold it to Third Parties at Enormous Profit**

7

8          34.    Over the life of the Khrapunov Racketeering Enterprise, the

9    Defendants and their co-conspirators carried out multiple acts all directed at the

10   same goal: to convert property rightfully belonging to the people of Almaty, sell it

11   for a profit, then launder the proceeds to conceal their origin and convey the

12   proceeds out of Kazakhstan in order to escape the reach of the Kazakh authorities

13   and thereby get away with their crimes.  As a result, Viktor, Leila, Iliyas, Elvira

14   and their co-conspirators looted Almaty of hundreds of millions of dollars and

15   transported millions in stolen funds into and within the United States in violation

16   of U.S. law.

17         35.    Four examples of Defendants' illegal acquisition of property

18   belonging to Almaty and its people are set forth below.  Through the four

19   transactions detailed below, Viktor, Leila, Iliyas, Elvira, their family and their co-

20   conspirators generated approximately $28.57 million in illicit profits resulting from

21   the illegal conversion and re-sale of four pieces of property.  In total, the

22   Khrapunov Racketeering Enterprise is believed to have illegally acquired over 80

23   pieces of real estate, valued at approximately $300 million, from Almaty and its

24   people.  They now seek to further their wrongdoing by hiding stolen funds in the

25   United States.

26   **Real Estate 1**

27         36.    In or about 2000, Viktor abused his position as Mayor of Almaty to

28   cause a large tract of state-owned land near two rivers in Almaty ("Real Estate 1")

LATHAM&WATKINS␣␣␣
ATTORNEYS AT LAW
LOS ANGELES

DC\3806777.4

11

COMPLAINT FOR DAMAGES, INJUNCTIVE
RELIEF AND OTHER EQUITABLE RELIEF

1  to be transferred to Leila for a total price of approximately $121,000.  The transfer

2  was accomplished via a series of fraudulent transactions and front companies

3  controlled by Leila and Iliyas.  Through several more transfers designed to conceal

4  the illegal conduct, Leila and Iliyas ultimately sold Real Estate 1 for a total of

5  $15.57 million, yielding more than $15 million in illicit profit as a result of this

6  single transaction.

7       37.     Viktor's transfer of Real Estate 1 violated the Land Code of the

8  Republic of Kazakhstan, which requires that public property be sold via auction, as

9  well as the Water Code, which mandates that land in water conservation zones may

10  only be provided to private individuals and entities for temporary use.

11       38.     To carry out the illegal conversion of Real Estate 1, Viktor, Leila, and

12  Iliyas utilized at least six Kazakhstan entities controlled by Leila and Iliyas,

13  including: (a) Almaty-Demalys; (b) Viled Establishment; (c) KazRealIncom LLP

14  ("KRI"); (d) Karasha Plus LLP ("Karasha"); (e) Building Services Company

15  ("BSC"); and (f) Asia Holding Development LLP ("Asia Holding").  Through a

16  series of transfers and sales engineered by Viktor, Leila, and Iliyas, Real Estate 1

17  was first transferred to Almaty-Demalys, which in turn ultimately was transferred

18  to Viled.

19       39.     On or about August 25, 2003, Leila caused Viled to sell Almaty-

20  Demalys to KRI for approximately $121,000 (18,800,000 ₸).  Less than six

21  months later, Leila caused KRI to sell Almaty-Demalys to Karasha for the same

22  amount.  Next, Leila caused Karasha to transfer ownership of Real Estate 1 directly

23  to her.  As a result of this series of transfers, Leila obtained full ownership of Real

24  Estate 1.

25       40.     On or about October 6, 2003, Leila contributed a portion of Real

26  Estate 1 to BSC, which she then sold to an unrelated third party in a transaction

27  that valued that portion of Real Estate 1 at approximately $8 million

28  (1,179,999,980 ₸).  Leila caused the remaining portion of Real Estate 1 to be

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

DC\3806777.4

12

COMPLAINT FOR DAMAGES, INJUNCTIVE
RELIEF AND OTHER EQUITABLE RELIEF

conveyed directly to Iliyas.  Iliyas, in turn, contributed it to Asia Holding, and then sold Asia Holding to a separate unrelated third party for approximately $7.57 million.  Of the $7.57 million, Iliyas transferred approximately $2.21 million to Elvira's Swiss bank accounts, including accounts at Sarasin & Co. Ltd., Credit Suisse, and Schroeder & Co., and retained the remainder for himself.

41.     Thus, Leila paid approximately $121,000 for Real Estate 1, which she and Iliyas later re-sold for a total of $15.57 million.

**Real Estate 2**

42.     On or about April 16, 2001, Viktor used his position as mayor to cause a public building in Almaty to be sold to Leila's company, KRI, for approximately $347,000 (52,155,100 ₸).  Viktor did so by manipulating a public auction to ensure that KRI won the auction.

43.     Under the laws of Kazakhstan, potential buyers of state-owned property are obligated to state how they intend to invest in and develop the property.  In an attempt to make KRI's bid appear legitimate, during the bidding process Leila caused KRI to fraudulently represent that KRI would invest a significant amount in Real Estate 2 to build a health center for the benefit of the people of Almaty.  That representation was false at the time it was made and, in fact, KRI never intended to and never did build any such health center.  Instead, on or about October 1, 2003, Leila caused KRI to sell Real Estate 2 to Karasha and, two days later, Leila caused Karasha to sell Real Estate 2 directly to her.  Shortly thereafter, Leila contributed Real Estate 2 to BSC, which she then sold to an unrelated third party in a transaction that valued Real Estate 2 at approximately $4.1 million (611,445,206 ₸).  Leila and Viktor thus obtained illegal profit of over $3.7 million as a result of their illicit acquisition and re-sale of Real Estate 2.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

DC\3806777.4

13

COMPLAINT FOR DAMAGES, INJUNCTIVE
RELIEF AND OTHER EQUITABLE RELIEF

**Real Estate 3**

44.    In addition to manufacturing the sale of state-owned assets to Leila and other family members and co-conspirators, Viktor also abused his authority as mayor to seize privately-owned land and transfer it to Leila and others for re-sale.

45.    On or about August 25, 2003, Viktor caused Almaty to seize land owned by privately-owned third party Shadid Engineering LLP ("Real Estate 3"). Approximately one month later, Viktor caused Real Estate 3 to be sold to Leila's company Karasha for approximately $105,000 (15,600,000 ₸).  Leila then caused Karasha to sell Real Estate 3 directly to her.  Leila next contributed Real Estate 3 to BSC, and sold BSC to an unrelated third party in a transaction that valued Real Estate 3 at approximately $2 million.  As a result, Leila obtained nearly $1.9 million in illicit profit at the expense of Almaty and its people.

**Real Estate 4**

46.    In or about November 2004, Viktor caused Almaty to sell land ("Real Estate 4") to two additional Kazakhstan companies owned and controlled by Leila, Victoriya-KMK LLP and Ademtyau-KMK LLP.  Real Estate 4 was located in a water conservation zone and, therefore, under Kazakh law, could be provided to private persons or entities only for temporary use.  Nevertheless, in violation of the law and his obligations as mayor of Almaty, Viktor caused Real Estate 4 to be sold to Leila's companies for approximately $1.3 million (18,870,100 ₸).  On or about December 23, 2005 and January 25, 2006, Leila sold Real Estate 4 to an unrelated third party for approximately $8.6 million (1,223,950,000 ₸) – resulting in illicit profit to Leila and Viktor of approximately $7.3 million.

47.    Together, the illegal conversion of Real Estate 1-4, and ultimate sale of those properties to unrelated third parties, resulted in profit to Viktor, Leila, Iliyas, Elvira, their family members and their co-conspirators of over $28.57 million.  These are merely four examples of Viktor and his family and co-conspirators' wrongdoing.  In total, approximately 80 parcels of real estate

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

DC\3806777.4

14

COMPLAINT FOR DAMAGES, INJUNCTIVE
RELIEF AND OTHER EQUITABLE RELIEF

rightfully belonging to Almaty and its people were illegally alienated by the Defendants and their co-conspirators for their own personal gain. On information and belief, the Defendants and their co-conspirators profited by over $300 million from these illegal transactions, all at the expense of the people of Almaty, and now are seeking to use the United States as a haven in which to enjoy their ill-gotten gains.

        **D.**    **The Laundering of Stolen Funds:  The Defendants and Their Co-Conspirators Laundered Illegally Obtained Funds in Switzerland and the United States**

    48.    The Defendants and their co-conspirators laundered the proceeds of their crimes in Switzerland and the United States in order to hide the assets from authorities and reap the rewards of their wrongdoing.  Once the Swiss authorities began to investigate the Defendants and their co-conspirators and to freeze their assets, the Defendants and their co-conspirators increased their illegal laundering activities in the United States to further conceal the proceeds.  Upon information and belief, the Defendants and their co-conspirators selected the United States as one jurisdiction in which to hide the stolen funds because they felt they would be immune from redress for their crimes here.  The United States does not have a mutual legal assistance treaty or extradition treaty with Kazakhstan.

    49.    The Defendants and their co-conspirators used numerous holding companies in order to hide and to launder the illicit funds they siphoned out of Kazakhstan through Switzerland and ultimately into and within the United States and other countries.  These holding companies included at least two Swiss companies owned and controlled by Iliyas and Elvira, SDG Capital SA ("SDG") and Swiss Promotion Group SA ("SPG").  In total, Iliyas, Elvira, and Leila have transferred at least $125 million into these two Swiss companies alone.

    50.    Between 2008 and 2012, Iliyas, Elvira, Leila, and sham companies they control have injected over $115 million into SDG.  SDG was formed in or

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

DC\3806777.4

15

COMPLAINT FOR DAMAGES, INJUNCTIVE
RELIEF AND OTHER EQUITABLE RELIEF

about July 2008 and, until approximately May 2009, was owned and controlled by Harlem Securities, a British Virgin Islands corporation that was, in turn, owned by Iliyas.  In or about May 2009, Elvira purchased SDG from Harlem Securities for approximately $99,000.  Following that purchase, Iliyas continued to exert full control over SDG Capital.

51.     Iliyas, Elvira, Leila, and sham companies they control also have contributed substantial assets, believed to be in excess of $10 million, to SPG.  Iliyas is the ultimate beneficial owner of SPG via a variety of offshore holding companies.

52.     All of the funds contributed to SDG, SPG, and other front companies controlled by Iliyas, Elvira, and Leila represent and are traceable to the ill-gotten proceeds of Viktor and his family and co-conspirators' looting of real estate and other assets rightfully belonging to Almaty and its people.

53.     In an ongoing effort to launder and conceal the source of the funds they stole from the people of Almaty, after moving the funds to various accounts and holding companies in Switzerland, the Defendants and their co-conspirators began transferring the stolen funds into the United States.  Below are merely three examples of the numerous transactions wrongfully engaged in by Defendants and their co-conspirators in furtherance of the Khrapunov Racketeering Scheme.

54.     For example, in or about July 2012, Elvira, with the knowledge and assistance of Viktor, Leila, Dmitri, Iliyas, and Madina, caused over $3 million to be transferred into a United States bank account owned or controlled by her, and at all times all Defendants and their co-conspirators knew that money to have been stolen from the people of the City of Almaty.  Upon information and belief, before transferring these funds into the United States, the Defendants and their co-conspirators caused the funds to be moved through various off-shore bank accounts, including accounts held by sham holding companies, for the sole purpose of illicitly concealing the source of the stolen funds and with the goal of making

LATHAM&WATKINS^LLP
ATTORNEYS AT LAW
LOS ANGELES

DC\3806777.4

16

COMPLAINT FOR DAMAGES, INJUNCTIVE
RELIEF AND OTHER EQUITABLE RELIEF

the stolen funds appear legitimate.  Upon information and belief, this $3 million transferred into the United States by the Defendants and their co-conspirators is traceable to the funds they looted from Almaty.  Upon information and belief, the Defendants and their co-conspirators made use of the United States wires and United States mail in furtherance of this illegal transaction.  The Defendants and their co-conspirators transferred these funds into the United States in furtherance of the goals of the Khrapunov Racketeering Scheme, with the intent to conceal the illegitimate source of the funds and thereby prevent Almaty from recovering the funds they stole.

55.     As another example, in or about November 2012, Iliyas, with the full knowledge and assistance of the other Defendants and co-conspirators, caused approximately $1.3 million to be transferred from an off-shore bank account owned or controlled by him into a United States bank account owned by RPM USA LLC and controlled by Iliyas.  At all times all Defendants and their co-conspirators knew that money to have been stolen from the people of the City of Almaty.  Upon information and belief, before transferring these funds into the United States, Iliyas and the other Defendants and co-conspirators caused the funds to be moved through various off-shore bank accounts, including accounts held by sham holding companies, for the sole purpose of illicitly concealing the source of the stolen funds and with the goal of making the stolen funds appear legitimate.  Upon information and belief, this $1.3 million transferred into the United States by the Defendants and their co-conspirators is traceable to the funds they looted from Almaty.  Upon information and belief, the Defendants and their co-conspirators made use of the United States wires and United States mail in furtherance of this illegal transaction.  The Defendants and their co-conspirators transferred these funds into the United States in furtherance of the goals of the Khrapunov Racketeering Scheme, with the intent to conceal the illegitimate source of the funds and thereby prevent Almaty from recovering the funds they stole.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

DC\3806777.4

17

COMPLAINT FOR DAMAGES, INJUNCTIVE
RELIEF AND OTHER EQUITABLE RELIEF

56.     As a third example, in or about June 2012, Elvira and Iliyas – again, with the full knowledge and assistance of the other Defendants and co-conspirators – caused approximately $25,000 to be transferred from a Swiss bank account owned or controlled by Iliyas into a United States bank account owned or controlled by Elvira.  At all times all Defendants and their co-conspirators knew that money to have been stolen from the people of the City of Almaty.  Upon information and belief, before transferring these funds into the United States, the Defendants and their co-conspirators caused the funds to be moved through various off-shore bank accounts, including accounts held by sham holding companies, for the sole purpose of illicitly concealing the source of the stolen funds and with the goal of making the stolen funds appear legitimate.  Upon information and belief, this $25,000 transferred into the United States by the Defendants and their co-conspirators is traceable to the funds they looted from Almaty.  Upon information and belief, the Defendants and their co-conspirators made use of the United States wires and United States mail in furtherance of this illegal transaction.  The Defendants and their co-conspirators transferred these funds into the United States in furtherance of the goals of the Khrapunov Racketeering Scheme, with the intent to conceal the illegitimate source of the funds and thereby prevent Almaty from recovering the funds they stole.

57.     In or about December 2010, Elvira and Dmitri used funds illegally obtained through the Khrapunov Racketeering Enterprise's criminal activity in Kazakhstan and laundered through various off-shore bank accounts and entities to appear legitimate to purchase a luxurious single-family home located at 2578 Hutton Drive in Beverly Hills, California, for approximately $3.65 million.  Elvira and Dmitri knew that the money they used to engage in this transaction was stolen from the people of Almaty, and illegally laundered to appear legitimate.  They purchased this property with the intent to use the transaction to further conceal the illegitimate source of the funds, which are traceable to the funds the Defendants

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

DC\3806777.4

18

COMPLAINT FOR DAMAGES, INJUNCTIVE
RELIEF AND OTHER EQUITABLE RELIEF

1 and their co-conspirators embezzled from the people of Almaty.  Furthermore,

2 upon information and belief, Elvira and Dmitry made use of the United States mail

3 and wires, as well as United States financial institutions, to engage in this

4 transaction.  As a result of the foregoing, Elvira and Dmitri violated, among other

5 U.S. laws, 18 U.S.C. §§ 1956 (money laundering and conspiracy to commit money

6 laundering), 1957 (transactions in property derived from unlawful activity), 2314

7 (transport of stolen money), 1341 (mail fraud), and 1343 (wire fraud).  Elvira and

8 Dmitri acted with the agreement and knowledge of Viktor, Leila, Iliyas, and

9 Madina, and as a result, all Defendants also violated 18 U.S.C. § 371 (conspiracy).

10      58.  In March 2012, Iliyas and Madina, also using ill-gotten proceeds of

11 the looting scheme laundered through various off-shore bank accounts and entities

12 to appear legitimate, purchased a lavish single-family home located at 606 North

13 Alta Drive in Beverly Hills, California, for approximately $5.45 million.  Iliyas

14 and Madina knew that the money they used to engage in this transaction was stolen

15 from the people of Almaty, and illegally laundered to appear legitimate.  Indeed,

16 Iliyas and Madina attempted to further conceal the source of the stolen funds used

17 to make this purchase by using Candian International Ltd. to complete the

18 purchase, and they purchased this property with the intent to use the transaction to

19 further conceal the illegitimate source of the funds, which are traceable to the

20 funds the Defendants and their co-conspirators embezzled from the people of

21 Almaty.  Furthermore, upon information and belief, Iliyas and Madina made use of

22 the United States mail and wires, as well as United States financial institutions, to

23 engage in this transaction.  As a result of the foregoing, Iliyas and Madina violated,

24 among other U.S. laws, 18 U.S.C. §§ 1956, 1957, 2314, 1341, and 1343.  Iliyas

25 and Madina acted with the agreement and knowledge of Viktor, Leila, Elvira, and

26 Dmitri, and as a result, all Defendants also violated 18 U.S.C. § 371.

27      59.  In or about mid-2012, the Public Prosecutor of Geneva opened an

28 investigation into Viktor, Leila, Iliyas, and Elvira on suspicion of money

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

DC\3806777.4

19

COMPLAINT FOR DAMAGES, INJUNCTIVE
RELIEF AND OTHER EQUITABLE RELIEF

1  laundering in violation of Swiss law.  In or about November 2012, the Public
2  Prosecutor of Geneva ordered frozen certain Swiss accounts and assets belonging
3  to Viktor, Leila, Iliyas, and Elvira.  After this action by Swiss government
4  authorities, the Defendants and their co-conspirators continued and increased their
5  laundering activities in the United States.

6      60.    In January 2013, Iliyas and Madina purchased a second mansion in
7  Beverly Hills using illicit funds stolen from Almaty and laundered through various
8  off-shore bank accounts and entities to appear legitimate.  Iliyas and Madina knew
9  that the money they used to engage in this transaction was stolen from the people
10  of Almaty, and illegally laundered to appear legitimate.  Indeed, Iliyas and Madina,
11  with Elvira's assistance, used another sham holding company, 628 Holdings LLC,
12  to launder and conceal the source of the illicit funds.  To that end, Iliyas and
13  Madina caused 628 Holdings LLC to purchase for $6.2 million a five-bedroom
14  single-family home located at 628 North Alta Drive in Beverly Hills, California for
15  the benefit and use of Iliyas and Madina.  Elvira is listed in public records as an
16  officer of 628 Holdings LLC.  Iliyas and Madina purchased this property with the
17  intent to use the transaction to further conceal the illegitimate source of the funds,
18  which are traceable to the funds the Defendants and their co-conspirators
19  embezzled from the people of Almaty.  Furthermore, upon information and belief,
20  Iliyas and Madina made use of the United States mail and wires, as well as United
21  States financial institutions, to engage in this transaction.  As a result of the
22  foregoing, Iliyas, Madina, and Elvira violated, among other U.S. laws, 18 U.S.C.
23  §§ 1956, 1957, 2314, 1341, and 1343.  Iliyas, Madina, and Elvira acted with the
24  agreement and knowledge of Viktor, Leila, and Dmitri, and as a result, all
25  Defendants also violated 18 U.S.C. § 371.

26      61.    In or about July 2013, Elvira and Dmitri sold the house at 2578
27  Hutton Drive for approximately $4.97 million and purchased an expansive, two-
28  acre estate located at 11986 Lockridge Road in Studio City, California for

DC\3806777.4

20

COMPLAINT FOR DAMAGES, INJUNCTIVE
RELIEF AND OTHER EQUITABLE RELIEF

approximately $5.7 million, again using funds stolen from Almaty and laundered through various off-shore bank accounts and entities to appear legitimate. Elvira and Dmitri knew that the money they used to engage in this transaction was stolen from the people of Almaty, and illegally laundered to appear legitimate. Indeed, shortly after they purchased this property, in a further attempt to conceal their possession and use of those funds, Elvira and Dmitri transferred it to The Kasan Family Trust, a trust for which they serve as trustees. They purchased this property with the intent to use the transaction to further conceal the illegitimate source of the funds, which are traceable to the funds the Defendants and their co-conspirators embezzled from the people of Almaty. Furthermore, upon information and belief, Elvira and Dmitry made use of the United States mail and wires, as well as United States financial institutions, to engage in this transaction. As a result of the foregoing, Elvira and Dmitri violated, among other U.S. laws, 18 U.S.C. §§ 1956, 1957, 2314, 1341, and 1343. Elvira and Dmitri acted with the agreement and knowledge of Viktor, Leila, Iliyas, and Madina, and as a result, all Defendants also violated 18 U.S.C. § 371.

62.     In or about September 2013, Iliyas and Madina sold the house at 606 North Alta Drive for approximately $6.975 million. Upon information and belief, Iliyas and Madina sold this property less than 18 months after they purchased it in a further attempt to launder and conceal the source of the funds, which are traceable to the funds they and the other Defendants and co-conspirators looted from the people of the City of Almaty.

63.     The Defendants and their co-conspirators' luxurious lifestyles in the United States were not limited to the purchase of Beverly Hills and Studio City mansions. In or about April 2013, Elvira leased a 2013 Rolls Royce sedan valued at approximately $302,000. In addition to the Rolls Royce, Elvira leased a 2013 Bentley sedan valued at approximately $320,000. Elvira is the registered owner of a 2013 Mercedes Benz sport utility vehicle valued at approximately $114,000 and

LATHAM&WATKINS⁕
ATTORNEYS AT LAW
LOS ANGELES

DC\3806777.4

21

COMPLAINT FOR DAMAGES, INJUNCTIVE
RELIEF AND OTHER EQUITABLE RELIEF

1   a 2011 Cadillac sport utility vehicle valued at approximately $75,000.  Elvira used

2   funds stolen from Almaty and laundered through various off-shore bank accounts

3   and entities to appear legitimate, while knowing those funds to be stolen, to acquire

4   these vehicles.  Upon information and belief, the funds used to purchase or lease

5   these vehicles are traceable to the funds stolen from Almaty.  Furthermore, upon

6   information and belief, Elvira made use of the United States mail and wires, as

7   well as United States financial institutions, to engage in these purchase and lease

8   transactions.  As a result of the foregoing, Elvira violated, among other U.S. laws,

9   18 U.S.C. §§ 1956, 1957, 2314, 1341, and 1343.  In doing so, Elvira acted with the

10  agreement and knowledge of Viktor, Leila, Iliyas, Madina, and Dmitri, and as a

11  result, all Defendants also violated 18 U.S.C. § 371.

12          64.     Elvira, Dmitri, Iliyas, and Madina also have attempted to launder

13  funds obtained from the plundering of Almaty by making investments in multiple

14  U.S. companies, including Maro Design LLC, Haute Hue LLC, RPM USA LLC,

15  and RPM-Maro LLC.  Elvira, Dmitri, Iliyas, and/or Madina own or control all of

16  the above-named sham entities and, on information and belief, all of the monies

17  used to fund investments in the sham entities were laundered through various off-

18  shore bank accounts and entities to appear legitimate and are derived from, and

19  traceable to, funds looted from the people of the City of Almaty.  Elvira, Dmitri,

20  Iliyas, and Madina injected funds into these and other sham holding companies

21  with the intent to use the holding companies to further conceal the illegitimate

22  source of the funds.  Furthermore, upon information and belief, Elvira, Dmitri,

23  Iliyas, and Madina made use of the United States mail and wires, as well as United

24  States financial institutions, to engage in these investments.  As a result, Elvira,

25  Dmitri, Iliyas, and Madina again acted in violation of 18 U.S.C. §§ 1956, 1957,

26  2314, 1341, and 1343.  They at all times acted with the agreement and knowledge

27  of Viktor and Leila, and as a result, all Defendants also violated 18 U.S.C. § 371.

28

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

DC\3806777.4

22

COMPLAINT FOR DAMAGES, INJUNCTIVE
RELIEF AND OTHER EQUITABLE RELIEF

65.     Further, Iliyas and Elvira have caused SDG and SPG to move additional assets stolen from Almaty into the United States by, among other things, using a chain of Luxembourg and Delaware entities to invest in real estate in New York.  In or about July 2012, RPM USA LLC, which is owned or controlled by Iliyas and is a wholly owned subsidiary of SPG, invested approximately $6 million in a New York-based medical device company.  Upon information and belief, that $6 million was laundered through various off-shore bank accounts and entities to appear legitimate and is traceable to the funds the Defendants and their co-conspirators looted from Almaty.  Iliyas used those funds to invest in the medical device company with the intent to further conceal the illicit source of those funds.  Upon information and belief, Iliyas and Elvira made use of the United States mail and wires, as well as United States financial institutions, to invest in the medical device company.  Additionally, RPM USA LLC and Maro Design LLC, which is owned or controlled by Elvira, own 49% and 51%, respectively, of RPM-Maro LLC.

66.     Upon information and belief, in 2013, Iliyas invested approximately $67.5 million stolen from the people of Almaty to purchase a partial interest in a luxury hotel in New York.  Upon information and belief, that $67.5 million was laundered through various off-shore bank accounts and entities to appear legitimate and is traceable to the funds the Defendants and their co-conspirators looted from Almaty.  Iliyas used those funds to purchase the hotel with the intent to further conceal the illicit source of those funds.  Additionally, in order to conceal the source of the funds used to make this investment, Iliyas used a series of holding companies ultimately owned by SDG and controlled by him.  SDG is the owner of a Luxembourg entity, Tridaou SPV SA.  Triadou SPV SA owns 50% of a Delaware limited liability company, CF 135 West Member LLC.  CF 135 West Member LLC owns 75% of another Delaware limited liability company, 135 West Street Holder LLC.  135 West Street Holder LLC owns another Delaware limited

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

DC\3806777.4

23

COMPLAINT FOR DAMAGES, INJUNCTIVE
RELIEF AND OTHER EQUITABLE RELIEF

1   liability company, 135 West 52nd Street Mezz LLC.  135 West 52nd Street Mezz

2   LLC owns yet another Delaware limited liability company, 135 West 52nd Street

3   Owner LLC.  135 West 52nd Street Owner LLC, in turn, is the owner of the hotel,

4   which was purchased in 2013 for $180 million.  Upon information and belief,

5   Iliyas and the other Defendants and co-conspirators use complicated networks of

6   entities such as this with the intent to conceal the source of the funds they inject

7   into the United States, all of which are traceable to the funds embezzled from the

8   people of Almaty.  Upon information and belief, Iliyas made use of the United

9   States mail and wires, as well as United States financial institutions, to purchase a

10  partial interest in this hotel.  The hotel currently is in the process of being

11  converted into luxury condominiums.

12      67.   By this lawsuit, Almaty seeks to hold Defendants responsible for their

13  illegal conduct in the United States in violation of U.S. law.

14                        **FIRST CLAIM FOR RELIEF**

15      (For Violations of RICO, 18 U.S.C. §§ 1962(c), 1962(d), 1964(c), against all

16                                Defendants)

17      68.   Almaty hereby incorporates by reference the allegations in paragraphs

18  1 through 67, as though fully set forth herein.

19      69.   From in or about 1997 and continuing to the present, by reason of its

20  organization, structure, and activities, the Khrapunov Racketeering Enterprise

21  constituted a RICO enterprise within the meaning of 18 U.S.C. § 1961(4).  The

22  Khrapunov Racketeering Enterprise was comprised of myriad individuals and

23  entities, all associated in fact as part of the Khrapunov Racketeering Enterprise,

24  including but not limited to the Defendants, co-conspirators, and sham entities

25  named herein.  The Khrapunov Racketeering Enterprise was engaged in, and the

26  activities of the Khrapunov Racketeering Enterprise affected, interstate and foreign

27  commerce.

28

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

DC\3806777.4

24

COMPLAINT FOR DAMAGES, INJUNCTIVE
RELIEF AND OTHER EQUITABLE RELIEF

70.     As alleged herein, the Khrapunov Racketeering Enterprise participants, including Defendants and each of them, engaged and conspired to engage in acts in the United States to further the goals of their criminal enterprise, in violation of U.S. law.

71.     Defendants engaged and conspired to engage in money laundering in violation of 18 U.S.C. § 1956 by conducting numerous financial transactions using illegally obtained funds laundered through various off-shore accounts and entities to, among other things, purchase real estate and other assets in Beverly Hills, Studio City, and elsewhere and to fund business entities in furtherance of the Khrapunov Racketeering Scheme, knowing that such funds were stolen from the people of Almaty and with the intent of concealing the source of those funds.

72.     Defendants further engaged and conspired to engage in money laundering in violation of 18 U.S.C. § 1956 by transporting, transmitting, and/or transferring funds stolen from the people of Almaty and laundered through various off-shore accounts and entities into and within the United States in order to, among other things, purchase real estate and assets in Beverly Hills, Studio City, and elsewhere and to fund business entities in furtherance of the Khrapunov Racketeering Scheme, knowing that such funds were stolen from the people of Almaty and with the intent of concealing the source of those funds.

73.     Defendants further engaged and conspired to engage in money laundering in violation of 18 U.S.C. § 1956 by conducting financial transactions using those stolen funds by, among other things, using stolen funds laundered through various off-shore accounts and entities to purchase real estate and other assets in Beverly Hills, Studio City, and elsewhere and to fund business entities in furtherance of the Khrapunov Racketeering Scheme, knowing that such funds were stolen from the people of Almaty and with the intent of concealing the source of those funds.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

DC\3806777.4

25

COMPLAINT FOR DAMAGES, INJUNCTIVE
RELIEF AND OTHER EQUITABLE RELIEF

74.     Defendants engaged and conspired to engage in money transactions in property derived from specified unlawful activity in violation of 18 U.S.C. § 1957 by, among other things, knowingly transferring funds in excess of $10,000 stolen from Almaty into and within the United States via United States financial institutions to purchase real estate and other assets in Beverly Hills, Studio City, and elsewhere and to fund business entities knowing that such funds were derived from and traceable to funds stolen from the people of Almaty.

75.     Defendants engaged and conspired to engage in the foreign transport of stolen money or property known to be stolen, converted or taken by fraud in violation of 18 U.S.C. § 2314 by transferring funds derived from and traceable to funds stolen from the people of Almaty into and within the United States, in excess of $5,000, knowing those funds to have been stolen from the people of Almaty and/or obtained from the people of Almaty by means of false or fraudulent pretenses, representations, or promises by, among other things, transferring such funds from bank accounts in Switzerland into the United States via United States financial institutions and using those funds to purchase real estate and other assets in Beverly Hills, Studio City, and elsewhere and to fund business entities.

76.     Defendants, and each of them, conspired to commit the violations of U.S. law described herein, and one or more of the Defendants or their co-conspirators acted to violate such laws.  Defendants, and each of them, thus also violated 18 U.S.C. § 371.

77.     Defendants engaged and conspired to engage in mail fraud in violation of 18 U.S.C. § 1341 and wire fraud in violation of 18 U.S.C. § 1343 by knowingly using the United States mails and wires to transfer illegally obtained funds into and within the United States, for the purpose of furthering the Khrapunov Racketeering Scheme and, while concealing the funds' illegal source, used those funds to purchase real estate in Beverly Hills and Studio City,

LATHAM&WATKINSᴸᴸᴾ
ATTORNEYS AT LAW
LOS ANGELES

DC\3806777.4

26

COMPLAINT FOR DAMAGES, INJUNCTIVE
RELIEF AND OTHER EQUITABLE RELIEF

California and to fund business entities to enable those entities to conduct business in the United States using the illegally-obtained funds.

78.     Defendants engaged and conspired to engage in the above violations of U.S. law in order to implement the objectives and accomplish the unlawful purposes of the Khrapunov Racketeering Enterprise as set forth herein, and thereby engaged in predicate acts of racketeering within the meaning of 18 U.S.C. § 1961(1)(B).

79.     Each of the Defendants conducted or participated, directly or indirectly, in the conduct of the affairs of the Khrapunov Racketeering Enterprise through a pattern of racketeering activity, within the meaning of 18 U.S.C. § 1961(5) in violation of 18 U.S.C. § 1962(c), consisting as applicable of multiple acts of money laundering, conducting money transactions in property derived from specified unlawful activity,  foreign transport of stolen money or property known to be stolen, converted or taken by fraud, mail fraud, and/or wire fraud, as specified herein.  Each of the Defendants engaged in two or more predicate acts of racketeering, and each committed at least one such act of racketeering after the effective date of RICO (*i.e.*, October 15, 1970).

80.     From in or about 1997, and continuing to the present, Defendants associated together, with one another and with others, and acted in concert for the common and unlawful purposes of the Khrapunov Racketeering Enterprise and in order to implement the schemes and employ the devices described herein.

81.     In so doing, Defendants unlawfully, willfully, and knowingly did combine, conspire, confederate, and agree together, with each other and with others to commit RICO violations under 18 U.S.C. § 1962(c) and, thereby, violated 18 U.S.C. § 1962(d).  In furtherance of the conspiracy and to effect the objects thereof, Defendants committed in the Central District of California and elsewhere the overt acts as described herein, among others.

LATHAM&WATKINS<sub>LLP</sub>
ATTORNEYS AT LAW
LOS ANGELES

DC\3806777.4

27

COMPLAINT FOR DAMAGES, INJUNCTIVE
RELIEF AND OTHER EQUITABLE RELIEF

82.     As a direct and proximate result of RICO violations by the Defendants of 18 U.S.C. §§ 1962(a), 1962(b), 1962(c), and/or 1962(d), Almaty has suffered damages in an amount to be determined at trial and presently estimated to be not less than $300 million.  Almaty has been injured in its business or property by reason of each such Defendant's violations and, pursuant to the civil remedy provisions of 18 U.S.C. § 1964(c), is thereby entitled to recover threefold the damages it has suffered, together with its costs of suit and reasonable attorneys' fees.

## SECOND CLAIM FOR RELIEF

(For Violations of RICO, 18 U.S.C. §§ 1962(a), 1962(d), 1964(c), against all Defendants)

83.     Almaty hereby incorporates by reference the allegations in paragraphs 1 through 82, as though fully set forth herein.

84.     From in or about 1997 and continuing to the present, by reason of its organization, structure, and activities, the Khrapunov Racketeering Enterprise constituted a RICO enterprise within the meaning of 18 U.S.C. § 1961(4).  The Khrapunov Racketeering Enterprise was comprised of myriad individuals and entities, all associated in fact as part of the Khrapunov Racketeering Enterprise, including but not limited to the Defendants, co-conspirators, and sham entities named herein.  The Khrapunov Racketeering Enterprise was engaged in, and the activities of the Khrapunov Racketeering Enterprise affected, interstate and foreign commerce.

85.     Each of the Defendants was at the center of and was a principal perpetrator of a fraudulent scheme and is liable under 18 U.S.C. § 1962(a) as a direct and indirect beneficiary of the pattern of racketeering herein alleged.

86.     As alleged herein, the Khrapunov Racketeering Enterprise participants, including Defendants and each of them, engaged and conspired to

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

DC\3806777.4

28

COMPLAINT FOR DAMAGES, INJUNCTIVE
RELIEF AND OTHER EQUITABLE RELIEF

engage in acts in the United States to further the goals of their criminal enterprise, in violation of U.S. law.

87.     Defendants engaged and conspired to engage in money laundering in violation of 18 U.S.C. § 1956 by conducting numerous financial transactions using illegally obtained funds laundered through various off-shore accounts and entities to, among other things, purchase real estate and other assets in Beverly Hills, Studio City, and elsewhere and to fund business entities in furtherance of the Khrapunov Racketeering Scheme, knowing that such funds were stolen from the people of Almaty and with the intent of concealing the source of those funds.

88.     Defendants further engaged and conspired to engage in money laundering in violation of 18 U.S.C. § 1956 by transporting, transmitting, and/or transferring funds stolen from the people of Almaty and laundered through various off-shore accounts and entities into and within the United States in order to, among other things, purchase real estate and assets in Beverly Hills, Studio City, and elsewhere and to fund business entities in furtherance of the Khrapunov Racketeering Scheme, knowing that such funds were stolen from the people of Almaty and with the intent of concealing the source of those funds.

89.     Defendants further engaged and conspired to engage in money laundering in violation of 18 U.S.C. § 1956 by conducting financial transactions using those stolen funds by, among other things, using stolen funds laundered through various off-shore accounts and entities to purchase real estate and other assets in Beverly Hills, Studio City, and elsewhere and to fund business entities in furtherance of the Khrapunov Racketeering Scheme, knowing that such funds were stolen from the people of Almaty and with the intent of concealing the source of those funds.

90.     Defendants engaged and conspired to engage in money transactions in property derived from specified unlawful activity in violation of 18 U.S.C. § 1957 by, among other things, knowingly transferring funds in excess of $10,000 stolen

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

DC\3806777.4

29

COMPLAINT FOR DAMAGES, INJUNCTIVE
RELIEF AND OTHER EQUITABLE RELIEF

from Almaty into and within the United States via United States financial institutions to purchase real estate and other assets in Beverly Hills, Studio City, and elsewhere and to fund business entities, knowing that such funds were derived from and traceable to funds stolen from the people of Almaty.

91.     Defendants engaged and conspired to engage in the foreign transport of stolen money or property known to be stolen, converted or taken by fraud in violation of 18 U.S.C. § 2314 by transferring funds derived from and traceable to funds stolen from the people of Almaty into and within the United States, in excess of $5,000, knowing those funds to have been stolen from the people of Almaty and/or obtained from the people of Almaty by means of false or fraudulent pretenses, representations, or promises by, among other things, transferring such funds from bank accounts in Switzerland into the United States via United States financial institutions and using those funds to purchase real estate and other assets in Beverly Hills, Studio City, and elsewhere and to fund business entities.

92.     Defendants, and each of them, conspired with each other and with others to commit the violations of U.S. law described herein, and one or more of the Defendants or their co-conspirators acted to violate such laws.  Defendants, and each of them, thus also violated 18 U.S.C. § 371.

93.     Defendants engaged and conspired to engage in mail fraud in violation of 18 U.S.C. § 1341 and wire fraud in violation of 18 U.S.C. § 1343 by knowingly using the United States mails and wires to transfer illegally obtained funds into and within the United States, for the purpose of furthering the Khrapunov Racketeering Scheme and, while concealing the funds' illegal source, used those funds to purchase real estate in Beverly Hills and Studio City, California and to fund business entities to enable those entities to conduct business in the United States using the illegally-obtained funds.

94.     Defendants engaged and conspired to engage in the above violations of U.S. law in order to implement the objectives and accomplish the unlawful

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

DC\3806777.4

30

COMPLAINT FOR DAMAGES, INJUNCTIVE
RELIEF AND OTHER EQUITABLE RELIEF

1   purposes of the Khrapunov Racketeering Enterprise as set forth herein, and thereby
2   engaged in predicate acts of racketeering within the meaning of 18 U.S.C. §
3   1961(1)(B).

4       95.    Furthermore, each Defendant received income derived directly or
5   indirectly from a pattern of racketeering in which each of said Defendants
6   participated as a principal within the meaning of 18 U.S.C. § 2.

7       96.    During the period commencing in or about 1997 and continuing to the
8   present, the Defendants, having received income derived, directly or indirectly,
9   from a pattern of racketeering activity, used or invested, directly or indirectly, in
10  violation of 18 U.S.C. § 1962(a), income or the proceeds of income from said
11  illegal racketeering activity in the acquisition of an interest in, or the establishment
12  or operation of the Khrapunov Racketeering Enterprise or one or more affiliated
13  entities.  Said uses and investments in enterprises affecting interstate or foreign
14  commerce include without limitation the uses and investments described herein.

15      97.    In so doing, Defendants unlawfully, willfully and knowingly did
16  combine, conspire, confederate, and agree together, with each other and with
17  others to commit RICO violations under 18 U.S.C. § 1962(c) and, thereby, violated
18  18 U.S.C. § 1962(d).  In furtherance of the conspiracy and to effect the objects
19  thereof, Defendants and their co-conspirators committed in the Central District of
20  California and elsewhere the overt acts as described herein, among others.

21      98.    As a direct and proximate result of RICO violations by the Defendants
22  of 18 U.S.C. § 1962(a) and/or 18 U.S.C. § 1962(d), Almaty has suffered damages
23  in an amount to be determined at trial and presently estimated to be not less than
24  $300 million.  Almaty has been injured in its business or property by reason of
25  each such Defendant's violations in that financial assets stolen or otherwise
26  diverted from and thereby lost to Almaty have been used and invested, directly or
27  indirectly, to acquire an interest in and to establish and operate numerous
28  enterprises affecting interstate or foreign commerce without benefit to Almaty or

1   its people.  Accordingly, pursuant to the civil remedy provisions of 18 U.S.C. §

2   1964(c), Almaty is entitled to recover threefold the damages it has suffered,

3   together with its costs of suit and reasonable attorneys' fees.

4                        **THIRD CLAIM FOR RELIEF**

5                (For Breach of Fiduciary Duty against Viktor)

6        99.    Almaty hereby incorporates by reference the allegations in paragraphs

7   1 through 98, as though fully set forth herein.

8        100.   As alleged above, Viktor owed a fiduciary duty to Almaty and its

9   people to hold and control the assets of the Almaty government for the benefit of

10  Almaty and its people, and not for his personal benefit or the personal benefit of

11  his relatives, associates, and accomplices.

12       101.   By engaging in the acts alleged above, Viktor breached his fiduciary

13  duty to Almaty and its people.  As a direct and proximate result of such breaches,

14  Almaty has suffered damages in an amount to be determined at trial and presently

15  estimated to be not less than $300 million.

16       102.   In committing the acts and perpetrating the schemes alleged herein,

17  Viktor intended to injure Almaty and acted with malice and oppression and with a

18  willful and conscious disregard for the rights of Almaty and its people.  In so

19  doing, Viktor has acted toward Almaty and its people in such manner as to warrant

20  disgorgement of his uses and investments of Almaty's money and property

21  together with an award of punitive and exemplary damages in an amount no less

22  than $300 million.

23                       **FOURTH CLAIM FOR RELIEF**

24             (For Conversion and Conspiracy to Convert against all Defendants)

25       103.   Almaty hereby incorporates by reference the allegations in paragraphs

26  1 through 102, as though fully set forth herein.

27       104.   Defendants, and each of them, have wrongfully converted, aided and

28  abetted, and caused to be converted, to their own use, and that of their friends,

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES
DC\3806777.4
32
COMPLAINT FOR DAMAGES, INJUNCTIVE
RELIEF AND OTHER EQUITABLE RELIEF

1  families, associates, and accomplices, money, funds, and property belonging to

2  Almaty and its people.  Such conversions have been for the benefit of the

3  Defendants and their friends, families, associates, and accomplices, and to the

4  detriment of the true owners of the property, Almaty and its people.  Such acts of

5  conversion include the acts alleged herein.

6       105.   Defendants unlawfully, willfully, and knowingly did combine,

7  conspire, confederate, and agree together, with each other, and with others to

8  convert money, funds, and property belonging to Almaty and its people to their

9  own use, and that of their friends, families, associates, and accomplices.  In

10  furtherance of the conspiracy and to affect the objects thereof, Defendants

11  committed the overt acts, among others, referenced above.

12       106.   As a direct and proximate result of these acts of conversion by

13  Defendants, Almaty has suffered damages in an amount to be determined at trial,

14  and presently estimated to be not less than $300 million.

15       107.   In committing the acts and perpetrating the schemes alleged herein,

16  Defendants intended to injure Almaty and acted with malice and oppression and

17  with a willful and conscious disregard for the rights of Almaty and its people.  In

18  so doing, Defendants acted toward Almaty and its people in such manner as to

19  warrant disgorgement of their uses and investments of Almaty's money and

20  property together with an award of punitive and exemplary damages in an amount

21  no less than $300 million.

22       **<u>FIFTH CLAIM FOR RELIEF</u>**

23      (For Fraud and Deceit and Conspiracy to Defraud against Viktor and Leila)

24       108.   Almaty hereby incorporates by reference the allegations in paragraphs

25  1 through 107, as though fully set forth herein.

26       109.   In the course of conducting and participating in the conduct of the

27  affairs of the Khrapunov Racketeering Enterprise, Viktor and Leila made

28  representations to Almaty and others, which representations were false and

LATHAM&WATKINS<sub>LLP</sub>
ATTORNEYS AT LAW
LOS ANGELES

DC\3806777.4

33

COMPLAINT FOR DAMAGES, INJUNCTIVE
RELIEF AND OTHER EQUITABLE RELIEF

1   necessary to implement the unlawful looting, laundering, investment and

2   obstruction schemes described above.

3          110.   As set forth above, Viktor, who owed a fiduciary duty to Almaty, and

4   Leila failed to disclose and otherwise concealed facts from Almaty and others, the

5   disclosure of which was necessary to make the representations made by them to

6   Almaty not materially misleading.  Viktor and Leila knew that said facts were not

7   being disclosed and were material, and they intended by concealment of these facts

8   to facilitate continuation of their unlawful diversion of assets belonging to Almaty

9   and its people.

10         111.   Almaty relied to its detriment on the representations of integrity by

11  Viktor and Leila.  Viktor and Leila flagrantly breached the trust and confidence of

12  Almaty by committing numerous acts of fraud, deceit, conversion, and

13  racketeering alleged herein, through which they plundered the assets of Almaty.

14         112.   In the course of developing their elaborate scheme to defraud, Viktor

15  and Leila secured the assistance, among others, of associates and accomplices, who

16  with Viktor and Leila unlawfully, willfully and knowingly did combine, conspire,

17  confederate, and agree together, with each other and with others to facilitate, aid

18  and abet, and conceal the scheme and artifice to defraud, and to obtain money and

19  property by false representations and promises, thereby enabling the massive

20  diversions and concealment of looted funds identified in this Complaint.

21         113.   As a direct and proximate result of the foregoing fraudulent conduct

22  and conspiracy to defraud, Almaty has suffered damages in an amount to be

23  determined at trial, and presently estimated to be not less than $300 million.

24         114.   In committing the acts and perpetrating the schemes alleged herein,

25  Viktor and Leila intended to injure Almaty and acted with malice and oppression

26  and with a willful and conscious disregard for the rights of Almaty and its people.

27  In so doing, Defendants acted toward Almaty and its people in such manner as to

28  warrant disgorgement of their uses and investments of Almaty's money and

1   property together with an award of punitive and exemplary damages in an amount

2   no less than $300 million.

3   ## SIXTH CLAIM FOR RELIEF

4   (For an Accounting, and Imposition of a Constructive Trust and Equitable Lien

5   against all Defendants)

6   115.   Almaty hereby incorporates by reference the allegations in paragraphs

7   1 through 114, as though fully set forth herein.

8   116.   During Viktor's mayoralty of Almaty, he, acting as mayor, controlled

9   virtually all of the valuable assets of the Almaty government.  These assets

10   included money and real and personal property owned by the Almaty government,

11   the right to convey, for the benefit of the people of Almaty, real and personal

12   property owned by the Almaty government, and the right to decide who could do

13   business in Almaty through the granting of licenses, concessions, and permits.

14   Viktor further was entrusted with the ability to cause privately owned property to

15   be seized by the Almaty government, purportedly for the benefit of Almaty and its

16   people.

17   117.   Viktor owed a fiduciary duty to Almaty and its people to hold and

18   control these assets for the benefit of Almaty and its people, and not for his

19   personal benefit or the personal benefit of his friends, families, associates, and

20   accomplices.  As alleged above, Viktor, aided and abetted by the other Defendants

21   and co-conspirators, converted the assets of the Almaty government to his personal

22   benefit and the personal benefit of his friends, families, associates, and

23   accomplices. They did so by looting money and property owned by the Almaty

24   government and/or by private parties and by accepting bribes, kickbacks,

25   gratuities, and commissions in exchange for the granting of the legal right to do

26   business in Almaty.  All such conversions of assets were done in violation of

27   Viktor's duties to the beneficial owners of such assets, Almaty and its people.  If

28

1   Viktor or the other Defendants are permitted to retain these assets, they will be

2   unjustly enriched at Almaty's expense.

3        118.   Defendants other than Viktor received money and property stolen

4   from the Almaty government by Viktor and other economic benefits taken or

5   conferred upon them by Viktor in violation of his fiduciary duty.  These

6   Defendants received such money, property, and other economic benefits without

7   giving value for them or with notice to Almaty that such assets had been stolen or

8   otherwise acquired in violation of Viktor's duties to Almaty and its people.  If

9   these Defendants are permitted to retain such assets, they will be unjustly enriched

10   at Almaty's expense.

11        119.   As a result of the foregoing, Almaty is entitled to an accounting by

12   each of the Defendants of all real and personal property held, acquired, or disposed

13   of by them at any time since 1997.

14        120.   As a result of the foregoing, Almaty is entitled to a constructive trust

15   and equitable lien upon all real and personal property of Defendants, wherever

16   located worldwide.

17        121.   Defendants regularly misused and continue to misuse the corporate

18   and other forms of business organization as a cloak for committing fraud and as a

19   means of perpetrating injustice.  By reason of the elaborate and fraudulent schemes

20   used by Defendants to conceal transfers of stolen money and property and to

21   conceal ownership of Defendants' assets, it would be unjust and inequitable to

22   require Almaty to trace the source of money used to acquire specific assets, or to

23   prove that specific assets were acquired with money or property stolen from

24   Almaty. Instead, the burden should be shifted to Defendants to prove that they had

25   sources of income other than the unlawful looting and investment schemes

26   described herein, and to prove that particular assets were acquired by them with

27   such independent, lawful income.

28

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

DC\3806777.4

36

COMPLAINT FOR DAMAGES, INJUNCTIVE
RELIEF AND OTHER EQUITABLE RELIEF

1

## **PRAYER**

2     WHEREFORE, Plaintiff prays for judgment against Defendants as follows:

3     A.     For compensatory damages;

4     B.     For treble damages;

5     C.     For punitive damages;

6     D.     For prejudgment interest;

7     E.     For a constructive trust;

8     F.     For an accounting;

9     G.     For injunctive relief;

10    H.     For disgorgement;

11    I.     For all costs and fees incurred in prosecuting this Complaint;

12    J.     For such other and further relief as this Court deems just and proper.

13    Dated:  April 8, 2015

14                                    LATHAM & WATKINS LLP
15                                    David J. Schindler
                                      Julie R. F. Gerchik
16                                    Kristen M. Tuey

17
18                                    By ____/s/ David J. Schindler____
                                      David J. Schindler
19                                    Attorneys for Plaintiff the City of
                                      Almaty

20

21

22

23

24

25

26

27

28

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

DC\3806777.4

37

COMPLAINT FOR DAMAGES, INJUNCTIVE
RELIEF AND OTHER EQUITABLE RELIEF