# EXHIBIT 26

# FILED UNDER SEAL

| | | | RECEIPT NO. | 3780 |
|---|---|---|---|---|

Granite Escrow Services
439 N. Canon Drive, Suite 220
Beverly Hills, CA 90210
(310) 288-0110

ESCROW NO.
500-005257-MF

DATE
12/30/2011

Property:      606 N. Alta Drive, Beverly Hills, CA  90210

RECEIVED
OF          CIE Privee De conseilis ET FBO Canadian International
            and/or assignee

AMOUNT
$****163,492.50

ONE HUNDRED SIXTY-THREE THOUSAND FOUR HUNDRED NINETY-TWO AND 50/100 DOLLARS ————————

| | ABA Number | Check Number | Description |
|---|---|---|---|
| CASH | | | |
| CHECK | | | |
| CASHIER'S CHECK | | | |
| DRAFT | | | |
| OTHER | wire | | |

Checking Account Number _____

Received on behalf of   BUYER/BORROWER

BY _____
      Jo Ann Frederiksen

ORIGINAL

GE0000327

EXHIBIT 27

12/30/11 08:02 AM  2134275115 via VSI-FAX                    Page 1 of 1 #521281



**CITY NATIONAL BANK**
The way up.®

            If you have questions regarding this Wire Transfer
               please call (213)673-7825 or (800)575-5502.

ADVICE OF CREDIT
-----------------

AMOUNT:                  $ 163,492.50                        606.

ACCOUNT #:               ▓▓▓▓▓▓▓▓

ACCOUNT NAME:            GRANITE ESCROW SERVICES

TRANSACTION:             20111230-0001749

FROM:                    CITIBANK, NEW YORK

FED REFERENCE:           1230B1Q8021C025388

ORIGINATING BANK:        COMPAGNIE PRIVEE DE CONSEILS ET D'I

ORIGINATOR:              CIE PRIVEE DE CONSEILS ET DINV SA
                         RUE DE RIVE 15
                         CASE POSTALE 3681
                         1211 GENEVE 3

RECEIVER:                GRANITE ESCROW SERVICES
                         (BEVERLY HILLS TRUST ACCOUNT)
                         1400 NEWPORT CENTER DR # 250
                         NEWPORT BEACH CA 92660

ORIGIN TO BENEFICIARY:   REF: ESCROW NO 500-005254MF

SENDER:                  BASLER KANTONALBANK
                         P.O. BOX 2255
                         CH 4002 BASEL SWITZERLAND

SENDER REFERENCE:        S05136406F9901

*Disclaimer: the information contained in this facsimile transmission is confidential and may also contain legally privileged information or work product. The information is intended only for the use of the individual or entity to whom it is addressed. If you are not the intended recipient or the employee or agent responsible to deliver it to the intended recipient, you are hereby notified that any use, dissemination, distribution or copying of this communication is strictly prohibited. If you have received this facsimile transmission in error, notify the sender immediately by telephone and return the original message to us by mail. Thank you.*

GE0000328

EXHIBIT 27

Granite Escrow Services
439 N. Canon Drive, Suite 220
Beverly Hills, CA 90210
(310) 288-0110

RECEIPT NO.          4021

ESCROW NO.
500-005257-MF

DATE
03/15/2012

Property:          606 N. Alta Drive, Beverly Hills, CA  90210

RECEIVED          Chabrier & Associates
OF

AMOUNT
$**5,366,212.53

FIVE MILLION THREE HUNDRED SIXTY-SIX THOUSAND TWO HUNDRED TWELVE AND 53/100 DOLLARS ———

|                  | ABA Number | Check Number | Description |
|------------------|------------|--------------|-------------|
| CASH             |            |              |             |
| CHECK            |            |              |             |
| CASHIER'S CHECK  |            |              |             |
| DRAFT            |            |              |             |
| OTHER            | wire       | ▓▓▓▓▓▓▓      |             |

Checking Account Number _____

Received on behalf of   BUYER/BORROWER

BY _____
   Mark Fishman

ORIGINAL

EXHIBIT 28



**CITY NATIONAL BANK**
The way up.™

            If you have questions regarding this Wire Transfer
                please call (213)673-7825 or (800)575-5502.

ADVICE OF CREDIT
==================

AMOUNT:                    $ 5,366,212.53

ACCOUNT #:                 ■■■■■■■■■

ACCOUNT NAME:              GRANITE ESCROW SERVICES

TRANSACTION:               20120315-0001852

FROM:                      UBS AG

FED REFERENCE:             0315B6B7IK1C001538

ORIGINATING BANK:          UBS AG

ORIGINATOR:                1/CHABRIER + ASSOCIES
                           1/1201 GENEVE
                           6/CH/UBS/0240-00314800

RECEIVER:                  GRANITE ESCROW SERVICES
                           (BEVERLY HILLS TRUST ACCOUNT)
                           1400 NEWPORT CENTER DR # 250
                           NEWPORT BEACH CA 92660

ORIGIN TO BENEFICIARY:     MARK FISHMAN
                           ESCROW NO 500-005257MF

SENDER:                    UBS AG
                           LAUSANNE, CH

SENDER REFERENCE:          US01075KU0085351

ORIGINATOR REFERENCE:      ZD81075AR0394983

*Disclaimer: the information contained in this facsimile transmission is confidential and may also contain legally privileged information or work product. The information is intended only for the use of the individual or entity to whom it is addressed. If you are not the intended recipient or the employee or agent responsible to deliver it to the intended recipient, you are hereby notified that any use, dissemination, distribution or copying of this communication is strictly prohibited. If you have received this facsimile transmission in error, notify the sender immediately by telephone and return the original message to us by mail. Thank you.*

GE0000330

EXHIBIT 28

# EXHIBIT 29

# FILED UNDER SEAL



**Mark Fishman**

| | |
|---|---|
| **From:** | Zach Goldsmith <zjgoldsmith@gmail.com> |
| **Sent:** | Friday, January 11, 2013 4:19 PM |
| **To:** | 'Mark Fishman' |
| **Subject:** | RE: 606 N. Alta Drive |

the buyer will be 628 Holdings, LLC, a Delaware limited liability company.  Iliyas is the owner; Elvira is the Manager and authorized signatory.  She will be able to sign all documents needed for closing.
Name:  Elvira Kudryashova
Title:  Manager
Email: kira4hue@gmail.com



**ZACH GOLDSMITH**
Hilton & Hyland
*Exclusive Affiliate of Christie's International Real Estate*
250 North Canon Drive, Beverly Hills, CA 90210

C : 310.908.6860 | O : 310.492.0744
zach@hiltonhyland.com
zachgoldsmith.com

**From:** Mark Fishman [mailto:mfishman@graniteescrow.com]
**Sent:** Friday, January 11, 2013 6:45 AM
**To:** 'Zach Goldsmith'
**Subject:** RE: 606 N. Alta Drive

Please forward the LLC name and signer info

Thanks,


**Mark Fishman**
*Escrow Officer*
Granite Escrow Services
439 N. Canon Drive, Suite 220
Beverly Hills, CA  90210
mfishman@graniteescrow.com
(310)288-0110 Ext 2600
(310) 684-3080 (private fax)
www.graniteescrow.com

*"Our strength is in our people"*

Assistant's
Jo Ann  310-288-0110 ext 2601   jfrederiksen@graniteescrow.com
Monica 310-288-0110 ext 2603   mpalma@graniteescrow.com
Josh     310-288-0110  ext 2604   jlinden@graniteescrow.com

1

GE0000610

EXHIBIT 30



RECEIPT NO.        5260

Granite Escrow Services
439 N. Canon Drive, Suite 220
Beverly Hills, CA 90210
(310) 288-0110

ESCROW NO.          DATE
500-005821-MF        01/18/2013

Property:        628 N Alta Drive, Beverly Hills, CA  90210

RECEIVED        Vilder Company SA
   OF

AMOUNT
$**5,997,956.15

FIVE MILLION NINE HUNDRED NINETY-SEVEN THOUSAND NINE HUNDRED FIFTY-SIX AND 15/100 DOLLARS -

| | ABA Number | Check Number | Description |
|---|---|---|---|
| CASH | | | |
| CHECK | | | |
| CASHIER'S CHECK | | | |
| DRAFT | | | |
| OTHER | wire | ███████ | |

Checking Account Number _____

Received on behalf of   BUYER/BORROWER

BY _____
   Mark Fishman

ORIGINAL

GE0000707

EXHIBIT 31





**CITY NATIONAL BANK**

The way up.

If you have questions regarding this Wire Transfer
please call (213)673-7825 or (800)575-5502.

ADVICE OF CREDIT
================

AMOUNT:                    $ 5,997,956.15

ACCOUNT #:                 ███████

ACCOUNT NAME:              GRANITE ESCROW SERVICES

TRANSACTION:               20130118-0000526

FROM:                      DEUTSCHE BANK TRUST CO. AMERICAS

FED REFERENCE:             0118B1Q8383C002722

ORIGINATING BANK:          FBME BANK LTD

ORIGINATOR:                VILDER COMPANY S.A.
                           C/O CHABRIER AVOCATS
                           RUE DU MONT-BLANC 3
                           GENEVA 1201, SWITZERLAND

RECEIVER:                  GRANITE ESCROW SERVICES
                           (BEVERLY HILLS TRUST ACCOUNT)
                           1400 NEWPORT CENTER DR # 250
                           NEWPORT BEACH CA 92660

ORIGIN TO BENEFICIARY:     MARK FISHMAN ESCROW 500-005821-MF
                           ON BEHALF OF CANDIAN INTERN. LTD

SENDER REFERENCE:          0118153823002884

*Disclaimer: the information contained in this facsimile transmission is confidential and may also contain legally privileged information or work product. The information is intended only for the use of the individual or entity to whom it is addressed. If you are not the intended recipient or the employee or agent responsible to deliver it to the intended recipient, you are hereby notified that any use, dissemination, distribution or copying of this communication is strictly prohibited. If you have received this facsimile transmission in error, notify the sender immediately by telephone and return the original message to us by mail. Thank you.*

GE0000708

EXHIBIT 31

Granite Escrow Services
439 N. Canon Drive, Suite 220
Beverly Hills, CA 90210
(310) 288-0110

Property:     628 N Alta Drive, Beverly Hills, CA 90210

RECEIPT NO.        5083

ESCROW NO.          DATE
500-005821-MF       11/30/2012

RECEIVED     Vilder Company S A
OF

AMOUNT
$****186,000.00

ONE HUNDRED EIGHTY-SIX THOUSAND AND 00/100 DOLLARS -------------------------------------------------------

| | ABA Number | Check Number | Description |
|---|---|---|---|
| CASH | | | |
| CHECK | | | |
| CASHIER'S CHECK | | | |
| DRAFT | | | |
| OTHER | wire | | |

Checking Account Number _____

Received on behalf of   BUYER/BORROWER

BY _____
   Mark Fishman

ORIGINAL

GE0000706

EXHIBIT 32

/30/12 05:29 AM  (213) 427-5115 via VSIFAX                    Page 1 of 1 #266056  BE



**CITY NATIONAL BANK**
The way up.®

        If you have questions regarding this Wire Transfer
            please call (213)673-7825 or (800)575-5502.

ADVICE OF CREDIT
================

AMOUNT:                    $ 186,000.00

ACCOUNT #:                 ████████

ACCOUNT NAME:              GRANITE ESCROW SERVICES

TRANSACTION:               20121130-0000982

FROM:                      DEUTSCHE BANK TRUST CO. AMERICAS

FED REFERENCE:             1130B1Q8383C007247

ORIGINATING BANK:          FBME BANK LTD

ORIGINATOR:                VILDER COMPANY S. A.
                           C/O CHABRIER AVOCATS
                           RUE DU MONT-BLANC 3
                           GENEVA 1201, SWITZERLAND

RECEIVER:                  GRANITE ESCROW SERVICES
                           (BEVERLY HILLS TRUST ACCOUNT)
                           1400 NEWPORT CENTER DR # 250
                           NEWPORT BEACH CA 92660

ORIGIN TO BENEFICIARY:     MARK FISHMAN ESCROW 500-005821-MF
                           ON BEHALF OF CANDIAN INTERN. LTD

SENDER REFERENCE:          1130508914007286

Disclaimer: the information contained in this facsimile transmission is confidential and may also contain legally privileged information
or work product. The information is intended only for the use of the individual or entity to whom it is addressed. If you are not the
intended recipient or the employee or agent responsible to deliver it to the intended recipient, you are hereby notified that any use,
dissemination, distribution or copying of this communication is strictly prohibited. If you have received this facsimile transmission in
error, notify the sender immediately by telephone and return the original message to us by mail. Thank you.

GE0000705

EXHIBIT 32



439 N. Canon Drive, Suite 220
Beverly Hills, CA 90210

Phone:  (310) 288-0110
Fax:  (310) 288-0111

628 Holdings, LLC
Zach Goldsmith
250 N. Canon Drive
Beverly Hills, CA  90210

Date:  January 22, 2013
Escrow No. 500-005821-MF
Re:      628 N Alta Drive
          Beverly Hills, CA 90210

Dear Mr. Iliyas Khrapunov:

The above referenced escrow closed on January 22, 2013.  In connection therewith, we are enclosing the following documents:

   Closing/Settlement Statement.  PLEASE RETAIN FOR INCOME TAX PURPOSES.
   Closing Package on CD

Your escrow will be held by our office for a period of five years from the close of escrow.  It has been a pleasure to have handled your escrow, and we trust we may be of service to you in the future.

Sincerely,
Granite Escrow Services

Josh Linden Escrow Assistant for
Mark Fishman
Escrow Officer

GE0000580

EXHIBIT 33

## ASSIGNMENT AND ASSUMPTION AGREEMENT

THIS ASSIGNMENT AND ASSUMPTION AGREEMENT is entered into and effective as of January ___, 2013 (this "Agreement"), by and between Stuart Rubin ("Assignor"), and 628 Holdings LLC, a Delaware limited liability company ("Assignee").

### RECITALS

Assignee's predecessor in interest (Candian International Limited) and Assignor are parties to Purchase Agreement dated 11/15/2012, as amended by Counter Offers #1, 2, 3 & 4 (the "Purchase Agreement"), whereby Assignor has agreed to sell and transfer to Assignee the property located at 628 N. Alta Drive, Beverly Hills, California (the "Sale").

In connection with the Sale, Assignor has agreed to assign to Assignee the Residential Lease dated 9/10/2011, as amended by Amendment No. 1 thereto dated January ___, 2013 (the "Lease") between Assignor and GMG Exim (USA) Inc. (the "Tenant"), and Assignee has agreed to assume the Lease.

All capitalized terms, if not defined herein, shall have the meaning or meanings assigned to them in the Purchase Agreement.

NOW THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereby agree as follows:

1.      Effective as of the closing date of the Sale (the "Closing Date"), Assignor hereby assigns the Lease to Assignee, and all of Assignor's rights in and claims to and under such Lease.

2.      Effective as of the Closing Date, Assignee hereby assumes and agrees to perform, fulfill and discharge, and all liabilities and obligations of Assignor under such Lease, other than any liabilities or obligations that may have accrued prior to the Closing Date.

3.      Assignor shall transfer all deposits held under the Lease to Assignee on or prior to the Closing Date. The parties may elect to offset such deposits against the purchase price otherwise payable under the Purchase Agreement.

4.      Assignor shall deposit into escrow an Estoppel Certificate signed by Tenant prior to the Closing Date.

5.      Each of the parties hereto hereby represents and warrants that it has full power and authority to enter into this Agreement.

6.      No amendment or waiver of any provision of this Agreement shall be effective unless in writing signed by both parties. Except as expressly provided herein, no party

*SR E.K.*

GE0000490

EXHIBIT 34

shall assign its rights or delegate its duties hereunder without the written consent of the other party. This Agreement shall be binding upon the successors and assigns of Assignor and Assignee.

**IN WITNESS WHEREOF**, the parties hereto have caused this Assignment and Assumption Agreement to be duly executed by their respective authorized officers as of the date first above written.

**STUART RUBIN**

By: _____
STUART Rubin

**628 HOLDINGS, LLC**

By: _____
Name: Elvira Kudryashova
Title: Manager

US_ACTIVE-111639438.1-RAHANNA 01/09/2013 11:43 PM

EXHIBIT 34

## AMENDMENT TO LEASE AGREEMENT

THIS AMENDMENT TO LEASE AGREEMENT (the "Amendment") is made and entered into as of January 15, 2013, by and between Stuart Rubin ("Landlord"), and GMG Exim (USA) Inc. (the "Tenant" together with Landlord, the "Parties").

### RECITALS

A.     On September 10, 2011, the Parties entered into a Residential Lease Agreement (the "Lease") with respect to the property (located at 628 N. Alta Drive, Beverly Hills, California (the "Property");

B.     Landlord has entered into an agreement to sell the property to 628 Holdings, LLC, a Delaware limited liability company (the "Buyer"); and

C.     In connection with the sale, Landlord and Tenant wish to amend the Lease as set forth herein.

NOW, THEREFORE, in consideration of the covenants and promises set forth herein, and for other good and valuable consideration, intending to be legally bound hereby the Parties agree as follows:

1.     Acknowledgment of Sale.  Tenant acknowledges and agrees that the Property will be sold to the Buyer or its assignees (the "Sale"), and that the Lease, as amended hereby (including the personal guarantee of Yudson Gondobintoro), will be assigned by Landlord to Buyer and will remain in full force and effect following the Sale.  Tenant will execute an estoppel certificate in a customary form provided by Landlord.

2.     Payment of Rent.  Following the Sale, the Buyer will be entitled to exercise all rights of the Landlord pursuant the Lease.  Tenant will make all rental payments due under the Lease after the date of the Sale to Buyer, pursuant to the bank payment instructions supplied by Buyer.

3.     Waiver and Termination of Rights of First Refusal.  Tenant waives the "right of first refusal" to purchase the property referred to in Section 42 of the Lease in connection with the Sale.  Such right of first refusal is hereby terminated and shall have no further force or effect.

4.     Miscellaneous.  This Amendment will be construed in accordance with and governed in all respects by the laws of the State of California without regard to any conflicts of law principles that would result in application of laws of any other jurisdiction.  This Amendment may be executed in two or more counterparts, each of which shall be deemed an original but all of which, together, shall constitute one instrument. The Lease, as amended by this Amendment, constitutes the full and entire understanding and agreement between the Parties with regard of the subjects hereof.  Except as otherwise set forth in this Amendment, nothing in this Amendment shall be deemed to waive or modify any of the provisions of the Lease.  The provisions of this Amendment shall bind and inure to the benefit of the respective heirs, representatives, successors and assigns of the Parties.

*[Remainder of Page Intentionally Left Blank – Signature Page Follows]*

US_ACTIVE-111640601.1-RAHANNA 01/11/2013 5:54 PM

EXHIBIT 34

IN WITNESS WHEREOF, this Amendment is executed as of the date first written above.

**STUART RUBIN**                              **GMG EXIM (USA), INC.**

By: _____          By: _____
Name: STUART RUBIN                        Name: YUDSON GONDOBINTORO
Title: _____            Title: President

- 2 -

1651495.3

GE0000493

EXHIBIT 34



CALIFORNIA
ASSOCIATION
OF REALTORS®

**TENANT ESTOPPEL CERTIFICATE**
(C.A.R. Form TEC, Revised 4/11)

Tenant: _GMG Exim (USA) Inc. - Yudson Gondobintoro_

Premises: _628 N. Alta Drive, Beverly Hills, CA 90210_

To whom it may concern: The undersigned is the Tenant of the above premises and makes the following representations:
1. **LEASE TERMS:**
   A. (☒ if checked) A copy of the Lease is attached hereto.
   B. Date of the Lease: _September 15, 2011_
   C. Name of the current Landlord: _Stuart Rubin_
   D. Name of the current Tenant: _GMG Exim (USA) Inc. - Yudson Gondobintoro_
   E. Current monthly base rent: $ _22,500.00_ , paid through: _January 14, 2013_
   F. Security deposit: $ _32,250.00_  Other deposits: $ _N/A_
   G. Expiration date of current term: _September 14, 2013_

   H. Number and Location of Parking Spaces: _____
   I. Number and Location of Storage Spaces: _____
   J. Who pays utilities services: Water: ☐ Landlord ☒ Tenant; Electric: ☐ Landlord ☒ Tenant; Gas: ☐ Landlord ☒ Tenant; Waste Disposal: ☒ Landlord ☐ Tenant; Gardener: ☒ Landlord ☐ Tenant; Sewer: ☒ Landlord ☐ Tenant; Other: _Pool_ ☒ Landlord ☐ Tenant; Other: _____ ☐ Landlord ☐ Tenant.
   K. Who owns appliances: Stove: ☒ Landlord ☐ Tenant; Refrigerator: ☒ Landlord ☐ Tenant; Washer/Dryer: ☒ Landlord ☐ Tenant; Microwave: ☒ Landlord ☐ Tenant; Other: _____ ☐ Landlord ☐ Tenant.
2. The Tenant represents that the original Lease remains in full force and effect and constitutes the entire agreement between Tenant and Landlord, except for the following modifications, amendments, addendums, assignments, extensions, and/or preferential rights or options to purchase/lease:

   There are no verbal or written agreements or understandings between Landlord and Tenant with respect to the Premises, except as set forth above.
3. Tenant is the actual occupant and is in possession of the Leased Premises. Tenant has not assigned, transferred or hypothecated its interest under the Lease. Any construction, build-out, improvements, alterations, or additions to the Premises required under the Lease have been fully completed in accordance with the plans and specifications described in the Lease.
4. All obligations of Landlord under the Lease have been fully performed and Landlord is not in default under any term of the Lease. Tenant has no defenses, off-sets or counterclaims to the payment of rent or other amounts due from Tenant to Landlord under the Lease.
5. Tenant has not been given any free rent, partial rent, rebates, rent abatements, or rent concessions of any kind, except as follows:

6. Tenant has not filed and is not the subject of any filing for bankruptcy or reorganization under federal bankruptcy laws or similar state laws.
7. Tenant represents that Tenant: (a) is not in default of the performance of any obligations under the Lease; (b) has not committed any breach of the Lease; and (c) has not received any notice of default under the Lease, which has not been cured.
8. The correct address for notices to Tenant is the Premises above unless otherwise specified in writing.
9. The person signing below represents that he/she is duly authorized by Tenant to execute this Statement in Tenant's behalf.
10. Tenant understands that: (a) a lender may make a loan secured in whole or part by the Premises, and that if Lender does so, Lender's action will be in material reliance on this Estoppel Certificate; and/or (b) a buyer may acquire the Premises or the building in which the Premises is located, and if buyer completes the purchase, buyer will do so in material reliance on this Estoppel Certificate.

Date: _1-15-2013_

Tenant _GMG Exim (USA) Inc. - Yudson Gondobintoro_

Tenant _Yud_ Title _President_
By _STUART Rubin_

Receipt Acknowledged:
Date: _1 15 13_
Landlord or Manager
By _____ Title _____

The copyright laws of the United States (Title 17 U.S. Code) forbid the unauthorized reproduction of this form, or any portion thereof, by photocopy machine or any other means, including facsimile or computerized formats. Copyright © 1990-2011, CALIFORNIA ASSOCIATION OF REALTORS®, INC. ALL RIGHTS RESERVED.
THIS FORM HAS BEEN APPROVED BY THE CALIFORNIA ASSOCIATION OF REALTORS® (C.A.R.). NO REPRESENTATION IS MADE AS TO THE LEGAL VALIDITY OR ADEQUACY OF ANY PROVISION IN ANY SPECIFIC TRANSACTION. A REAL ESTATE BROKER IS THE PERSON QUALIFIED TO ADVISE ON REAL ESTATE TRANSACTIONS. IF YOU DESIRE LEGAL OR TAX ADVICE, CONSULT AN APPROPRIATE PROFESSIONAL.
This form is available for use by the entire real estate industry. It is not intended to identify the user as a REALTOR®. REALTOR® is a registered collective membership mark which may be used only by members of the NATIONAL ASSOCIATION OF REALTORS® who subscribe to its Code of Ethics.

Published and Distributed by:
REAL ESTATE BUSINESS SERVICES, INC.
a subsidiary of the California Association of REALTORS®
525 South Virgil Avenue, Los Angeles, California 90020

Reviewed by _____ Date _____

TEC REVISED 4/11 (PAGE 1 OF 1)

**TENANT ESTOPPEL CERTIFICATE (TEC PAGE 1 OF 1)**

| Agent: | Phone: 310.247.7770 | Fax: 310.247.7780 | Prepared using zipForm® software |
|---|---|---|---|
| Broker: Westside Estate Agency 210 N. Canon Drive Beverly Hills, CA 90210 | | | |

GE0000494

EXHIBIT 34

1              UNITED STATES DISTRICT COURT
2             CENTRAL DISTRICT OF CALIFORNIA
3
4

CITY OF ALMATY, a foreign        )
5   state,                           )
                                     )
6                    Plaintiff,      )
                                     ) Case No.
7              vs.                   ) CV14-3650-FMO-CW
                                     )
8   VIKTOR KHRAPUNOV, an             )
    individual; et al.,              )
9                                    )
                     Defendants.     )
10  _____ )
11
12
13
14
15      VIDEO-RECORDED DEPOSITION OF MICHAEL WOLOZ
16             Los Angeles, California
17             Tuesday, June 9, 2015
18                  Volume I
19
20
21
22  Reported by:
    CATHRYN L. BAKER
23  CSR No. 7695
24  Job No. 2083804
25  PAGES 1 - 153

                                    Page 1

EXHIBIT 35

```
 1    The time is 11:37.  This is disc two of the
 2    deposition of Mr. Michael Woloz.
 3    BY MR. FISCHER:
 4        Q    Mr. Woloz, did you discuss your deposition
 5    with anyone during the break besides your attorneys?  11:37AM
 6        A    I did not.
 7        Q    You said before that you worked on three
 8    properties for Elvira and Dmitri?
 9        A    Yes.
10        Q    And we just discussed the 11986 Lockridge    11:37AM
11    Road.
12        A    Yes.
13        Q    Do you recall if the second is at 628 North
14    Alta Drive in Beverly Hills?
15        A    Yes, that is correct.                        11:37AM
16        Q    Who hired you to perform work on this job?
17        A    Elvira.
18        Q    When?
19        A    I'd have to look at the dates, but 2000 --
20    let's see, 2014, May, June.  I'm not even sure what   11:38AM
21    the dates.  Sometime in there.
22        Q    So this was after you completed work at
23    Lockridge Road?
24        A    We were at the tail end of Lockridge, yes.
25        Q    Do you remember, did she hire you through   11:38AM
```

Page 74

EXHIBIT 35

```
 1    an in-person conversation or over the phone?  Do you

 2    remember the circumstances of your hiring?

 3         A    I don't remember exactly.

 4         Q    Did she tell you what she wanted done at

 5    628 North Alta?                               11:38AM

 6         A    Yes.  There was a leak from the deck above

 7    into the family room.

 8         Q    Do you know who owned the property at the

 9    time?

10         A    Other than she said it was her mother, no.  11:38AM

11         Q    When did she say it was her mother who

12    owned the property?

13         A    I don't know exactly.  I think she said I

14    have -- her mother owns the property and it's got a

15    leaky deck and go over and take care of it.      11:39AM

16         Q    This was in the initial conversation when

17    she hired you?

18         A    Yes.  Yes.

19         Q    Did she say her mother's name?

20         A    No.                                  11:39AM

21         Q    Did she say anything at all about her

22    mother other than she owns this property?

23         A    No.

24         Q    Have you ever met her mother?

25         A    No.                                  11:39AM
```

Page 75

EXHIBIT 35

```
 1        Q    Was anyone living at the property at the
 2   time?
 3        A    There was a renter there.
 4        Q    Do you recall his name?
 5        A    Yeah.  Yudson, G-o-h, I believe is his last    11:39AM
 6   name.  I can't pronounce it.
 7        Q    Right.
 8        A    I met him a number of times.
 9        Q    Understood.  How many times, ballpark, did
10   you meet him?                                            11:39AM
11        A    Well, we worked there for probably weeks so
12   many, many times.
13        Q    Did you have conversations with him?
14        A    Other than "good morning" and "can you move
15   some furniture," no.                                     11:40AM
16        Q    So you never talked about Elvira with him?
17        A    No.
18        Q    Or Dmitri?
19        A    No.
20        Q    Or Elvira's mother?                            11:40AM
21        A    No.
22        Q    Did you conduct any other work on the
23   property besides repairing that leak?
24        A    No.
25        Q    Okay.                                          11:40AM
```

Page 76

EXHIBIT 35

```
 1   STATE OF CALIFORNIA   ) ss:

 2   COUNTY OF LOS ANGELES )

 3

 4       I, CATHRYN L. BAKER, C.S.R. No. 7695, do

 5   hereby certify:

 6       That the foregoing deposition of MICHAEL

 7   WOLOZ was taken before me at the time and place

 8   therein set forth, at which time the witness was

 9   placed under oath by me;

10       That the testimony of the witness and all

11   objections made at the time of the examination were

12   recorded stenographically by me, were thereafter

13   transcribed under my direction and supervision and

14   that the foregoing is a true record of same.

15       I further certify that I am neither

16   counsel for nor related to any party in said action,

17   nor in any way interested in the outcome thereof.

18       IN WITNESS WHEREOF, I have subscribed my

19   name this 12th day of June, 2015.

20

21

22

23

24   _____

25       CATHRYN L. BAKER, C.S.R. No. 7695

                                         Page 153
```

EXHIBIT 35

# SDG CAPITAL SA

1201 GENEVE, Switzerland

The GUO of this controlled subsidiary is MR PHILIPPE GLATZ

| | |
|---|---|
| **BvD ID number** | CHCHE114438604 |
| **Latest account date** | 2015 |

## Contact information

RUE DU MONT-BLANC 3
1201 GENEVE
Switzerland
**Canton**                          Geneva

## Legal & account information

| | | | |
|---|---|---|---|
| **Status** | Active | **Last available year** | 2015 (in Orbis since 01/2015) |
| **National legal form** | Limited company - AG/SA | **No. of available years** | 8 |
| **Date of incorporation** | 04/08/2008 | **Account published in** | CHF |
| **Type of entity** | Mutual and pension fund/Nominee/Trust/Trustee | | |
| | | **Available accounts** | Limited financial data |
| **Information provider** | CRIF Teledata AG | **Filing type** | Local registry filing |
| | | **Accounting template** | Industrial company |

We use different sources for the estimated figures pre and post 2012. These sources use slightly different methodology.

## Size & group information

| | | | |
|---|---|---|---|
| **BvD major sector** | Other services | | |
| **Category of the company** | Small company | **BvD Independence Indicator** | D |
| **Number of employees (2015)** | 4 | **No of companies in corporate group** | 15 |
| | | **No of recorded shareholders** | 1 |
| | | **No of recorded subsidiaries** | 5 |
| | | **No of recorded branches** | 0 |

## Industry & activities

| | |
|---|---|
| **Type of entity** | Mutual and pension fund/Nominee/Trust/Trustee |
| **BvD major sector** | Other services |
| **NACE Rev. 2 main section** | K - Financial and insurance activities |

**Industry classification codes**
**NOGA 2008 code(s)**
**Primary code(s):**
  642002    -   Activities of other holding companies

**NACE Rev. 2 code(s) {derived from NOGA 2008 codes}**
**Core code:**
  6420    -   Activities of holding companies
**Primary code(s):**
  6420    -   Activities of holding companies

**NAICS 2012 code(s) {derived from NOGA 2008 codes}**
**Core code:**
  5511    -   Management of Companies and Enterprises
**Primary code(s):**
  551111    -   Offices of Bank Holding Companies

EXHIBIT 36

---

**Industry & activities**

551112      -   Offices of Other Holding Companies

**US SIC code(s) {derived from NOGA 2008 codes}**
**Core code:**
671      -   Holding offices
**Primary code(s):**
6712      -   Offices of bank holding companies
6719      -   Offices of holding companies, not elsewhere classified
6722      -   Management investment offices, open-end

---

**Key financials & employees**

*The figures in italic below are indicated by the information provider as estimates.*

| Local registry filing/Limited financials | 2015 USD | 2014 USD | 2013 USD | 2012 USD | 31/12/2011 USD |
|---|---|---|---|---|---|
| Exchange rate: USD/CHF | 12 months 1.06385 | 12 months 1.01102 | 12 months 1.12170 | 12 months 1.09099 | 12 months 1.06281 |
| Number of employees | *4* | *4* | *4* | *4* | n.a. |

| Local registry filing/Limited financials | 31/12/2010 USD | 31/12/2009 USD | 31/12/2008 USD |
|---|---|---|---|
| Exchange rate: USD/CHF | 12 months 1.06383 | 12 months 0.97040 | 12 months 0.94011 |
| Number of employees | n.a. | n.a. | n.a. |

---

**Evolution of a key variable: Operating revenue (Turnover)**

*This company has no data for your selected year(s).*

EXHIBIT 36

### Global standard format

*The figures in italic below are indicated by the information provider as estimates.*

#### Balance sheet

| Local registry filing/Limited financials | 2015 USD | 2014 USD | 2013 USD | 2012 USD | 31/12/2011 USD |
|---|---|---|---|---|---|
| Exchange rate: USD/CHF | 12 months 1.06385 | 12 months 1.01102 | 12 months 1.12170 | 12 months 1.09099 | 12 months 1.06281 |
| **Liabilities & Equity** | | | | | |
| Capital | 10,638,455 | 10,110,201 | 11,217,049 | 10,909,884 | 10,628,122 |

#### Memo lines

| | | | | | |
|---|---|---|---|---|---|
| Number of employees | *4* | *4* | *4* | *4* | n.a. |

#### Balance sheet

| Local registry filing/Limited financials | 31/12/2010 USD | 31/12/2009 USD | 31/12/2008 USD |
|---|---|---|---|
| Exchange rate: USD/CHF | 12 months 1.06383 | 12 months 0.97040 | 12 months 0.94011 |
| **Liabilities & Equity** | | | |
| Capital | 10,638,298 | 9,704,027 | 9,401 |

#### Memo lines

| | | | |
|---|---|---|---|
| Number of employees | n.a. | n.a. | n.a. |

### Global ratios

There is no ratio information available for this entity.

### Current Directors / Managers / Contacts

Sources that rely on informal research and social networking are **not shown**.

#### Boards & committees

⚇ = also shareholder

| | Name | Original job title | Body | Source |
|---|---|---|---|---|
| 1. | Mr Marc Olivier Rene Gillieron P051087376 | - President of the Board of Directors and Chief Executive Officer (since 08/08/2014) | BoD | OF |
| 2. ⚇ | Mr Philippe Glatz P072650412 | - Member (since 03/05/2013) | BoD | CRIF Teledata AG OF CRIF Teledata AG |

#### Management & staff

| | Name | Original job title | Dept | Source |
|---|---|---|---|---|
| 1. | Mr Marc Olivier Rene Gillieron P051087376 | - President of the Board of Directors and Chief Executive Officer (since 08/08/2014) | SenMan | OF CRIF Teledata AG |

EXHIBIT 36

---

**Auditors & other advisors**

**Auditor :**          PricewaterhouseCoopers SA, Geneve since 11/11/2011

**Controlling shareholders**

**BvD Independence Indicator: D**

**Current definition of the UO:**    path of min 50.01% of control, known or unknown shareholders

The companies/individuals underlined and displayed in bold blue are available on **ORBIS/CONTACTS**

| Shareholder name | Country | Type | Ownership Direct (%) | Total (%) | Source Source ident. | Date of info. | Company information Op. Revenue (mil USD)* | No of employees |
|---|---|---|---|---|---|---|---|---|
| **MR PHILIPPE GLATZ** | BR | I | 100.00 | 100.00 | OF | 04/2015 | - | - |
| **SDG CAPITAL SA** | CH | E | | | | | n.a. | 4 |

 = Also a manager in the company underneath in the path

\* = For an insurance company the corresponding value is the Gross Premium Written and for a bank it is the Operating Income (memo)

**Current shareholders**

**Current filter:** No filter

| Shareholder name | Country | Type | Ownership Direct (%) | Total (%) | Source Source ident. | Date of info. | Variation | Company information Op. Revenue (mil USD)* | No of employees |
|---|---|---|---|---|---|---|---|---|---|
| 1.  **MR PHILIPPE GLATZ** | BR | I | 100.00 | 100.00 | OF | 04/2015 | ↻ | - | - |

 = Also a manager

\* = For an insurance company the corresponding value is the Gross Premium Written and for a bank it is the Operating Income (memo)

**Current subsidiaries**

**Current filter:** No filter

The companies underlined and displayed in bold blue are available on **ORBIS**

| Subsidiary name | Country | Ownership Direct (%) | Total (%) | Status | Source Source ident. | Date of info. | Variation | Company information Op. Revenue (mil USD)* | No of employees |
|---|---|---|---|---|---|---|---|---|---|
| 1.  **HDP HÔTEL DU PARC HOLDING SÀRL** | CH | 100.00 | 100.00 | - | OF | 04/2015 | ➡ | n.a. | 15 |
| 2.  **HÔTEL DU PARC, MONT-PÈLERIN SA** | CH | 100.00 | 100.00 | - | OF | 04/2015 | ➡ | n.a. | 35 |
| 3.  **RE ESTATES SÀRL** | CH | 100.00 | 100.00 | - | OF | 04/2015 | ➡ | n.a. | 4 |
| 4.  **SWISS DEVELOPMENT GROUP SA** | CH | 100.00 | 100.00 | - | OF | 04/2015 | ➡ | n.a. | 35 |
| 5.  **THERMAL DEVELOPMENTS 2 SA** | CH | 100.00 | 100.00 | - | OF | 04/2015 | ➡ | n.a. | 4 |

 = Name is the same as, or similar to, a PEP's name or a risk relevant name in the LexisNexis WorldCompliance database.

\* = For an insurance company the corresponding value is the Gross Premium Written and for a bank it is the Operating Income (memo)

EXHIBIT 36

FILED: NEW YORK COUNTY CLERK 06/10/2015 05:24 PM          INDEX NO. 653462/2014

NYSCEF DOC. NO. 74                                          RECEIVED NYSCEF: 06/10/2015

# EXHIBIT B

EXHIBIT 37




COMMUNIQUE DE PRESSE

# Philippe Glatz acquiert
# Swiss Development Group

Genève, le 27 mars 2013 – Leader dans la création de biens immobiliers de haut de gamme, tant en Suisse qu'à l'étranger, Swiss Development Group annonce aujourd'hui que le groupe a été acquis par Philippe Glatz qui en devient l'actionnaire principal. Le capital de la société demeure à 100% aux mains d'actionnaires suisses.

Swiss Development Group regroupe, entres autres, les projets immobiliers Du Parc Kempinski Residences à Chardonne, 51 Degrees à Loèche-les-bains, Résidences Pinacle à Saas-Fee, l'Hôtel Igloo en France, les sociétés Rockefeller Estates (ventes immobilières), Rockefeller Living (Club de propriétaires).

Philippe Glatz est un entrepreneur actif en Suisse, en France et au Brésil. Ses entreprises oeuvrent dans le secteur hospitalier, dans les domaines industriels, de l'aéronautique et de l'immobilier. Depuis plus de vingt ans, ses entreprises se développent grâce à une croissance organique, une politique d'acquisitions diversifiées et des stratégies de partenariat.

«Cette acquisition nous permet d'accéder à l'expertise de Swiss Development Group et de son équipe en matière de développement immobilier innovant, de création de projets hôteliers et de projets résidentiels haut de gamme avec services exclusifs. En premier lieu, il s'agira d'assurer la continuité de la croissance de Swiss Development Group en s'appuyant sur les projets en cours, tout en développant des synergies avec nos sociétés existantes dans les domaines du service ou de la santé. Par la suite, l'on pourra engager de nouveaux projets pour renforcer notre secteur immobilier par exemple dans les pays émergents à forte croissance que je connais particulièrement bien » a affirmé Philippe Glatz.

Swiss Development Group conservera sa structure d'organisation, son équipe de direction ainsi que tous les employés et collaborateurs actifs au sein de ses différentes unités d'affaires. Toutes les activités et tous les projets en cours sont maintenus.

« Nous nous réjouissons de l'entrée de M. Glatz au capital de Swiss Development Group et de pouvoir profiter ainsi des connaissances, de l'expérience et du soutien de celui-ci. Nous pourrons consolider nos acquis, assurer la croissance et l'expansion de notre entreprise. Nous sommes confiants que l'arrivée de ce nouvel actionnaire ouvrira de toutes nouvelles perspectives de développement pour la société» a affirmé Jean-François Garneau, directeur de Swiss Development Group.

EXHIBIT 37

 

**A propos de Philippe Glatz**

Philippe Glatz a passé son enfance à Lausanne, puis à Rabat où son père séjournait en tant que fonctionnaire international auprès de l'ONU. De retour en Europe, il poursuit des études de linguistique à Fribourg et à Toulouse, se spécialise dans l'enseignement et crée sa première entreprise, une école privée. Après une formation post grade en gestion hospitalière, il reprend en 1988 la Clinique des Grangettes de Genève, établissement qu'il a développé pour en faire, à ce jour avec ses 450 collaborateurs, un groupe de santé, spécialisé dans la chirurgie, l'obstétrique, la pédiatrie, la cardiologie et l'oncologie. Il fonde, en outre, plusieurs nouvelles entreprises dont principalement : en l'an 2000, C-Pack Creative Packaging, société basée à Florianópolis au Brésil qui fabrique des emballages en plastique de haute technicité et de qualité supérieure pour les segments pharmaceutique, alimentaire et cosmétique. Aujourd'hui, avec environ 550 collaborateurs, C-Pack est le premier fabricant d'emballage en plastique extrudé en Amérique du Sud. En 2011, Philippe Glatz ouvre à Florianópolis au Brésil son second hôpital, dénommé SOS cardio, spécialisé en cardiologie, et occupant 350 collaborateurs. Par le passé, Philippe Glatz fut aussi actif en politique. De 1998 à 2005, il a été député au Grand Conseil de Genève dont il a présidé la commission des finances et la commission de contrôle de gestion. Il a par ailleurs été membre du Conseil de fondation du CIDE (Comité International pour la Dignité de l'Enfant) et membre ainsi que trésorier de la Croix-Rouge genevoise de 1990 à 2006. Aujourd'hui, il focalise exclusivement son activité sur le développement des entreprises et des emplois dont il a la responsabilité.

**A propos de Swiss Development Group**

Swiss Development Group SA (SDG) est une société spécialisée dans la création de biens immobiliers de haut de gamme exclusivement situés dans des lieux prestigieux en Suisse et à l'étranger. L'activité de SDG recouvre l'acquisition, le développement, la gestion et la vente de propriétés, de résidences avec services hôteliers, ainsi que des propriétés destinées à usages multiples. SDG est dirigée par une équipe de professionnels de l'immobilier, de la finance et du marketing.

L'expertise et les compétences spécifiques de l'entreprise résident dans la création de propriétés de haut de gamme associées à un large éventail de services, répondant ainsi au mode de vie et aux attentes d'une clientèle internationale, exigeante. Grâce à la collaboration avec des architectes, designers, artisans, hôteliers et autres partenaires de réputation internationale, SDG crée des objets immobiliers d'avant-garde visant la qualité, l'élégance et valeur sûre, des notions suisses intemporelles. Les résidences conçues par SDG sont disponibles par le biais de son propre agent immobilier, Rockefeller Estates, qui offre l'assurance à chaque acheteur de bénéficier d'un service personnalisé et irréprochable pendant et après le processus d'achat. En outre, tout acquéreur d'une résidence SDG est invité à rejoindre, s'il le désire, le club exclusif Rockefeller Living qui offre à ses membres un large éventail de services et d'équipements haut de gamme.
http://www.sdg.ch

*** Fin ***

Pour toute information complémentaire, merci de prendre contact avec Revolution PRCo,
Alexis Delmege - Directeur - alexis.delmege@revolutionprco.ch - 076 382 68 18

EXHIBIT 37

   

**PROJECT – PRESS RELEASE**

# Philippe Glatz acquires
# Swiss Development Group

Geneva, 27 March 2013 - Swiss Development Group, a leading creator of high-end real estate in both Switzerland and abroad, has today announced the Group has been acquired by Philippe Glatz, who becomes the major shareholder in the process. The company's share capital remains 100% owned by Swiss shareholders.

The Swiss Development Group portfolio includes the following real estate projects, to name but a few: Du Parc Kempinski Private Residences at Chardonne, 51 Degrees at Loèche-les-bains, Résidences Pinacle at Saas-Fee, Hotel Igloo in France, and the companies Rockefeller Estates (real estate sales) and Rockefeller Living (owners' club).

Philippe Glatz is an entrepreneur with interests in Switzerland, France and Brazil. His businesses are involved in the hospital, industrial, aerospace and real estate sectors. For more than 20 years now, his businesses have developed through a combination of organic growth, a varied acquisition policy, and strategic partnerships.

'This acquisition gives us access to the expertise of Swiss Development Group and its team in terms of innovative real estate development and the creation of hotel and high-end residential projects with exclusive services. First and foremost, the focus will be on ensuring Swiss Development Group continues to grow through any projects currently underway, while also developing synergies with our existing companies in the areas of services or healthcare. Subsequently, we will be looking to become involved in new projects with a view to strengthening our position within the real estate sector in those fast-growing emerging countries which I know particularly well,' confirms Philippe Glatz.

Swiss Development Group will retain its organisational structure and its management team, as well as all employees and personnel working in the various business units. All the activities and projects currently underway will continue.

'We are delighted about Mr Glatz taking up a shareholding in Swiss Development Group and the opportunity this gives us to benefit from his expertise, experience, and support. We will be able to consolidate our assets and ensure our business continues to grow and expand. We are confident that the arrival of this new shareholder will give the company new opportunities to develop,' believes Jean-François Garneau, Director of Swiss Development Group.

EXHIBIT 37

 

### About Philippe Glatz

Philippe Glatz spent his childhood in Lausanne and then in Rabat, where his father was posted with the UN in his capacity as an international civil servant. Upon returning to Europe, he studied linguistics at Fribourg and Toulouse before specialising in the field of education and setting up his first business in the form of a private school. After taking a post-graduate course in hospital management, he took over the *Clinique des Grangettes* in Geneva in, 1988 and subsequently developed this establishment into what is now a healthcare group with 450 employees specialising in surgery, obstetrics, paediatrics, cardiology, and oncology. He has also founded a number of new businesses, most notably C-Pack Creative Packaging in 2000, a company based in Florianópolis, Brazil, and involved in the manufacture of high-tech and high-quality plastic packaging for the pharmaceuticals, food, and cosmetics sectors. With around 550 employees, C-Pack is now South America's leading manufacturer of packaging made from extruded plastic. In 2011 Philippe Glatz opened his second hospital at Florianópolis under the name of SOS cardio, a specialist cardiology unit with 350 employees. Philippe Glatz has also been active in politics in the past. Between 1998 and 2005 he was a member of the Grand Conseil de Genève (Geneva's cantonal parliament), where he chaired the finance and administration commissions. He has also been a member of the Foundation Board of CIDE (Comité International pour la Dignité de l'Enfant – International Committee for the Dignity of Children), as well as both a member and treasurer of the Geneva branch of the Red Cross between 1990 and 2006. These days all his energies are devoted to developing his businesses and the jobs for which he is responsible.

### About Swiss Development Group

Swiss Development Group SA (SDG) is a company specialising in the creation of high-end real estate located exclusively in prestigious locations in Switzerland and abroad. SDG's activities include the acquisition, development, management, and sale of residential, hospitality, and mixed-use properties. SDG is managed by a team of real estate, finance, and marketing professionals.

The company's specific areas of competence and expertise are devoted to the creation of high-end properties associated with a wide range of services tailored to the lifestyle and expectations of a demanding international client base. Working with internationally renowned architects, designers, craftsmen, hoteliers, and other partners, SDG creates visionary properties which offer the timeless appeal of Swiss quality, elegance, and sound value. The residential properties designed by SDG are only available from the company's private estate agency, Rockefeller Estates, which ensures every client enjoys the utmost in personal service throughout the purchasing process and beyond. Clients who purchase SDG residential property are also invited, if they wish, to join Rockefeller Living, an exclusive club which offers its members a wide range of high-end services and amenities.
http://www.sdg.ch

*** End ***

If you would like any further information, please contact Revolution PRCo,
Alexis Delmege, Director at: alexis.delmege@revolutionprco.ch or +41 (0)76 382 68 18

EXHIBIT 37

FILED: NEW YORK COUNTY CLERK 11/10/2014 12:56 PM
NYSCEF DOC. NO. 3

INDEX NO. 653462/2014
RECEIVED NYSCEF: 11/10/2014

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
-------------------------------------------------------------------X
TRIADOU SPV S.A.,

               Plaintiff,

    -against-

CF 135 FLAT LLC, CF 135 WEST MEMBER LLC,
and THE CHETRIT GROUP LLC

               Defendants.
-------------------------------------------------------------------X

Index No.:

**AFFIRMATION IN
SUPPORT**

      DAVID C. VAN LEEUWEN, an attorney duly licensed to practice law in the State

of New York, hereby affirms under the penalties of perjury pursuant to CPLR § 2106

that:

      1. I am an attorney with the law firm of Rosabianca & Associates, PLLC,

attorneys for the Plaintiff in the above-entitled action. As such, I am fully familiar with

the facts set forth herein. Unless alleged upon information and belief, the statements

herein are based upon my personal knowledge of this matter.

      2. I submit this Affirmation in support to Plaintiff's Motion for Summary Judgment

in Lieu of Complaint, which seeks an Order pursuant to the CPLR § 3213 directing

judgment to be entered in favor of Plaintiff and against Defendants in the amount of Five

Million Two Hundred Fifty Thousand ($5,250,000.00) Dollars, together with the interest

thereon from November 2, 2014, attorneys' fees and the costs and disbursements of

this Motion, on the grounds that Defendants have failed to pay upon an instrument for

the payment of money only which is now due and payable.

1

EXHIBIT 38

3. Based on the foregoing, Plaintiff's motion should be granted its entirety.

4. Plaintiff is a company formed under the laws of the Grand Duchy of Luxembourg, with an address of 40 Wall Street, 30th Floor, New York, NY, 10005.

5. Upon information and belief, Defendant CF 135 Flat LLC ("Defendant CF 135 Flat") is a Delaware limited liability company with its principal place of business located at 512 Seventh Avenue, 15th Floor, New York, NY 10018.

6. Upon information and belief, Defendant CF 135 West Member LLC is a Delaware limited liability company with its principal place of business located at 512 Seventh Avenue, 15th Floor, New York, NY 10018.

7. Upon information and belief, Defendant The Chetrit Group LLC is a Delaware limited liability company with its principal place of business located at 512 Seventh Avenue, 15th Floor, New York, NY 10018.


## ARGUMENT

### PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT MUST BE GRANTED AS DEFENANTS HAVE FAILED TO PAY UPON AN INSTRUMENT FOR THE PAYMENT OF MONEY ONLY WHICH IS NOW DUE AND OWING

8. "A plaintiff is entitled to an accelerated procedure to commence and pursue an action to recover on an instrument for the payment of money only (see CPLR 3213)." DDS Partners, LLC v. Celenza, 6 A.D.3d 347 (1st Dept. 2004); see also Interman Indus. Prods. v. R. S. M. Electron Power, 37 N.Y.2d 151 (1975).

9. A Motion for Summary Judgment in Lieu of a Complaint is appropriate for cases in which "a formal complaint is superfluous, and even the delay incident upon

2

EXHIBIT 38

waiting for an answer and then moving for summary judgment is needless." <u>Interman Indus. Prods. v. R. S. M. Electron Power</u>, 37 N.Y.2d 151 (1975).

10. A typical example of an instrument within the meaning of the statue is an unconditional promise to pay a sum certain, signed by the maker, and due on demand or at a definite time. *See* <u>DDS Partners, LLC v. Celenza</u>, 6 A.D.3d 347 (1st Dept. 2004).

11. "An instrument within the intent of the statute is one which clearly, unequivocally and unconditional sets for the basis for liability and the particular liability involved." <u>Emperor Industries, Inc. v. Rothbaum</u>, 851 N.Y.S.2d 69 (Sup. Ct. NY County 2007).

12. In this case, Plaintiff is entitled to a judgment against Defendants in the amount of Five Million Two Hundred Fifty Thousand ($5,250,000.00) Dollars, based on Defendants' failure to pay the aforesaid sum on November 2, 2014 pursuant to the Agreement to Assign and Guaranty relating thereto, as more completely set forth herein.

13. On August 4, 2014, Plaintiff entered into an agreement to assign, by which Plaintiff agreed to assign and sell to Defendant CF 135 FLAT LLC all of the Plaintiff's right, title and membership interest in CF 135 WEST MEMBER LLC ("Agreement to Assign"), along with an assignment executed between the same parties. A copy of the Agreement to Assign and the assignment are annexed hereto and made a part hereof as **Exhibit A.**

14. According to Article 1(c) of the Agreement to Assign, the sum of Five Million Two Hundred Fifty Thousand ($5,250,000.00) Dollars ("Second Installment Payment") was due to be paid by Defendant CF 135 Flat to Plaintiff on or before <u>November 2,</u>

3

EXHIBIT 38

2014. It should be noted that this aforesaid sum was an unconditional obligation of Defendant CF 135 Flat.

15. On August 4, 2014, Defendants executed a guaranty agreement whereby Defendants irrevocably, absolutely and unconditionally guaranteed to Plaintiff the full, prompt and complete payment of the sums listed under Sections 1(c) through 1(g) of the Agreement to Assign. A copy of the Guaranty is annexed hereto as **Exhibit B.**

16. Pursuant to Section 2(d) of the Guaranty, Defendants' liability for the Purchase Price is primary, and the Plaintiff does not need to commence an action against Defendant CF 135 Flat prior to proceeding directly against the Defendants.

17. Pursuant to Section 2(c) of the Guaranty, Defendants are also liable to Plaintiff for reasonable attorneys' fees and disbursements in connection with this Motion.

18. Despite Plaintiff's service of a Notice to Comply upon Defendant CF 135 Flat's counsel on October 31, 2014 ("Notice to Comply"), and a Notice of Default upon all Defendants on November 4, 2014 ("Notice of Default"), no payment has been made to date, despite due demand therefore. Copies of the Notice to Comply and Notice of Default are annexed hereto and made a part hereof as **Exhibits C & D** respectively.

19. There is no defense to this action, and it cannot be disputed that the remaining balance to be paid is Five Million Two Hundred Fifty Thousand ($5,250,000.00) Dollars, together with the interest thereon from November 2, 2014, together with attorney's fees, costs, and disbursements of this Motion.

20. Based on the foregoing, the undersigned respectfully requests that an order be entered granting summary judgment in lieu of complaint in the amount of Five Million

4

EXHIBIT 38

Two Hundred Fifty Thousand ($5,250,000.00) Dollars, together with the interest thereon from November 2, 2014, together with the costs, disbursements of this Motion, attorneys' fees and such other and further relief as this Court may deem just and proper.

## ATTORNEYS' FEES

21.   Our firm's legal fees with respect to this matter are billed on an hourly basis through November 7, 2014 at the rate of $350.00 per hour.

22.   With respect to the experience levels of the above referenced attorneys, Luigi Rosabianca has been and admitted for over fifteen (15) years and has extensive experience litigating all forms of commercial litigation matters.  David C. Van Leeuwen has been admitted over eight (8) years and also has extensive experience litigating all forms of commercial litigation matters.  Diane Artal has has been admitted for over two (2) years and has been admitted as a Swiss attorney for over six (6) years with extensive experience in corporate and commercial law.

23. The total legal fees sought in this proceeding to date is the sum of Eight Thousand Two Hundred Forty Nine ($8,249.25) Dollars.

## CONCLUSION

24.   Plaintiff demands that judgment be entered against the Defendants on all causes of action in the sum of Five Million Two Hundred Fifty Thousand ($5,250,000.00) Dollars, plus attorney's fees in the sum of Eight Thousand Two Hundred Forty Nine ($8,249.25) Dollars, together with the interest thereon from November 2, 2014, costs and disbursements of this Motion.

5

EXHIBIT 38

25.  For the reasons stated herein, the Plaintiff's motion should be granted in its

entirety.

26.  No previous application for the relief herein prayed for has been made.


Dated:        New York, New York
              November 10, 2014


                                    _____
                                    DAVID C. VAN LEEUWEN


6


EXHIBIT 38

FILED: NEW YORK COUNTY CLERK 11/10/2014 12:56 PM

NYSCEF DOC. NO. 4

INDEX NO. 653462/2014

RECEIVED NYSCEF: 11/10/2014

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
-------------------------------------------------------------X
TRIADOU SPV S.A.,

                     Plaintiff,

        -against-

CF 135 FLAT LLC, CF 135 WEST MEMBER LLC,
and THE CHETRIT GROUP LLC,

                     Defendants.
-------------------------------------------------------------X

Index No.:

**AFFIDAVIT IN SUPPORT
OF MOTION FOR
SUMMARY JUDGMENT
IN LIEU OF COMPLAINT**

COUNTRY OF SWITZERLAND  )
                           ) SS.:
CANTON OF GENEVA         )

      Cesare Cerrito, first being duly sworn, says:

      1.     I am the Sole Director for the Plaintiff in the above-entitled action. As such, I am fully familiar with the facts and circumstances set forth herein. The statements herein are based upon my personal knowledge of this matter, unless alleged to be upon information and belief.

      2.     I make this affidavit in support of Plaintiff's Motion for Summary Judgment in Lieu of Complaint, which seeks an Order pursuant to the CPLR § 3213 directing judgment to be entered in favor of Plaintiff and against Defendants in the amount of Five Million Two Hundred Fifty Thousand ($5,250,000.00) Dollars, together with the interest thereon from November 2, 2014, attorneys' fees and the costs and disbursements of this Motion, on the grounds that Defendants have failed to pay upon an instrument for the payment of money

1



EXHIBIT 38

only which is now due and payable.

    3.    Plaintiff has instituted this action to recover Five Million Two Hundred Fifty Thousand ($5,250,000.00) Dollars in principal, together with the interest thereon from November 2, 2014, together with the costs and disbursements of this Motion, together with reasonable attorneys' fees, based on a certain Agreement to Assign made by and between Defendant CF 135 FLAT LLC ("Defendant CF 135 Flat") and Plaintiff on August 4, 2014 ("Agreement to Assign"), along with its Assignment executed between the same parties (See **Exhibit A**), and guaranteed by Defendants under a certain Guaranty, dated August 4, 2014 ("Guaranty") (See **Exhibit B**).

i.    Payment of Money Only; Agreement to Assign and Guaranty.

    4.    The contractual relationship between Plaintiff and Defendants arose as follows:

    a.    On August 4, 2014, Plaintiff entered into the Agreement to Assign, by which Plaintiff agreed to assign and sell to Defendant CF 135 FLAT all of the Plaintiff's right, title and interest in and to CF 135 WEST MEMBER LLC. As agreed to by Defendant CF 135 FLAT in the Agreement to Assign, the purchase price was Twenty Eight Million ($28,000,000.00) Dollars (the "Purchase Price"), payable as set forth in Section 1 of the Agreement to Assign.

    b.    On the same date, Plaintiff and Defendants executed the Guaranty, whereby Defendants irrevocably, absolutely and unconditionally guaranteed to Plaintiff the full, prompt and complete payment of the sums listed under Sections 1(c) through 1(g) of the Agreement to Assign. According to the Guaranty, the Defendants' liability is primary

2



EXHIBIT 38

and the Plaintiff does not need to commence an action against Defendant CF 135 Flat prior to proceeding directly against the Defendants.

5.    According to Article 1(c) of the Agreement to Assign, the second installment payment in the sum of Five Million Two Hundred Fifty Thousand ($5,250,000.00) Dollars was due to be paid by Defendant CF 135 Flat to Plaintiff on or before November 2, 2014. Despite Plaintiff's service of a Notice to Comply upon Defendant CF 135 Flat's counsel on October 31, 2014 ("Notice to Comply") **(See Exhibit C)**, and a Notice of Default upon all Defendants on November 4, 2014 ("Notice of Default") **(See Exhibit D)**, no payment has been made to date. Defendants' obligation to pay the aforesaid sums was not conditional in any manner.

ii.    Attorneys' Fees.

6.    Pursuant to Section 2(c) of the Guaranty, Plaintiff is also entitled to recovery against the Defendants for the legal fees and costs incurred in the instant action/connection with this Motion.

7.    Prior to commencing this action, Notice to Comply and Notice of Default were sent respectively on October 31, 2014 and November 4, 2015. After the Defendants defaulted on their payment of the second installment in the sum of Five Million Two Hundred Fifty Thousand ($5,250,000.00) Dollars, the instant action was commenced by purchasing an index number and the service of the attached Motion for Summary Judgment in Lieu of Complaint.

8.    Annexed hereto is a breakdown of the services rendered and fees charged as a result of these actions **(See Exhibit E)**.

3

EXHIBIT 38

9.     The total of the legal fees that has been billed in connection with the aforementioned services to date is $8,245.29

iii.     Conclusion.

10.     There is no defense to this action, and it cannot be disputed that the remaining balance to be paid is Five Million Two Hundred Fifty Thousand ($5,250,000.00) Dollars, plus attorneys' fees in the sum of Eight Thousand Two Hundred Forty Nine ($8,249.25) Dollars, together with the interest thereon from November 2, 2014, costs and disbursements of this Motion.

11.     Based on the foregoing, I respectfully request that an order be entered granting summary judgment in lieu of a complaint in the amount of Five Million Two Hundred Fifty Thousand ($5,250,000.00) Dollars, plus attorneys' fees in the sum of Eight Thousand Two Hundred Forty Nine ($8,249.25) Dollars, together with the interest from November 2, 2014, costs and disbursements, and such other and further relief as this Court may deem just and proper.

The undersigned Notary assumes
no responsability as to the content
of the present document.

CESARE CERRITO

Sworn to before me this
___ day of November, 2014

Notary Public

4

**APOSTILLE**
(Convention de la Haye du 5 octobre 1961)
1. Pays: Suisse
   Le présent acte public
2. a été signé par _He K Lessali_
3. agissant en qualité de _notaire_
4. est revêtu du sceau/timbre de _lc._
.........................................................
Attesté
5. à Genève          6. le _1 0 NOV. 2014_
7. République et Canton de Genève
8. sous N° 000002411
9. Sceau / timbre          10. Signature
                                    P.-A. Leya

EXHIBIT 38

FILED: NEW YORK COUNTY CLERK 11/10/2014 12:56 PM

NYSCEF DOC. NO. 5

INDEX NO. 653462/2014

RECEIVED NYSCEF: 11/10/2014

EXHIBIT A

EXHIBIT 38

## AGREEMENT

**AGREEMENT** entered into as of this 4th day of August, 2014 (the "Effective Date") by and between CF 135 FLAT LLC ("Assignee") a Delaware limited liability company, with an office c/o The Chetrit Group, LLC, 512 Seventh Avenue, 15th Floor, New York, New York 10018 and TRIADOU SPV S.A. ("Assignor"), a Luxembourgish company, with an address c/o Rosabianca & Associates, PLLC, 40 Wall Street, 30th Floor, New York, NY, 10005.

## WITNESSETH

**WHEREAS** the parties did cause to be organized CF 135 WEST MEMBER LLC, a Delaware limited liability company (the "Company");

**WHEREAS**, the parties did enter into an operating agreement of the Company (the "Company LLC Agreement");

**WHEREAS**, the Company owns 75% of the membership interests in 135 West 52nd Street Holder LLC, which is the sole member of 135 West 52nd Street Mezz LLC, which is the sole member of 135 West 52nd Street Owner LLC which is the owner of premises located at 135 West 52nd Street, New York, New York (the "Premises"); and

**WHEREAS**, Assignor wishes to transfer and assign to Assignee, and Assignee wishes to acquire from Assignor, all of the Interests, as hereinafter defined, on the terms herein set forth.

**NOW, THEREFORE**, in consideration of the sum of Ten ($10) Dollars, together with the payments and credit set forth in Section 1 herein, and the covenants, promises and undertakings set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Assignor and Assignee agree as follows:

1.      Assignor agrees to transfer and assign to Assignee, and Assignee agrees to acquire from Assignor, all of the Interests, as hereinafter defined. The Purchase Price for the Interests is the sum of Twenty Eight Million ($28,000,000.00) Dollars (the "Price") and Assignee shall pay the Price as follows:

   (a) The sum of Six Million ($6,000,000.00) Dollars heretofore paid by The Chetrit Group in connection with the "Happy Family" and "Landscape" transactions, to be applied as a credit to the Price as of the Effective Date. The Chetrit Group shall execute all documents, including an acknowledgment of receipt relating to the sum credited as mentioned hereinabove, and shall do any and all acts as shall be reasonably necessary to evidence the aforesaid credit;

   (b) The sum of One Million ($1,000,000.00) Dollars (the "Initial Payment") heretofore paid by Assignee on May 9, 2014;

   (c) The sum of Five Million Two Hundred Fifty Thousand ($5,250,000.00) Dollars on or before ninety (90) days after the Effective Date;

EXHIBIT 38

(d) The sum of Five Million Two Hundred Fifty Thousand ($5,250,000.00) Dollars on or before one hundred fifty (150) days after the Effective Date;

(e) The sum of Five Million Two Hundred Fifty Thousand ($5,250,000.00) Dollars on or before two hundred forty (240) days after the Effective Date;

(f) The sum of Five Million Two Hundred Fifty Thousand ($5,250,000.00) Dollars on or before three hundred thirty (330) days after the Effective Date;

(g) In addition to the Price, after Assignee shall have received a return of all Capital Contributions, as defined in the Company LLC Agreement in full force and effect on the date hereof, heretofore and hereafter made by Assignee in connection with the Premises inclusive of the Price (i.e. the amounts set forth in subparagraphs (a) through (f) above) and a return of Seven (7%) percent per annum on all such amounts computed from the date such amounts were either contributed or made by Assignee or its affiliates until all such sums are returned to Assignee (the "Return on Investment"), then Assignor shall be entitled to receive an amount equal to Twelve (12%) percent of the profit generated from the sale or transfer of ownership of the entire Premises to any unrelated third-party, but in no event less than Four Million ($4,000,000.00) Dollars in the aggregate (the "Profit Participation"). The Assignee hereby represents that it shall not modify the purpose of the Company as set forth in the Company LLC Agreement in full force and effect on the date hereof. Assignee shall pay the Profit Participation to Assignor within six (6) months after the Return on Investment has occurred, whether or not all the units of the Premises are sold. The Return on Investment is deemed to occur as soon as the Company has the available cash to pay the Return on Investment, whether or not the Return on Investment is distributed to the Assignee, after payment of any and all ordinary and necessary expenses of the Company and establishment of necessary reserves. In the event that unnecessary loans are made to the Company by Assignee or other members of the Company, the interests on any such loan shall be paid after the full Profit Participation is paid to Assignor. For the purpose of this Agreement, the sale or transfer of ownership of the Premises shall include, without limitation, the sale of any part of the Premises or all of the direct or indirect membership interests in the fee owner or its sole member or master leases with an unrelated third party.

Assignee shall cause 135 West 52nd Street Holder LLC, 135 West 52nd Street Mezz LLC, and 135 West 52nd Street Owner LLC (all entities collectively referred to as "Assignee and its Affiliates") to keep and maintain, for their respective entity, complete and accurate books, records, reports and accounts, in accordance with sound accounting practices, in which shall be entered all transactions of each respective entity. In connection with its Profit Participation, Assignor shall be entitled to conduct an audit and inspection of the books and records of Assignee and its Affiliates every eighteen (18) months from the Effective Date until payment in full of the Profit Participation by Assignee to Assignor (the "Audit"), by using its accountant or other qualified representative, during regular business hours, upon reasonable prior written notice to Assignee. The last audit shall be ordered three (3) months after Assignee's notice to Assignor of the last sale of units in the Premises. In the event the Audit shows that Assignor's Profit Participation shall be greater than what was represented by Assignee, Assignee shall pay the difference to Assignor forthwith. The fees and expenses relating to the Audit shall be at

2

EXHIBIT 38

Assignor's sole expense, unless the audit report discloses that Assignor has been underpaid in excess of five percent (5%), and/or the audit report discloses that Assignor has not been timely paid within six (6) months after the Return on Investment occurred as defined hereinabove, in which events Assignee and its Affiliates shall reimburse Assignor the reasonable costs of the Audit thereof in addition to any other amount due.

In addition, Assignee shall provide Assignor with a complete report on the progress of the construction and sales of the Premises, every eighteen (18) months from the Effective Date until payment in full of the Profit Participation by Assignee to Assignor, the latest report being due eighteen (18) months after Assignee's notice of the last sale of units in the Premises.

2.    (A)    The closing of the transfer of the Interests (the "Closing") shall occur simultaneously with the execution of this Agreement, at which time all of the following shall take place:

(i)    Assignor shall execute and deliver to Assignee or any designee of Assignee (the party receiving the assignment sometimes referred to herein as "Transferee") an assignment (the "Assignment") in the form attached hereto as Schedule A to effectuate the transfer of the Interests. At Assignee's request, the Assignment shall be delivered in blank and Assignee may insert the name of the assignee of the Interests at a later date.

(ii)    Assignee, the Company and The Chetrit Group, LLC shall execute and deliver to Assignor a Guaranty of Payment for the amounts listed in Section 1 (c) through (g) herein (the "Guaranty"), in the form attached hereto as Schedule B. It is specifically understood and agreed that the Assignment shall be effective as of the Closing and that Assignor's sole recourse in the event Assignee shall fail to pay the Price to Assignor shall be to enforce this Agreement and the Guaranty referred to in this Section 2(ii).

(iii)    Upon execution of this Agreement, the parties shall execute and deliver mutual releases in the forms attached hereto as Schedule C.

(B)    The foregoing documents will be delivered at the Closing.

3.    As used in this Agreement, the term "Interest" or "Interests" shall include all of the Assignor's right, title and interest in and to the Company and the Premises, including, without limitation, all of Assignor's interest as a member in the Company, and all voting rights, Assignor's capital account in the Company, any sums that may be reflected on the Company's books or otherwise as a loan made by Assignor or any Affiliate of Assignor, the right to receive distributions of cash, property or otherwise and the right to participate in and receive profits, losses and/or income from the Company, together with any and all other rights which Assignor ever had or to which Assignor may now or hereafter be entitled as a member of the Company as set forth in the Company LLC Agreement or pursuant to applicable law or otherwise. Notwithstanding the foregoing, Assignor is deemed entitled to its Profit Participation as set forth in Section 1(g) of this Agreement.

3

EXHIBIT 38

4.    Assignor represents covenants and warrants that the following are true as of the date hereof and will be true as of the date of Closing and hereby acknowledges that Assignee is relying upon same in connection with the execution, delivery and performance of this Agreement:

(a)    Assignor is the owner of a fifty (50%) percent Membership Interest as set forth in the Company LLC Agreement and the direct record and beneficial owner of the Interests free and clear of any liens, including any lien which could in any way affect Assignor's ability to convey or Assignee's accepting a sale, transfer, conveyance or assignment of all or any portion of the Interests, and Assignor has the right, power and authority to sell, transfer, convey and assign good, valid and indefeasible title to the Interests, free and clear of any liens.

(b)    There is no order of any court, governmental agency or decision making body that prohibits the Assignor from making the assignment contemplated hereunder. To the best knowledge of Assignor, there does not exist any filed action, suit, claim or proceeding whether in law or in equity or any government investigation against Assignor which could affect all or any portion of the Interests or Assignor's rights therein or which question or challenge the validity of this Agreement or any action taken or to be taken pursuant to this Agreement. Assignor shall execute, deliver and perform this Agreement and consummate the transactions contemplated hereby without the necessity of obtaining any consent, approval or authorization or giving any notice or any other party.

(c)    Assignor has not given to anyone or authorized any (i) lien with respect to the Interests; (ii) securities convertible into or exchangeable for any portion of the Interests; (iii) options, warrants or other rights to purchase or subscribe for all or any portion of the Interests or to receive or participate in any profits or distributions from the Company; (iv) any right to vote, control or otherwise participate in or direct the management or control of the Company; (v) other agreements of any kind with respect to the Interests; (vi) nor has Assignor entered into any agreements or contracts obligating the Company to pay any money to anyone or to bind the Company or affect the Premises or other assets of the Company in any manner not consented to by Assignee;

(d)    Assignor is not insolvent; has not made an assignment for the benefit of creditors; has not filed a voluntary petition in bankruptcy or been adjudged a bankrupt or insolvent nor had entered against it an order for relief in any bankruptcy or insolvency proceeding; has not filed a petition or answer seeking reorganization, arrangement or similar relief under any statute, law or regulation; is not the subject of any involuntary proceeding of like nature; has not sought, consented to or acquiesced in the appointment of a trustee, receiver or liquidator of all or any substantial part of its assets; and no such proceedings are contemplated by Assignor;

4

EXHIBIT 38

(e) Neither the Company nor any of the subsidiaries of the Company are indebted to Assignor;

(f) No consent of or approval or permission by any third party is required as a condition to the entering into this Agreement by Assignor and consummating the transactions contemplated hereby;

(g) Neither the execution and delivery of this Agreement nor the completion of the transactions contemplated thereby will result in any breach or violation of the terms, conditions, or provisions of or conflict with or constitute a default under, or result in the creation of any lien upon any property or assets of Assignor pursuant to the terms of any agreement or document; nor will it violate any provision of law or any applicable order, writ or decree of any court or of any bureau or agency of government;

(h) Assignor is a Luxembourgish company organized and existing and in good standing under the laws of Luxemburg and has full right to enter into this Agreement and to complete the transactions contemplated thereby; and that the party executing this Agreement on behalf of Assignor has full right and authority to do so and no further consent or authority is required from anyone in order to permit the person executing this Agreement on behalf of Assignor to execute and deliver this Agreement and to complete the transactions contemplated thereby;

(i) This Agreement has been duly executed and delivered by Assignor and constitutes the legal, valid and binding obligation of Assignor enforceable in accordance with its terms, except as such enforceability may be limited by (i) bankruptcy, insolvency, reorganization, moratorium or other similar laws now or hereafter in effect relating to or limiting creditor's rights generally, and (ii) general principals of equity.

5. Assignee represents covenants and warrants that the following is true as of the date hereof and will be true as of the date of the Closing and acknowledges that Assignor is relying upon same in connection with the execution, delivery and performance of this Agreement:

(a) No consent of or approval or permission by any third party is required as a condition to the entering into this Agreement by Assignee and consummating the transactions contemplated hereby.

(b) The execution and delivery of this Agreement is the valid and binding obligation of Assignee and is enforceable against it in accordance with its terms.

(c) Neither the execution and delivery of this Agreement nor the completion of the transactions contemplated thereby will result in any breach or violation of the terms, conditions, or provisions of or conflict with or constitute a default under, or result in the creation of any lien upon any property or assets of the Assignee

EXHIBIT 38

pursuant to the terms of any agreement or document; nor will it violate any provision of law or any applicable order, writ or decree of any court or of any bureau or agency of government.

(d)     Assignee is duly organized and a validly existing limited liability company organized under the laws of the State of Delaware, is in good standing under the laws of the State of Delaware and has the full right and authority to execute this Agreement and consummate all of the transactions hereby contemplated.

(e)     There is no order of any court, governmental agency or decision making body that prohibits the Assignee from entering into this Agreement and completing the transactions contemplated hereunder. To the best of knowledge of Assignee, there does not exist any filed action, suit, claim or proceeding whether in law or in equity or any government investigation against Assignee which could affect, question or challenge the validity of this Agreement or any action taken to be taken by either pursuant to this Agreement. Assignee shall execute, deliver and perform this Agreement and consummate the transactions contemplated hereby without the necessity of obtaining any consent, approval or authorization or giving any notice to any other party.

(f)     Assignee is not insolvent; has not made an assignment for the benefit of creditors; has not filed a voluntary petition in bankruptcy or been adjudged a bankrupt or insolvent nor had entered against it an order for relief in any bankruptcy or insolvency proceeding; has not filed a petition or answer seeking reorganization, arrangement or similar relief under any statute, law or regulation; is not the subject of any involuntary proceeding of like nature; has not sought, consented to or acquiesced in the appointment of a trustee, receiver or liquidator of all or any substantial part of its assets; and no such proceedings are contemplated by Assignee.

6.     Except as set forth herein and in any of the documents executed and/or delivered in connection with the Closing, neither the Assignee, nor the Company, nor their respective affiliates or principals have made any representations or warranties with respect to the Company or its assets or the value of the Interests or the value or net worth of the Company and its assets or projected revenues or proceeds or any other matter or thing with respect to the Company or the Premises for the purpose of inducing Assignor to transfer the Interests; and in deciding to enter into this Agreement and to consummate the transactions contemplated hereby, Assignor has not placed any reliance on any statements, representations, opinions or warranties made by any person outside of this Agreement and any of the documents executed and/or delivered in connection with the Closing; and Assignor has conducted to its own satisfaction such due diligence as it has deemed necessary with respect to the value of the Interests, the net worth of the Company, and all matters and things respecting the Company and its assets and the Premises and such other matters as deemed appropriate by Assignor; and Assignor has determined to its full and complete satisfaction that the sale of the Interests by Assignor is in the best interests of Assignor. Assignor further acknowledges that from and after the date hereof, Assignor and its members, its successors and assigns shall be barred, prohibited and estopped from raising,

6

EXHIBIT 38

interposing, alleging or otherwise asserting any claims or taking any actions which are inconsistent with the foregoing statements.

7.     All of the representations, warranties, covenants and agreements contained herein shall survive the Closing for a period of one (1) year.

8.     Assignor shall have the right to sell, transfer, assign, use as a collateral or otherwise dispose of all, or any portion, of its rights under this Agreement, the Assignment and the Guaranty, including the right to receive payment of the amounts listed in Section 1 (b) through (g) herein, with accrued interest thereon if any, without the consent of the Assignee, the Company or The Chetrit Group, LLC (the "Transfer Right"). Assignee, the Company and The Chetrit Group, LLC hereby acknowledge the reasonableness of the Transfer Right. Assignee shall not assign this Agreement or any right or obligation of this Agreement, by operation of law or otherwise, without prior written consent of Assignor (Assignor and Assignee's assigns collectively referred to as "Permitted Assigns").

9.     The Parties hereby waive any objections they may have by alleging that this Agreement does not satisfy the formalities required by the Company LLC Agreement.

10.     This Agreement, along with the Assignment and the Guaranty, (a) shall constitute the entire agreement among the parties pertaining to its subject matter and supersedes any prior agreement or understanding among the parties with respect to its subject matter; (b) may not be amended or supplemented or waived except by a written instrument signed by the parties to be charged; and (c) shall be binding upon and inure to the benefit of the parties and their respective successors and Permitted Assigns.

10.     This Agreement and the rights of the parties hereto shall be governed by, interpreted and enforced in accordance with the internal laws of the State of New York without any regard to principles of conflict of laws. The Parties hereby agree to the exclusive jurisdiction of the State and Federal courts located in the State of New York, County of New York.

11.     The parties shall execute all certificates and other documents and shall do any and all other acts as shall be reasonably necessary to complete the transactions contemplated hereunder and agree that upon the written request of the other party hereto, each shall execute and deliver such further documents and do such further acts and things as the requesting party may reasonably request in order to effectuate the intent and purposes of this Agreement, including, but not limited to delivery by Assignor of resignations of its representatives or designees as officers and directors of the Company and any and all documents and forms necessary to change the signatories on the Company's bank accounts so as to delete Assignor's representatives as signatories to any Company bank account, if applicable.

12.     Each party shall be responsible for its own costs and expenses (including fees and disbursement of counsel) arising in connection with the drafting and execution of this Agreement, the Assignment and Guaranty.

7

EXHIBIT 38

13.    The parties hereto shall have all rights and remedies set forth in this Agreement and all rights and remedies available under the applicable law. The parties hereby acknowledge that money may not be an adequate remedy for any breach of the provisions of this Agreement and that any party may, in its sole discretion, apply to any court of law or equity of competent jurisdiction for specific performance or injunctive relief in order to enforce or prevent any violations of the provisions of this Agreement.

14.    This Agreement may be executed in two or more counterparts each of which shall be deemed an original and all of which when taken together shall constitute one and the same document. The signature of any party to any counterpart shall be deemed a signature to and may be appended to any other counterpart. Facsimile or electronically transmitted signatures shall be acceptable and given the same effect as original signatures.

[The rest of this page was intentionally left blank; signature page to follow.]

8

EXHIBIT 38

IN WITNESS WHEREOF, the parties have executed this instrument as of the day and year first above written.

ASSIGNOR:

TRIADOU SPV S.A.

By: _____
       Authorized Signatory

ASSIGNEE:

CF 135 FLAT LLC
a Delaware Limited Liability Company

By: _____
       Authorized Signatory

Acknowledgments by:

CF 135 WEST MEMBER LLC

By:_____
       Authorized Signatory

The CHETRIT GROUP

By:_____
       Authorized Signatory

9

EXHIBIT 38

STATE OF NEW YORK, COUNTY OF NEW YORK, ss.

On the 4th day of August, 2014, before me, the undersigned notary public, personally appeared Diane Artal, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that she executed the same in her capacity, and that by her signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.

> DAVID C. Van LEEUWEN
> Notary Public, State of New York
> No. 02VA6163263
> Qualified in Bronx County NY County
> Commission Expires March 19, 2014 15

_____
Notary Public
My commission expires on


STATE OF NEW YORK, COUNTY OF NEW YORK, ss.

On the ___th day of August, 2014, before me, the undersigned notary public, personally appeared _____, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his capacity, and that by his signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.

_____
Notary Public
My commission expires on         .

10

EXHIBIT 38

IN WITNESS WHEREOF, the parties have executed this instrument as of the day and year first above written.

ASSIGNOR:

TRIADOU SPV S.A.

By: _____
        Authorized Signatory

ASSIGNEE:

CF 135 FLAT LLC
a Delaware Limited Liability Company

By: _____
        Authorized Signatory

Acknowledgments by:

CF 135 WEST MEMBER LLC
By:_____
       Authorized Signatory

The CHETRIT GROUP
By:_____
       Authorized Signatory

9

EXHIBIT 38

STATE OF NEW YORK, COUNTY OF NEW YORK, ss.

On the ___ th day of August, 2014, before me, the undersigned notary public, personally appeared Diane Artal, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that she executed the same in her capacity, and that by her signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.

_____
Notary Public
My commission expires on

STATE OF NEW YORK, COUNTY OF NEW YORK, ss.

On the 4 th day of August, 2014, before me, the undersigned notary public, personally appeared Meyer Chetrit, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his capacity, and that by his signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.

_____
Notary Public
My commission expires on

LOIS HUTTER SANCHEZ
Notary Public, State of New York
No. 01HU5042516
Qualified in Queens County
Commission Expires April 24, 20.15

10

EXHIBIT 38

**Schedule A**
**Assignment**

11

EXHIBIT 38

## ASSIGNMENT

KNOW THAT TRIADOU SPV S.A., a Luxembourgish company, with an address c/o Rosabianca & Associates, PLLC, 40 Wall Street, 30th floor, New York, NY, 10005 ("Assignor"), in consideration of the sums set forth in Section 1 of a certain Agreement to Assign Membership Interests executed simultaneously with this Assignment by and between the parties hereto, and the sum of Ten ($10.00) Dollars and other good and valuable consideration to it in hand paid by CF 135 FLAT LLC, a Delaware limited liability company, with an address c/o The Chetrit Group, LLC, 512 Seventh Avenue, 15th floor, New York, New York ("Assignee"), the receipt and sufficiency of which are acknowledged, hereby sells, assigns and transfers unto Assignee all of its membership interests (the "Interests") in, to and under CF 135 WEST MEMBER LLC (the "Company"), which Interests represent all of the interests owned by Assignor in and to the Company, all of Assignor's rights contained in the Operating Agreement of the Company, any and all rights and interests of Assignor in and to any assets owned by or to which the Company has or may have any claim and any and all sums that may be reflected on the Company's books or otherwise as a loan made by Assignor or by an affiliate of Assignor to the Company, the rights to receive distributions of cash, property or otherwise as a member of the Company and the right to participate in and to receive profits, losses and/or income from the Company as member of the Company, together with any and all other rights which Assignor ever had or to which Assignor may now or hereafter be entitled as a member of the Company, as set forth in the limited liability company agreement of the Company or pursuant to applicable law or otherwise.

TO HAVE AND TO HOLD same unto the Assignee and to Assignee's heirs, executors, administrators and assigns, absolutely and forever.

Assignor represents, covenants and warrants that the following are true and acknowledges that Assignee is relying upon same: (a) Assignor (i) is the record and beneficial owner of the Interests free and clear of any liens and has the right, power and authority to transfer, good, valid and indefeasible title to the Interests, free and clear of any liens; (ii) Assignor may execute and deliver this Assignment without the necessity of obtaining any consent, approval or authorization or giving any notice; (iii) has not given to anyone or authorized any agreements or rights with respect to the Interests; and (iv) is not insolvent and is not the subject of any proceedings seeking relief from any creditors; and (b) This instrument has been duly executed and delivered by Assignor and constitutes the legal, valid and binding obligation of Assignor enforceable in accordance with its terms.  The party executing this instrument on behalf of Assignor is fully authorized to execute and deliver same to Assignee.

Assignee accepts this Assignment of Interests.

Upon the written request of either party hereto, the other shall execute and deliver such further documents and do such further acts and things as the requesting party may reasonably request in order to effectuate the intent and purposes of this Assignment.

This Assignment may be executed in two or more counterparts each of which shall be deemed an original and all of which when taken together shall constitute one and the same document. The signature of any party to any counterpart shall be deemed a signature to and may

EXHIBIT 38

be appended to any other counterpart. Facsimile or electronically transmitted signatures shall be acceptable and given the same effect as original signatures.

**IN WITNESS WHEREOF**, the parties have executed this Assignment as of the 4th day of August, 2014.

ASSIGNOR:

**TRIADOU SPV S.A.**

By: _____
          Authorized signatory

ASSIGNEE:

**CF 135 FLAT LLC**
a Delaware limited liability company

By: _____
          Authorized signatory

2

EXHIBIT 38

STATE OF NEW YORK, COUNTY OF NEW YORK, ss.

On the ___ th day of August, 2014, before me, the undersigned notary public, personally appeared Diane Artal, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that she executed the same in her capacity, and that by her signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.

_____
Notary Public
My commission expires on

STATE OF NEW YORK, COUNTY OF NEW YORK, ss.

On the 4 th day of August, 2014, before me, the undersigned notary public, personally appeared Meyer Chetrit, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his capacity, and that by his signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.

_____
Notary Public
My commission expires on

LOIS HUTTER SANCHEZ
Notary Public, State of New York
No. 01HU5042516
Qualified In Queens County
Commission Expires April 24, 201_

3

EXHIBIT 38

be appended to any other counterpart. Facsimile or electronically transmitted signatures shall be acceptable and given the same effect as original signatures.

**IN WITNESS WHEREOF**, the parties have executed this Assignment as of the 4th day of August, 2014.

ASSIGNOR:

**TRIADOU SPV S.A.**

By: _____
        Authorized signatory

ASSIGNEE:

**CF 135 FLAT LLC**
a Delaware limited liability company

By: _____
        Authorized signatory

2

EXHIBIT 38

STATE OF NEW YORK, COUNTY OF NEW YORK, ss.

On the 4th day of August, 2014, before me, the undersigned notary public, personally appeared Diane Artal, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that she executed the same in her capacity, and that by her signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.

DAVID C. Van LEEUWEN
Notary Public. State of New York
No. 02VAd163283
Qualified in ~~Bronx County~~ NY County
Commission Expires March 19, 2014 15

_____
Notary Public
My commission expires on


STATE OF NEW YORK, COUNTY OF NEW YORK, ss.

On the ___th day of August, 2014, before me, the undersigned notary public, personally appeared _____, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his capacity, and that by his signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.

_____
Notary Public
My commission expires on

3

EXHIBIT 38

**<u>Schedule B</u>**
**<u>Guaranty</u>**

EXHIBIT 38

**GUARANTY**

made by

**CF 135 FLAT LLC, CF 135 WEST MEMBER LLC
and THE CHETRIT GROUP, LLC,**
collectively as "Guarantor",

in favor of

**TRIADOU SPV S.A.**

Dated as of August 4, 2014

EXHIBIT 38

## GUARANTY

This **GUARANTY** (this "**Guaranty**"), dated as of August 4, 2014, made by **CF 135 FLAT LLC, CF 135 WEST MEMBER LLC** and **THE CHETRIT GROUP, LLC** (collectively, "**Guarantor**"), in favor of **TRIADOU SPV S.A.**, a Luxembourgish company (together with its successors and assigns, "**Assignor**").

R E C I T A L S:

A.    Pursuant to that certain Agreement to Assign Membership Interests dated as of the date hereof (the "**Agreement**") between TRIADOU SPV S.A., a Luxembourgish company ("**Assignor**") and CF 135 FLAT LLC, a Delaware limited liability company ("**Assignee**"), Assignor has agreed to assign its membership interests (the "**Interests**") in CF 135 West Member LLC to Assignee on the terms and conditions set forth in the Agreement;

B.    As a condition to Assignor assigning the Interests to Assignee, Assignor is requiring that Guarantor execute and deliver to Assignor this Guaranty;

**NOW, THEREFORE,** in consideration of the premises set forth herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged by Guarantor, Guarantor hereby agrees, covenants, represents and warrants to Assignor as follows:

1.    **Definitions.**

(a)    All capitalized terms used and not defined herein shall have the respective meanings given to such terms in the Agreement.

(b)    The term "**Guaranteed Obligations**" means individually and collectively as and whenever the same may arise, any and all loss, damage, cost, expense, liability, claim or other obligation incurred by Assignor (including attorney's fees and costs reasonably incurred) relating to payment and collection of the amounts listed in Section 1 (c) through (g) of the Agreement, including the Profit Participation.

2.    **Guaranty.**

(a)    Guarantor hereby irrevocably, absolutely and unconditionally guarantees to Assignor the full, prompt and complete payment when due of the Guaranteed Obligations.

(b)    All sums payable to Assignor under this Guaranty shall be payable on demand and without reduction for any offset, claim, counterclaim or defense.

EXHIBIT 38

(c)    Guarantor hereby agrees to indemnify, defend and save harmless Assignor from and against any and all costs, losses, liabilities, claims, causes of action, expenses and actual damages, excluding any consequential or punitive damages, including reasonable attorneys' fees and disbursements, which Assignor may actually suffer or incur by reason of Guarantor's failure to pay any of the Guaranteed Obligations when due.

(d)    Guarantor's liability hereunder shall be primary, and in any right of action which may accrue to Assignor pursuant to the Agreement or any other documents relating to the Guaranteed Obligations, the Assignor may, at Assignor's option, proceed against the Guarantor without having commenced any action or having obtained any judgment against the Assignee.

(e)    This Guaranty may be enforced by any person or entity who acquires, in any way whatsoever, Assignor's interest in the Guaranteed Obligations or who holds such obligations as collateral.

3.    **Waiver.**  This Guaranty sets forth the entire agreement and understanding of Assignor and Guarantor, and Guarantor absolutely, unconditionally and irrevocably waives any and all right to assert any defense, set-off, counterclaim or cross-claim of any nature whatsoever with respect to this Guaranty or the obligations of any other person or party relating to this Guaranty or the obligations of Guarantor under this Guaranty or otherwise with respect to the Agreement in any action or proceeding brought by Assignor with respect to the Agreement or the obligations of Guarantor under this Guaranty. Guarantor acknowledges that no oral or other agreements, understandings, representations or warranties exist with respect to this Guaranty or with respect to the obligations of Guarantor under this Guaranty except as specifically set forth in this Guaranty. All of Assignor's rights and remedies under the Agreement or under this Guaranty are intended to be distinct, separate and cumulative and no such right or remedy therein or herein mentioned is intended to be in exclusion of or a waiver of any of the others.

4.    **Events and Circumstances Not Reducing or Discharging Guarantor's Obligations.**  Guarantor hereby consents and agrees to each of the following and agrees that Guarantor's obligations under this Guaranty shall not be released, diminished, impaired, reduced or adversely affected in any way by any of the following, although without notice to or the further consent of Guarantor, and waives any common law, equitable, statutory or other rights (including rights to notice) or defenses that Guarantor might otherwise have as a result of or in connection with any of the following:

(a)    **Release of Obligors.**  Any compromise or full or partial release of the liability of Assignee or any other Person now or hereafter liable, whether directly or indirectly, jointly, severally, or jointly and severally, to pay the Guaranteed Obligations.

2

EXHIBIT 38

5.    **Representations and Warranties.**   Guarantor hereby represents and warrants to Assignor as follows (which representations and warranties shall be given as of the date hereof and shall survive the execution and delivery of this Guaranty):

(a)    **Execution.**   This Guaranty has been duly executed and delivered by Guarantor.

(b)    **Enforceability.**   This Guaranty constitutes a legal, valid and binding obligation of Guarantor, enforceable against Guarantor in accordance with its terms, except as enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or similar laws affecting the enforcement of creditors' rights generally.

(c)    **No Violation.**   The execution, delivery and performance by Guarantor of its obligations under this Guaranty does not and will not violate any law, regulation, order, writ, injunction or decree of any court or governmental body, agency or other instrumentality applicable to Guarantor, or result in a breach of any of the terms, conditions or provisions of, or constitute a default under, or result in the creation or imposition of, any mortgage, lien, charge or encumbrance of any nature whatsoever upon any of the assets of Guarantor pursuant to the terms of any mortgage, indenture, agreement or instrument to which Guarantor is a party or by which it or any of its properties is bound.

(d)    **No Litigation.**   There are no actions, suits or proceedings at law or in equity, pending or, to Guarantor's knowledge, threatened against or affecting Guarantor or which involve or might involve the validity or enforceability of this Guaranty or which might materially adversely affect the financial condition of Guarantor or the ability of Guarantor to perform any of its obligations under this Guaranty. Guarantor is not in default beyond any applicable grace or cure period with respect to any order, writ, injunction, decree or demand of any Governmental Authority which might materially adversely affect the financial condition of Guarantor or the ability of Guarantor to perform any of its obligations under this Guaranty.

6.    **Entire Agreement/Amendments.**   This instrument represents the entire agreement between the parties with respect to the subject matter hereof. The terms of this Guaranty shall not be waived, altered, modified, amended, supplemented or terminated in any manner whatsoever except by written instrument signed by Assignor and Guarantor.

7.    **Successors and Assigns.**   This Guaranty shall be binding upon Guarantor and its successors and assigns (including, without limitation, Guarantor's estate, executors, administrators, legal representatives, nominees, heirs and beneficiaries) and shall inure to the benefit of Assignor and its successors and assigns.

8.    **Applicable Law and Consent to Jurisdiction.**   This Guaranty shall be governed by, and construed and enforced in accordance with, the substantive laws of the State of New York pursuant to §5-1401 of the New York General Obligations Law.   Guarantor

3

EXHIBIT 38

irrevocably (a) agrees that any suit, action or other legal proceeding arising out of or relating to this Guaranty may be brought in a court of record in the City and County of New York or in the Courts of the United States of America located in the Southern District of New York, (b) consents to the non-exclusive jurisdiction of each such court in any such suit, action or proceeding and (c) waives any objection which it may have to the laying of venue of any such suit, action or proceeding in any of such courts and any claim that any such suit, action or proceeding has been brought in an inconvenient forum. Guarantor irrevocably consents to the service of any and all process in any such suit, action or proceeding by service of copies of such process to Guarantor at its address at 512 Seventh Avenue, 15th floor, New York, New York, 10018. Nothing in this Section 8, however, shall affect the right of Assignor to serve legal process in any other manner permitted by law.

9.    **Section Headings.** The headings of the sections and paragraphs of this Guaranty have been inserted for convenience of reference only and shall in no way define, modify, limit or amplify any of the terms or provisions hereof.

10.    **Severability.** Any provision of this Guaranty which may be determined by any competent authority to be prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction. To the extent permitted by applicable law, Guarantor hereby waives any provision of law which renders any provision hereof prohibited or unenforceable in any respect.

11.    **WAIVER OF TRIAL BY JURY.** GUARANTOR AND ASSIGNOR HEREBY WAIVE THE RIGHT OF TRIAL BY JURY IN ANY LITIGATION, ACTION OR PROCEEDING ARISING HEREUNDER OR IN CONNECTION HEREWITH.   THIS WAIVER OF RIGHT TO TRIAL BY JURY IS GIVEN KNOWINGLY AND VOLUNTARILY BY GUARANTOR AND ASSIGNOR, AND IS INTENDED TO ENCOMPASS EACH INSTANCE AND EACH ISSUE AS TO WHICH THE RIGHT TO A TRIAL BY JURY WOULD OTHERWISE ACCRUE. ASSIGNOR AND GUARANTOR ARE EACH HEREBY AUTHORIZED TO FILE A COPY OF THIS PARAGRAPH IN ANY PROCEEDING AS CONCLUSIVE EVIDENCE OF THIS WAIVER OF TRIAL BY JURY BY GUARANTOR AND ASSIGNOR.

12.    **Joint and Several Obligations.** If Guarantor consists of more than one Person, each such Person shall have joint and several liability for the obligations of Guarantor hereunder.

4

EXHIBIT 38

13.  **Further Assurances.**  Guarantor shall execute and acknowledge (or cause to be executed and acknowledged) and deliver to Assignor all documents, and take all actions, reasonably required by Assignor from time to time to confirm the rights created or now, or hereafter, intended to be created under this Guaranty, to protect and further the validity and enforceability of this Guaranty or otherwise carry out the purposes of this Guaranty.

14.  **Counterparts.**  This Agreement may be executed in any number of counterparts, each of which when so executed and delivered shall be an original, but all of which shall together constitute one and the same instrument.  Facsimile and pdf signatures shall be deemed originals for all purposes.

[NO FURTHER TEXT ON THIS PAGE]

5

EXHIBIT 38

IN WITNESS WHEREOF, Guarantor has executed this Guaranty as of the date first above written.

CF 135 FLAT LLC

By: _____
Authorized Signatory


CF 135 WEST MEMBER LLC

By: _____
Authorized Signatory


THE CHETRIT GROUP, LLC

By: _____
Authorized Signatory

EXHIBIT 38

STATE OF NEW YORK, COUNTY OF NEW YORK, ss.

On the 4 th day of August, 2014, before me, the undersigned notary public, personally appeared Meyer Chetrit , personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his capacity, and that by his signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.

Notary Public
My commission expires on

LOIS HUTTER SANCHEZ
Notary Public, State of New York
No. 01HU5042516
Qualified in Queens County
Commission Expires April 24, 20_15

EXHIBIT 38

## Schedule C
## Mutual Releases

13

EXHIBIT 38

## RELEASE

**KNOW THAT TRIADOU SPV S.A.**, a Luxembourgish company, having an address c/o Rosabianca & Associates, PLLC, 40 Wall Street, 30th floor, New York, NY, 10005, as Releasor, in consideration of the sum of Ten ($10) Dollars and other good and valuable consideration received from CF 135 FLAT LLC, a Delaware limited liability company, with an address c/o The Chetrit Group, LLC, 512 Seventh Avenue, 15th floor, New York, New York, the receipt and sufficiency of which is acknowledged, hereby releases and discharges CF 135 Flat LLC, CF 135 West Member LLC, The Chetrit Group, LLC, 135 West 52nd Street Holder LLC, 135 West 52nd Street Mezz LLC and 135 West 52nd Street Owner LLC (collectively, "Releasee") and Releasee's members, officers, directors, heirs, executors, administrators, successors and assigns from all actions, causes of action, suits, debts, sums of money, accounts, executions, claims and demands whatsoever, in law, admiralty or equity, which against the Releasee, the Releasor or Releasor's members, officers, directors heirs, executors, administrators, successors and assigns ever had, now have or hereafter can, shall or may have for, upon or by reason of any matter cause or thing whatsoever relating to or arising out of its assigned membership interests in CF 135 WEST MEMBER LLC (the "Company"), and any of its past interests in the properties owned by the Company and its subsidiaries, from the beginning of the world to the day on which this release is delivered to Releasee; excepting from this release the covenants, representations and agreements contained in a certain Agreement to Assign, dated as of August 4, 2014, executed between Releasor and CF 135 Flat LLC with respect to the assignment of Releasor's interests in the Company.

This Release shall not be changed orally.

Simultaneously with the execution of this Release, the Releasee shall execute a release in favor of the Releasor, which shall contain the same terms and conditions as herein.

This instrument may be executed in counterparts which taken together shall constitute one instrument. Facsimile and electronically transmitted signatures shall be deemed originals for the purposes of this instrument.

**IN WITNESS WHEREOF**, the Releasor has executed this Release as of this 4th day of August, 2014.

TRIADOU SPV S.A.

By: _____
         Authorized Signatory

1

EXHIBIT 38

STATE OF NEW YORK, COUNTY OF NEW YORK, ss.

On the 4th day of August, 2014, before me, the undersigned notary public, personally appeared Diane Artal, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that she executed the same in her capacity, and that by her signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.

DAVID C. Van LEEUWEN
Notary Public, State of New York
No. 02VA6163283
Qualified in Bronx County, NY County
Commission Expires March 19, 2017 15

Notary Public
My commission expires on

2

EXHIBIT 38

## RELEASE

**KNOW THAT** (i) CF 135 Flat LLC, a Delaware limited liability company, (ii) CF 135 West Member LLC, a Delaware limited liability company, (iii) 135 West 52nd Street Holder LLC, a Delaware limited liability company, (iv) 135 West 52nd Street Mezz LLC, a Delaware limited liability company, (v) 135 West 52nd Street Owner LLC, a Delaware limited liability company, and (vi) The Chetrit Group, LLC, a domestic limited liability company, all having an address c/o The Chetrit Group, LLC, 512 Seventh Avenue, 15th floor, New York, New York (collectively, "Releasor"), in consideration of the sum of Ten ($10) Dollars and other good and valuable consideration received from TRIADOU SPV S.A., a Luxembourgish company, having an address c/o Rosabianca & Associates, PLLC, 40 Wall Street, 30th floor, New York, NY, 10005 ("Releasee"), the receipt and sufficiency of which is acknowledged, hereby releases and discharges Releasee and Releasee's members, officers, directors, heirs, executors, administrators, successors and assigns from all actions, causes of action, suits, debts, sums of money, accounts, executions, claims and demands whatsoever, in law, admiralty or equity, which against the Releasee, the Releasor or Releasor's members, officers, directors heirs, executors, administrators, successors and assigns ever had, now have or hereafter can, shall or may have for, upon or by reason of any matter cause or thing whatsoever relating to or arising out of its assigned membership interests in CF 135 WEST MEMBER LLC (the "Company"), and any of its past interests in the properties owned by the Company and its subsidiaries, from the beginning of the world to the day on which this release is delivered to Releasee; excepting from this release the covenants, representations and agreements contained in a certain Agreement to Assign, dated as of August 4, 2014, executed between Releasor and Releasee with respect to the assignment of Releasee's interests in the Company.

This Release shall not be changed orally.

Simultaneously with the execution of this Release, the Releasee shall execute a release in favor of the Releasor, which shall contain the same terms and conditions as herein.

This instrument may be executed in counterparts which taken together shall constitute one instrument. Facsimile and electronically transmitted signatures shall be deemed originals for the purposes of this instrument.

**IN WITNESS WHEREOF**, the Releasor has executed this Release as of this 4th day of August, 2014.

CF 135 Flat LLC

By: _____
   Authorized Signatory

3

EXHIBIT 38

CF 135 West Member LLC

By: _____
      Authorized Signatory

135 West 52nd Street Holder LLC

By: _____
      Authorized Signatory

135 West 52nd Street Mezz LLC

By: _____
      Authorized Signatory

135 West 52nd Street Owner LLC

By: _____
      Authorized Signatory

The Chetrit Group, LLC

By: _____
      Authorized Signatory

4

EXHIBIT 38

STATE OF NEW YORK, COUNTY OF NEW YORK, ss.

On the 4 th day of August, 2014, before me, the undersigned notary public, personally appeared Meyer Untuik, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his capacity, and that by his signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.

Notary Public
My commission expires on

LOIS HUTTER SANCHEZ
Notary Public, State of New York
No. 01HU5042516
Qualified in Queens County
Commission Expires April 24, 20.15

STATE OF NEW YORK, COUNTY OF NEW YORK, ss.

On the __ th day of August, 2014, before me, the undersigned notary public, personally appeared _____, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his capacity, and that by his signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.

Notary Public
My commission expires on

5

EXHIBIT 38

## ASSIGNMENT

KNOW THAT TRIADOU SPV S.A., a Luxembourgish company, with an address c/o Rosabianca & Associates, PLLC, 40 Wall Street, 30th floor, New York, NY, 10005 ("Assignor"), in consideration of the sums set forth in Section 1 of a certain Agreement to Assign Membership Interests executed simultaneously with this Assignment by and between the parties hereto, and the sum of Ten ($10.00) Dollars and other good and valuable consideration to it in hand paid by CF 135 FLAT LLC, a Delaware limited liability company, with an address c/o The Chetrit Group, LLC, 512 Seventh Avenue, 15th floor, New York, New York ("Assignee"), the receipt and sufficiency of which are acknowledged, hereby sells, assigns and transfers unto Assignee all of its membership interests (the "Interests") in, to and under CF 135 WEST MEMBER LLC (the "Company"), which Interests represent all of the interests owned by Assignor in and to the Company, all of Assignor's rights contained in the Operating Agreement of the Company, any and all rights and interests of Assignor in and to any assets owned by or to which the Company has or may have any claim and any and all sums that may be reflected on the Company's books or otherwise as a loan made by Assignor or by an affiliate of Assignor to the Company, the rights to receive distributions of cash, property or otherwise as a member of the Company and the right to participate in and to receive profits, losses and/or income from the Company as member of the Company, together with any and all other rights which Assignor ever had or to which Assignor may now or hereafter be entitled as a member of the Company, as set forth in the limited liability company agreement of the Company or pursuant to applicable law or otherwise.

TO HAVE AND TO HOLD same unto the Assignee and to Assignee's heirs, executors, administrators and assigns, absolutely and forever.

Assignor represents, covenants and warrants that the following are true and acknowledges that Assignee is relying upon same: (a) Assignor (i) is the record and beneficial owner of the Interests free and clear of any liens and has the right, power and authority to transfer, good, valid and indefeasible title to the Interests, free and clear of any liens; (ii) Assignor may execute and deliver this Assignment without the necessity of obtaining any consent, approval or authorization or giving any notice; (iii) has not given to anyone or authorized any agreements or rights with respect to the Interests; and (iv) is not insolvent and is not the subject of any proceedings seeking relief from any creditors; and (b) This instrument has been duly executed and delivered by Assignor and constitutes the legal, valid and binding obligation of Assignor enforceable in accordance with its terms. The party executing this instrument on behalf of Assignor is fully authorized to execute and deliver same to Assignee.

Assignee accepts this Assignment of Interests.

Upon the written request of either party hereto, the other shall execute and deliver such further documents and do such further acts and things as the requesting party may reasonably request in order to effectuate the intent and purposes of this Assignment.

This Assignment may be executed in two or more counterparts each of which shall be deemed an original and all of which when taken together shall constitute one and the same document. The signature of any party to any counterpart shall be deemed a signature to and may

1

EXHIBIT 38

be appended to any other counterpart.  Facsimile or electronically transmitted signatures shall be acceptable and given the same effect as original signatures.

**IN WITNESS WHEREOF**, the parties have executed this Assignment as of the 4th day of August, 2014.

ASSIGNOR:

**TRIADOU SPV S.A.**

By: _____
        Authorized signatory

ASSIGNEE:

**CF 135 FLAT LLC**
a Delaware limited liability company

By: _____
        Authorized signatory

2

EXHIBIT 38

STATE OF NEW YORK, COUNTY OF NEW YORK, ss.

On the __th day of August, 2014, before me, the undersigned notary public, personally appeared Diane Artal, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that she executed the same in her capacity, and that by her signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.

                                    _____
                                            Notary Public
                                    My commission expires on


STATE OF NEW YORK, COUNTY OF NEW YORK, ss.

On the 4th day of August, 2014, before me, the undersigned notary public, personally appeared Meyer Chetrit , personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his capacity, and that by his signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.

                                    _____
                                            Notary Public
                                    My commission expires on        LOIS HUTTER SANCHEZ
                                                                    Notary Public, State of New York
                                                                          No. 01HU5042516
                                                                     Qualified In Queens County
                                                                  Commission Expires April 24, 201_

3

EXHIBIT 38

be appended to any other counterpart.  Facsimile or electronically transmitted signatures shall be acceptable and given the same effect as original signatures.

**IN WITNESS WHEREOF,** the parties have executed this Assignment as of the 4th day of August, 2014.

ASSIGNOR:

**TRIADOU SPV S.A.**

By: _____
      Authorized signatory

ASSIGNEE:

**CF 135 FLAT LLC**
a Delaware limited liability company

By: _____
      Authorized signatory

2

EXHIBIT 38

STATE OF NEW YORK, COUNTY OF NEW YORK, ss.

       On the ⊥ th day of August, 2014, before me, the undersigned notary public, personally appeared Diane Artal, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that she executed the same in her capacity, and that by her signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.

DAViD C. Van LEEUWEN
Notary Public, State of New York
No. 02VA6168283
Qualified in Bronx County NY County
Commission Expires March 19, 2014 15

_____
Notary Public
My commission expires on


STATE OF NEW YORK, COUNTY OF NEW YORK, ss.

       On the ___ th day of August, 2014, before me, the undersigned notary public, personally appeared _____, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his capacity, and that by his signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.

_____
Notary Public
My commission expires on

3

EXHIBIT 38

FILED: NEW YORK COUNTY CLERK 11/10/2014 12:56 PM

INDEX NO. 653462/2014

NYSCEF DOC. NO. 6

RECEIVED NYSCEF: 11/10/2014

EXHIBIT B

EXHIBIT 38

# GUARANTY

made by

## CF 135 FLAT LLC, CF 135 WEST MEMBER LLC and THE CHETRIT GROUP, LLC,
collectively as "Guarantor",

in favor of

## TRIADOU SPV S.A.

Dated as of August 4, 2014

EXHIBIT 38

## GUARANTY

This **GUARANTY** (this "**Guaranty**"), dated as of August 4, 2014, made by **CF 135 FLAT LLC, CF 135 WEST MEMBER LLC** and **THE CHETRIT GROUP, LLC** (collectively, "**Guarantor**"), in favor of **TRIADOU SPV S.A.**, a Luxembourgish company (together with its successors and assigns, "**Assignor**").

R E C I T A L S:

A.     Pursuant to that certain Agreement to Assign Membership Interests dated as of the date hereof (the "**Agreement**") between TRIADOU SPV S.A., a Luxembourgish company ("**Assignor**") and CF 135 FLAT LLC, a Delaware limited liability company ("**Assignee**"), Assignor has agreed to assign its membership interests (the "**Interests**") in CF 135 West Member LLC to Assignee on the terms and conditions set forth in the Agreement;

B.     As a condition to Assignor assigning the Interests to Assignee, Assignor is requiring that Guarantor execute and deliver to Assignor this Guaranty;

**NOW, THEREFORE,** in consideration of the premises set forth herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged by Guarantor, Guarantor hereby agrees, covenants, represents and warrants to Assignor as follows:

1.     **Definitions.**

(a)     All capitalized terms used and not defined herein shall have the respective meanings given to such terms in the Agreement.

(b)     The term "**Guaranteed Obligations**" means individually and collectively as and whenever the same may arise, any and all loss, damage, cost, expense, liability, claim or other obligation incurred by Assignor (including attorney's fees and costs reasonably incurred) relating to payment and collection of the amounts listed in Section 1 (c) through (g) of the Agreement, including the Profit Participation.

2.     **Guaranty.**

(a)     Guarantor hereby irrevocably, absolutely and unconditionally guarantees to Assignor the full, prompt and complete payment when due of the Guaranteed Obligations.

(b)     All sums payable to Assignor under this Guaranty shall be payable on demand and without reduction for any offset, claim, counterclaim or defense.

EXHIBIT 38

(c)     Guarantor hereby agrees to indemnify, defend and save harmless Assignor from and against any and all costs, losses, liabilities, claims, causes of action, expenses and actual damages, excluding any consequential or punitive damages, including reasonable attorneys' fees and disbursements, which Assignor may actually suffer or incur by reason of Guarantor's failure to pay any of the Guaranteed Obligations when due.

(d)     Guarantor's liability hereunder shall be primary, and in any right of action which may accrue to Assignor pursuant to the Agreement or any other documents relating to the Guaranteed Obligations, the Assignor may, at Assignor's option, proceed against the Guarantor without having commenced any action or having obtained any judgment against the Assignee.

(e)     This Guaranty may be enforced by any person or entity who acquires, in any way whatsoever, Assignor's interest in the Guaranteed Obligations or who holds such obligations as collateral.

3.     **Waiver.**   This Guaranty sets forth the entire agreement and understanding of Assignor and Guarantor, and Guarantor absolutely, unconditionally and irrevocably waives any and all right to assert any defense, set-off, counterclaim or cross-claim of any nature whatsoever with respect to this Guaranty or the obligations of any other person or party relating to this Guaranty or the obligations of Guarantor under this Guaranty or otherwise with respect to the Agreement in any action or proceeding brought by Assignor with respect to the Agreement or the obligations of Guarantor under this Guaranty. Guarantor acknowledges that no oral or other agreements, understandings, representations or warranties exist with respect to this Guaranty or with respect to the obligations of Guarantor under this Guaranty except ,as specifically set forth in this Guaranty. All of Assignor's rights and remedies under the Agreement or under this Guaranty are intended to be distinct, separate and cumulative and no such right or remedy therein or herein mentioned is intended to be in exclusion of or a waiver of any of the others.

4.     **Events and Circumstances Not Reducing or Discharging Guarantor's Obligations.**   Guarantor hereby consents and agrees to each of the following and agrees that Guarantor's obligations under this Guaranty shall not be released, diminished, impaired, reduced or adversely affected in any way by any of the following, although without notice to or the further consent of Guarantor, and waives any common law, equitable, statutory or other rights (including rights to notice) or defenses that Guarantor might otherwise have as a result of or in connection with any of the following:

(a)     **Release of Obligors.**   Any compromise or full or partial release of the liability of Assignee or any other Person now or hereafter liable, whether directly or indirectly, jointly, severally, or jointly and severally, to pay the Guaranteed Obligations.

2

EXHIBIT 38

5.   **Representations and Warranties.**   Guarantor hereby represents and warrants to Assignor as follows (which representations and warranties shall be given as of the date hereof and shall survive the execution and delivery of this Guaranty):

(a)   **Execution.**   This Guaranty has been duly executed and delivered by Guarantor.

(b)   **Enforceability.**   This Guaranty constitutes a legal, valid and binding obligation of Guarantor, enforceable against Guarantor in accordance with its terms, except as enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or similar laws affecting the enforcement of creditors' rights generally.

(c)   **No Violation.**   The execution, delivery and performance by Guarantor of its obligations under this Guaranty does not and will not violate any law, regulation, order, writ, injunction or decree of any court or governmental body, agency or other instrumentality applicable to Guarantor, or result in a breach of any of the terms, conditions or provisions of, or constitute a default under, or result in the creation or imposition of, any mortgage, lien, charge or encumbrance of any nature whatsoever upon any of the assets of Guarantor pursuant to the terms of any mortgage, indenture, agreement or instrument to which Guarantor is a party or by which it or any of its properties is bound.

(d)   **No Litigation.**   There are no actions, suits or proceedings at law or in equity, pending or, to Guarantor's knowledge, threatened against or affecting Guarantor or which involve or might involve the validity or enforceability of this Guaranty or which might materially adversely affect the financial condition of Guarantor or the ability of Guarantor to perform any of its obligations under this Guaranty.   Guarantor is not in default beyond any applicable grace or cure period with respect to any order, writ, injunction, decree or demand of any Governmental Authority which might materially adversely affect the financial condition of Guarantor or the ability of Guarantor to perform any of its obligations under this Guaranty.

6.   **Entire Agreement/Amendments.**   This instrument represents the entire agreement between the parties with respect to the subject matter hereof.   The terms of this Guaranty shall not be waived, altered, modified, amended, supplemented or terminated in any manner whatsoever except by written instrument signed by Assignor and Guarantor.

7.   **Successors and Assigns.**   This Guaranty shall be binding upon Guarantor and its successors and assigns (including, without limitation, Guarantor's estate, executors, administrators, legal representatives, nominees, heirs and beneficiaries) and shall inure to the benefit of Assignor and its successors and assigns.

8.   **Applicable Law and Consent to Jurisdiction.**   This Guaranty shall be governed by, and construed and enforced in accordance with, the substantive laws of the State of New York pursuant to §5-1401 of the New York General Obligations Law.   Guarantor

3

EXHIBIT 38

irrevocably (a) agrees that any suit, action or other legal proceeding arising out of or relating to this Guaranty may be brought in a court of record in the City and County of New York or in the Courts of the United States of America located in the Southern District of New York, (b) consents to the non-exclusive jurisdiction of each such court in any such suit, action or proceeding and (c) waives any objection which it may have to the laying of venue of any such suit, action or proceeding in any of such courts and any claim that any such suit, action or proceeding has been brought in an inconvenient forum. Guarantor irrevocably consents to the service of any and all process in any such suit, action or proceeding by service of copies of such process to Guarantor at its address at 512 Seventh Avenue, 15th floor, New York, New York, 10018. Nothing in this Section 8, however, shall affect the right of Assignor to serve legal process in any other manner permitted by law.

9.    **Section Headings.** The headings of the sections and paragraphs of this Guaranty have been inserted for convenience of reference only and shall in no way define, modify, limit or amplify any of the terms or provisions hereof.

10.    **Severability.** Any provision of this Guaranty which may be determined by any competent authority to be prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction. To the extent permitted by applicable law, Guarantor hereby waives any provision of law which renders any provision hereof prohibited or unenforceable in any respect.

11.    **WAIVER OF TRIAL BY JURY.** GUARANTOR AND ASSIGNOR HEREBY WAIVE THE RIGHT OF TRIAL BY JURY IN ANY LITIGATION, ACTION OR PROCEEDING ARISING HEREUNDER OR IN CONNECTION HEREWITH. THIS WAIVER OF RIGHT TO TRIAL BY JURY IS GIVEN KNOWINGLY AND VOLUNTARILY BY GUARANTOR AND ASSIGNOR, AND IS INTENDED TO ENCOMPASS EACH INSTANCE AND EACH ISSUE AS TO WHICH THE RIGHT TO A TRIAL BY JURY WOULD OTHERWISE ACCRUE. ASSIGNOR AND GUARANTOR ARE EACH HEREBY AUTHORIZED TO FILE A COPY OF THIS PARAGRAPH IN ANY PROCEEDING AS CONCLUSIVE EVIDENCE OF THIS WAIVER OF TRIAL BY JURY BY GUARANTOR AND ASSIGNOR.

12.    **Joint and Several Obligations.** If Guarantor consists of more than one Person, each such Person shall have joint and several liability for the obligations of Guarantor hereunder.

EXHIBIT 38

13.     **Further Assurances.**  Guarantor shall execute and acknowledge (or cause to be executed and acknowledged) and deliver to Assignor all documents, and take all actions, reasonably required by Assignor from time to time to confirm the rights created or now, or hereafter, intended to be created under this Guaranty, to protect and further the validity and enforceability of this Guaranty or otherwise carry out the purposes of this Guaranty.

14.     **Counterparts.**  This Agreement may be executed in any number of counterparts, each of which when so executed and delivered shall be an original, but all of which shall together constitute one and the same instrument.  Facsimile and pdf signatures shall be deemed originals for all purposes.

[NO FURTHER TEXT ON THIS PAGE]

5

EXHIBIT 38

**IN WITNESS WHEREOF,** Guarantor has executed this Guaranty as of the date first above written.

CF 135 FLAT LLC

By: _____
          Authorized Signatory


CF 135 WEST MEMBER LLC

By: _____
          Authorized Signatory


THE CHETRIT GROUP, LLC

By: _____
          Authorized Signatory

EXHIBIT 38

STATE OF NEW YORK, COUNTY OF NEW YORK, ss.

On the 4 th day of August, 2014, before me, the undersigned notary public, personally appeared Meyer Chetrit, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his capacity, and that by his signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.

_____
Notary Public

My commission expires on

LOIS HUTTER SANCHEZ
Notary Public, State of New York
No. 01HU5042516
Qualified in Queens County
Commission Expires April 24, 20 15

EXHIBIT 38

FILED: NEW YORK COUNTY CLERK 11/10/2014 12:56 PM

NYSCEF DOC. NO. 7

INDEX NO. 653462/2014

RECEIVED NYSCEF: 11/10/2014

EXHIBIT C

EXHIBIT 38

TRIADOU SPV S.A.

October 31st 2014

Via email (jgraff@ssglaw.com)

Josh Graff
Sukenik, Segal & Graff, P.C.
404 Fifth Avenue, Fifth Floor
New York, N.Y. 10018-2204

Dear Mr. Graff,

I am writing to you in your capacity as the counsel for CF 135 Flat LLC. Effective today, I have been appointed as the sole director of Triadou SPV SA ("Triadou"). You will find a copy of the duly signed resolution with my appointment attached with this correspondence.

As you are aware, on 4th August 2014 Triadou as Assignor entered into an Assignment Agreement with CF 135 Flat LLC as Assignee. Pursuant to Article 1(c) of the Agreement, the Assignee is due to pay to the Assignor an amount of USD 5'250'000 within 90 days following 4th August 2014. Given that such a date falls on 2nd November 2014, which is a Sunday, we expect that the payment shall be made by CF 135 Flat LLC on 31st October 2014.

In my capacity as sole director of Triadou SPV SA, I would like to formally request and instruct that the payment due on or before 2nd November 2014 is made to the bank account of SDG Capital SA, which is the sole shareholder of Triadou SPV SA. The account details are as follows:

**Beneficiary's Bank:** Bank Vontobel AG, St Alban-Anlage 58, 4052 Basel

**Beneficiary Name:** Compagnie Privée de Conseils et d'Investissements SA

**Payment Reference:** REF. 0300740, SDG CAPITAL SA

**Reason for payment:** "Loan on behalf of TRIADOU SPV SA"

**SWIFT:** VONTCHZZ

**IBAN:** CH93 0875 7000 0122 7336 2

**Clearing:** 8757

Respectfully,

Cesare Cerrito
Director, Triadou SPV SA

15, rue du Fort Bourbon
1249 Luxembourg

EXHIBIT 38

FILED: NEW YORK COUNTY CLERK 11/10/2014 12:56 PM

NYSCEF DOC. NO. 8

INDEX NO. 653462/2014

RECEIVED NYSCEF: 11/10/2014

EXHIBIT D

EXHIBIT 38

**ROSABIANCA**
**& ASSOCIATES, PLLC**
Attorneys and Counselors At Law

**NOTICE OF DEFAULT**

November 4, 2014

**VIA EMAIL and FEDEX**

Josh Graff, Esq.
Sukenik Segal & Graff, P.C.
404 5th Avenue, 5th Floor
New York, NY 10018
jgraff@ssglaw.com

Meyer Chetrit
Manager
CF 135 Flat LLC
c/o The Chetrit Group, LLC
512 Seventh Avenue, 15th Floor
New York, NY 10018

Meyer Chetrit
Manager
CF 135 West Member LLC
c/o The Chetrit Group, LLC
512 Seventh Avenue, 15th Floor
New York, NY 10018

Meyer Chetrit
Manager
The Chetrit Group, LLC
512 Seventh Avenue, 15th Floor
New York, NY 10018

**Re:    Notice of Default and Demand To Cure**
          **Agreement to Assign and Guaranty dated August 4, 2014**

Dear Mr. Graff and Mr. Chetrit:

As you are aware, the law firm of the undersigned represents Triadou SPV S.A. in connection with the matter above referenced.

According to Article 1(c) of the Agreement to Assign executed by and between CF 135 Flat LLC and Triadou SPV S.A. on August 4, 2014 (the "Agreement"), the sum of Five Million Two Hundred Fifty Thousand ($5,250,000.00) Dollars was due to be paid by CF 135 Flat LLC to Triadou SPV S.A. on or before November 2, 2014. A copy of the Agreement is

40 Wall Street, 30th Floor
New York, New York 10005
T  212.269.7722
F  212.269.7799

EXHIBIT 38

attached hereto for your reference.  Despite the fact that Triadou SPV S.A. served a Notice
to Comply upon Mr. Josh Graff on October 31, 2014, no payment has been made to date.

Pursuant to the Guaranty made by CF 135 Flat LLC, CF 135 West Member LLC and
The Chetrit Group, LLC (collectively, the "Guarantors") on August 4, 2014, the Guarantors
guaranteed complete payment of all installment payments due under the Agreement. As you
are aware, the Guarantors' liability is primary and Triadou SPV S.A. does not need to
commence an action against CF 135 Flat LLC prior to proceeding directly against the
Guarantors.  A copy of the Guaranty is also attached hereto for your reference.

Therefore, the undersigned hereby demands that payment from the Guarantors of
the amount of Five Million Two Hundred Fifty Thousand ($5,250,000.00) Dollars be sent no
later than 5:00 pm on November 5, 2014 by wire transfer to the following bank account:

**SDG CAPITAL S.A.:**

| | |
|---|---|
| Beneficiary's Name: | Compagnie Privée de Conseils et d'Investissements SA |
| Beneficiary Reference: | REF. 0300740, SDG CAPITAL SA |
| Beneficiary's Bank: | Bank Vontobel AG, St. Alban-Anlage 58, 4052 Basel |
| SWIFT: | VONTCHZZ |
| Clearing: | 8757 |
| IBAN USD: | CH93 0875 7000 0122 7336 2 |

In the event that the Guarantors fail to do so, the undersigned will be left with no
choice but to commence immediate litigation against all Guarantors to recover the monies
due, including all court costs, statutory interests and attorneys' fees.

This letter shall not be construed as a waiver of Triadou SPV S.A.'s legal rights or
remedies, all of which are hereby expressly reserved.

Your prompt response to this matter is urged.  Please be guided accordingly.

Sincerely,

ROSABIANCA & ASSOCIATES, PLLC

By:     _____
        Diane Artal, Esq.
        David Van Leeuwen, Esq.

Cc:     Joseph Chetrit (jochetrit@aol.com)
Enclosures.

EXHIBIT 38

FILED: NEW YORK COUNTY CLERK 11/10/2014 12:56 PM

NYSCEF DOC. NO. 9

INDEX NO. 653462/2014

RECEIVED NYSCEF: 11/10/2014

EXHIBIT E

EXHIBIT 38



**ROSABIANCA**
**& ASSOCIATES**
Attorneys and Counselors At Law

**Triadou SPV S.A.**

**Period:**    October 29 – November 10, 2014
Attorney:    Diane Artal, Esq.

Hourly
fee basis:   USD $300.00

| Date | Description of Work Performed | Time /min |
|------|-------------------------------|-----------|
| 10.29.14 | Drafted notice to comply | 30 |
| 10.29.14 | Email to Alexandre Chateaux and Jessy Jacquotte re: 2nd installment | 10 |
| 10.30.14 | Email from Jessy Jacquotte re: 2nd installment | 5 |
| 10.30.14 | Email exchange with Kevin Meyer and reviewed Triadou's notice to comply | 15 |
| 10.31.14 | Email exchange with Kevin Meyer re: 2nd installment | 5 |
| 10.31.14 | Email to Josh Graff with notice to comply | 5 |
| 10.31.14 | Email exchange with Cesare Cerrito re: 2nd installment | 10 |
| 10.31.14 | Call with Cesare Cerrito re: 2nd installment | 20 |
| 10.31.14 | Email exchange and calls with CPA re: assignment agreement | 35 |
| 10.31.14 | Email to Jessy Jacquotte re: 2nd installment | 5 |
| 11.03.14 | Email exchange with Cesare Cerrito re: 2nd installment | 10 |
| 11.03.14 | Email exchange with CPA re: assignment agreement/2nd installment | 10 |
| 11.03.14 | Email exchange with Jessy Jacquotte and Cesare Cerrito re: 2nd installment | 10 |
| 11.04.14 | Calls with Cesare Cerrito | 15 |
| 11.04.14 | Email exchange with Cesare Cerrito | 35 |
| 11.04.14 | Drafted Notice of Default | 40 |
| 11.04.14 | Email exchange and call to Josh Graff | 15 |
| 11.04.14 | Email exchange with Jessy Jacquotte and Cesare Cerrito re: 2nd installment | 5 |
| 11.04.14 | Reviewed Minutes of Triadou and direction payment for 2nd installment | 20 |
| 11.05.14 | Call with Cesare Cerrito | 5 |
| 11.05.14 | Email exchange with Josh Graff and Jo Chetrit | 20 |
| 11.05.14 | Email exchange with Jessy Jacquotte re: assignment agreement | 10 |
| 11.05.14 | 2 calls and email exchange with Cesare Cerrito re: 2nd installment | 30 |

40 Wall Street, 30th Floor
New York, NY 10005
T  212.269.7722
F  212.269.7799

EXHIBIT 38



**ROSABIANCA**
**& ASSOCIATES**
Attorneys and Counselors At Law

| Date | Description | Time /min |
|---|---|---|
| 11.06.14 | Email exchange with Cesare Cerrito re: 2nd installment | 60 |
| 11.06.14 | Email exchange with Josh Graff re: 2nd installment | 30 |
| 11.06.14 | Meeting with David Van Leeuwen re: motion for SJ | 20 |
| 11.07.14 | Email exchange with Jessy Jacquotte; reviewed payment letter v.2 re: 2nd installment | 15 |
| 11.07.14 | Email exchange with Cesare Cerrito re: 2nd installment | 30 |
| 11.07.14 | Call with Cesare Cerrito re: 2nd installment | 5 |
| 11.07.14 | Email exchange with Josh Graff re: 2nd installment | 15 |
| | | |
| TOTAL | TIME | 405 min |
| | BILLING | **$2,025.00** |

**Period:** **November 6 – November 10, 2014**
**Attorney:** David Van Leeuwen, Esq.

**Hourly**
**fee basis:** USD $350.00

| Date | Description of Work Performed | Time /min |
|---|---|---|
| | | |
| 11.06.14 | Meeting with Diane Artal re: SJ | 20 |
| 11.06.14 | Reviewed Assignment documents | 60 |
| 11.06.14 | Drafted Motion for SJ: affirmation, affidavit, notice | 390 |
| 11.06.14 | Legal research Motion SJ | 30 |
| 11.07.14 | Drafted Motion for SJ: affirmation, affidavit, notice | 430 |
| 11.07.14 | Preparation document exhibits | 40 |
| 11.10.14 | Filing Motion | 30 |
| | | |
| TOTAL | TIME | 1000 min |
| | BILLING | **$5,833.33** |

| Expenses | 4 overnight FEDEX - Notices of Default | $36.96 |
|---|---|---|
| | Motion | $45.00 |
| | RJI | $95.00 |
| | Court Filing Fee | $210.00 |
| | TOTAL | **$386.96** |

**TOTAL BILLING:** **$8,245.29**

40 Wall Street, 30th Floor
New York, NY 10005
T  212.269.7722
F  212.269.7799

EXHIBIT 38

FILED: NEW YORK COUNTY CLERK 03/30/2015 03:31 PM
NYSCEF DOC. NO. 45

INDEX NO. 653462/2014
RECEIVED NYSCEF: 03/30/2015

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
---------------------------------------------------------------x

TRIADOU SPV S.A.,

                          Plaintiff,

         -against-

CF 135 FLAT LLC, CF 135 WEST MEMBER LLC
and THE CHETRIT GROUP LLC,

                          Defendants.
---------------------------------------------------------------x

Index No. 653462/14

**ATTORNEY AFFIRMATION IN
SUPPORT OF DEFENDANTS'
ORDER TO SHOW CAUSE**

      David Salhanick, Esq., an attorney admitted to practice in the courts of the State of New

York affirms the following under the penalty of perjury:

      1.    I am an associate of the firm of Sukenik, Segal & Graff, P.C., attorneys for

defendants herein ("Defendants"); and as such, am fully familiar with the facts of this action and

of the matters set forth herein.  I submit this affirmation in connection with the motion by

Defendants, by order to show cause submitted herewith, for an Order (i) pending further Order of

this Court, staying the Clerk's entry of judgment in this action in favor of plaintiff Triadou SPV

S.A. ("Plaintiff") and against Defendants, and (ii) temporarily staying all proceedings in this

action, including the Clerk's entry of judgment in favor of plaintiff Triadou SPV S.A.

("Plaintiff") and against Defendants, until this motion has been heard.

<u>**PROCEDURAL HISTORY**</u>

      2.    Plaintiff commenced this action pursuant to CPLR Section 3213 as a motion for

summary judgment in lieu of complaint ("Plaintiff's Motion"), alleging, *inter alia,* that

Defendants owe it the principal sum of $5,250,000 under the terms of a written agreement ("the

Agreement") and a written guaranty ("Guaranty")

1

EXHIBIT 39

3.      Defendants opposed Plaintiff's Motion arguing, *inter alia*, that the Agreement is not an "instrument for the payment money only" as required by CPLR 3213, and that there is a triable issue of fact regarding Plaintiff's standing to maintain this action, as documentary evidence suggests that the debt allegedly owed by Defendants to Plaintiff may have been assigned or pledged by Plaintiff to a third-party.

4.      On February 3, 2015, this Court issued a decision and order (the "Order" a copy of which is appended hereto as "Exhibit 1") granting Plaintiff's Motion and directing the Clerk to enter a money judgment in favor of Plaintiff and against Defendants.[1]  Notably, while the Order expressly held that the Agreement is an "instrument for the payment of money only" under CPLR 3213, the Order failed to address Defendants' argument that there is a triable issue of fact regarding the sufficiency of Plaintiff's standing.

5.      On February 5, 2015, Plaintiff submitted a "proposed judgment" for entry by the Clerk. (the "Proposed Judgment," a copy of which is appended hereto as "Exhibit 2")  To date, the Clerk has yet to enter the Proposed Judgment or any other judgment in this action.

### NICHOLAS BOURG'S MARCH 24, 2015 LETTER TO DEFENDANTS

6.      On March 24, 2015, defendant The Chetrit Group LLC ("Chetrit") received a letter (the "March 24 Letter," a copy of which is appended hereto as "Exhibit 3") from Moses & Singer, LLP, counsel for Nicholas Bourg ("Bourg").  The March 24 Letter advised Chetrit that Bourg, who served as Plaintiff's director until late 2014, is owed sizeable sums by Plaintiff and/or Plaintiff's affiliated entities, and that Bourg has reason to believe that any payments to be made by Defendants to Plaintiff will be unlawfully absconded and/or removed from the state by Plaintiff to prevent Bourg's recovery therefrom.  According to the March 24 Letter, Bourg is

---

[1] The Order was entered on February 4, 2015.

2

EXHIBIT 39

prepared to immediately intervene in this action and seek an order of attachment of Plaintiff's

funds and a preliminary injunction preventing Defendants from repaying Plaintiff.

7.      The March 24 Letter states that in order to prevent the threatened litigation,

Plaintiff and Defendants must agree to hold all payments from Defendants to Plaintiff in an

escrow account maintained by Plaintiff's attorneys, Rosabianca & Associates, PLLC

("Rosabianca"), until the dispute between Bourg and Plaintiff has been resolved.  The March 24

Letter warns Chetrit that Bourg will hold Defendants liable for payments it makes to Plaintiff.

**EQUITY AND FAIRNESS DICTATES THAT ENTRY OF JUDGMENT BE STAYED
UNTIL THIS COURT DETERMINES BOURG'S ALLEGATIONS**

8.      Defendants have no desire to facilitate Plaintiff's possible fraudulent concealment

or to be sued by Bourg.  However, Defendants cannot possibly deposit money in Rosabianca's

escrow account as requested by Bourg.  Just days ago, on March 12, 2015, Luigi Rosabianca,

Esq., Rosabianca's founder and principal, was suspended from the practice of law by the First

Department for alleged misappropriation of his firm's IOLA funds. (a copy of the disciplinary

decision is appended hereto as "Exhibit 4")  In view of Rosabianca's alleged misappropriation of

escrow funds, it would be reckless for Defendants to now entrust Rosabianca with millions of

dollars.

9.      Additionally, Rosabianca has exhibited a pattern of suspicious and concerning

behavior in their dealings with Defendants.  Rosabiana has written to Defendants on Plaintiff's

behalf on numerous occasions demanding payments allegedly due Plaintiff under the Agreement.

In these demand letters, Rosabianca has requested that Defendants' payments be wired to an

account in Switzerland maintained for an entity named "SDG Capital S.A." ("SDG")  (*see, for

example,* the January 20, 2015 notice to comply sent by Rosabianca to Defendants, a copy of

which is appended hereto as "Exhibit 5")  However, Defendants have never heard of SDG and

3

EXHIBIT 39

has had no dealings with such entity.  If Plaintiff (Triadou SPV S.A.) is owed the $5,250,000 debt, why has Rosabianca directed Defendants to make payments into an SDG account?  Such demands smack of fraud.

10.     This past week, after Defendants discovered that Rosabianca had been suspended from the practice of law (as reported in the New York Law Journal on March 23, 2015), Defendants received another demand letter, this time from Peyrot & Associates, P.C. ("Peyrot"). This letter stated that Peyrot was now the attorneys for Plaintiff and demanded that money allegedly owed Plaintiff be wired to a Swiss bank on behalf of SDG.  A copy of Peyrot's letter to Defendants is appended hereto as "Exhibit 6."

11.     While Peyrot purported in its letter to represent Plaintiff, Peyrot has yet to file a substitution of attorney signed by Rosabianca and an authorized representative of Plaintiff as mandated by CPLR 321.  As such, Rosabianca remains Plaintiff's attorneys of record.

12.     In response to the Peyrot letter, my firm responded by letter dated March 26, 2015, a copy of which is appended hereto as "Exhibit 7."  Our response letter (1) questioned whether Peyrot actually represents Plaintiff and requested proof of such representation, and (2) questioned Peyrot's direction that payment be made to SDG, an entity to which Plaintiff has no apparent connection.

13.     In view of these circumstances, Defendants are genuinely and justly concerned that any payments that they remit to Plaintiff may be improperly diverted to a person or entity other than Plaintiff.

14.     Defendants now find themselves in an extremely difficult position.  Should the Clerk enter a money judgment against Defendants and Plaintiff act to enforce such judgment, Defendants will be forced to remit funds for which they may not be credited and which Plaintiff

4

EXHIBIT 39

may unlawfully divert.  Moreover, Bourg may try to hold Defendants liable for any payments they make to Plaintiff.  It would be profoundly unfair for this Court to permit Defendants to remain in this "no-win" situation, whereby payments made by Defendants to Plaintiff potentially facilitate unlawful concealment and lead to Defendants being sued.  As such, fairness dictates that the Court stay entry of judgment until Bourg's forthcoming litigation is resolved.

15.    Nor should the relief requested herein be denied because Defendants did not raise these concerns in opposing Plaintiff's Motion.  The relief Defendants now seek is based on facts which first became available to Defendants after the disposition of Plaintiff's Motion.  Several weeks after entry of the Order, Defendants (1) received the March 24 Letter from Bourg advising Defendants that any payments they make to Plaintiff may be unlawfully concealed and warning Defendants that they will be sued if they make certain payments, (2) learned of Luigi Rosiabianca's suspension for alleged misappropriation of escrow funds, and (3) received the letter from Peyrot in which Peyrot purports to represent Plaintiff and directs Defendants to make payments in Switzerland to SDG, an unfamiliar entity.  These newly discovered facts support Defendants' application for a stay of entry of judgment until Plaintiff's and Bourg's concerns have been adequately addressed.

16.    Accordingly, Defendants respectfully request that, pending further Order of this Court, the Clerk's entry of judgment against Defendants in this action be stayed.

**<u>DEFENDANTS REQUIRE AN EMERGENCY INTERIM STAY OF PROCEEDINGS</u>**

17.    Furthermore, because a judgment may be entered against Defendants before this Court has had the opportunity to rule on this motion, Defendants also require an **emergency interim stay of these proceedings**.  The interim stay shall only remain in effect until this Court hears this motion.

5

EXHIBIT 39

18. Moreover, the emergent nature of this motion necessitates the Court's <u>expeditious</u> review of Defendants' request for interim relief. Any delay in the Court's grant of an interim relief requested herein may allow Plaintiff to obtain funds from Defendants and to successfully conceal same before this Court can intervene.

19. Although Rosabianca remains Plaintiff's attorneys of record, Defendants have nonetheless drafted their order to show cause to include service of these papers on both Rosabianca and Peyrot to insure that Plaintiff receives notice of this application.

20. In accordance with CPLR 2217(b), the undersigned affirms that no prior application has been made for the relief sought herein.

21. In accordance with Uniform Rule 202.7(f), the undersigned affirms that Plaintiff's attorney has been given due notice of the herein application and that Plaintiff's attorney will be timely notified of all forthcoming filings, dates, and times relevant to this application in a manner sufficient to permit Plaintiff an opportunity to appear and/or respond.

WHEREFORE, it is respectfully requested that the Court issue an Order staying entry of judgment in this action and temporarily staying all proceedings in this action until this motion has been heard; together with such other and further relief as to this Court may seem just, proper and equitable.

Dated: New York, New York
       March 30, 2015

DAVID SALHANICK

EXHIBIT 39

FILED: NEW YORK COUNTY CLERK 03/30/2015 03:31 PM

NYSCEF DOC. NO. 46

INDEX NO. 653462/2014

RECEIVED NYSCEF: 03/30/2015

# EXHIBIT 1

EXHIBIT 39

FILED: NEW YORK COUNTY CLERK 02/04/2015 11:04 AM

NYSCEF DOC. NO. 35                                          RECEIVED NYSCEF: 02/04/2015

SUPREME COURT OF THE STATE OF NEW YORK— NEW YORK COUNTY

PRESENT : DONNA M. MILLS                        PART    58
                          *Justice*

---

*TRIADOU SPV S.A.,*

                                                INDEX NO.   653462/14

                        Plaintiff,
                                                MOTION DATE_____
              -v-
                                                MOTION SEQ. NO. 001
CF 135 FLAT LLC, CF 135 WEST MEMBER LLC,
and THE CHETRIT GROUP LLC,
                        Defendants.             MOTION CAL NO._____

---

The following papers, numbered 1 to _____ were read on this motion for Summary Judgment.

                                                        PAPERS NUMBERED

Notice of Motion/Order to Show Cause–Affidavits– Exhibits....    _____ 1 _____

Answering Affidavits– Exhibits_____          _____ 2 _____

Replying Affidavits_____          _____ 3 _____

CROSS-MOTION:      _____ YES   _✓_ NO

        Upon the foregoing papers, it is ordered that this motion for summary judgment

in lieu of complaint is decided as follows:

        It is undisputed that on August 4, 2014, Plaintiff, Triadou SPV S.A., entered into

an agreement to assign, by which Plaintiff agreed to assign and sell to Defendant CF

135 Flat LLC all of the Plaintiff's right, title and membership interest in CF 135 West

Member LLC. According to Article 1c of the Agreement to Assign, the sum of Five

Million Two Hundred Fifty Thousand Dollars ($5,250,000) was due to be paid by

Defendant CF 135 Flat to Plaintiff on or before November 2, 2014. On August 4, 2014,

EXHIBIT 39

Defendants executed a guaranty agreement whereby Defendants, CF West Member LLC and The Chetrit Group LLC, unconditionally guaranteed to Plaintiff the full prompt and complete payment of the sums listed in the subject Agreement to Assign. After not receiving payment as agreed to, despite due demand therefore, Plaintiff now brings this action for an order pursuant to CPLR § 3213 directing the entry of summary judgment in lieu of complaint in favor of the Plaintiff and against the Defendants. Defendants oppose the motion on the ground that there were additional payment obligations pursuant to the subject Agreement to Assign, and therefore the document relied on is not an instrument for the payment of money only.

To prevail on a motion for summary judgment in lieu of complaint, the plaintiff must provide proof of an agreement for money only, unconditional terms of repayment, and the defendant's failure to pay. (*SCP [Bermuda] v Bermudatel Ltd.*, 224 AD2d 214, 216 [1st Dept 1996]). The defendant must explicitly acknowledge the indebtedness, and the fact of the debt must be apparent from the agreement alone (*Weissman v Sinorm Deli*, 88 NY2d 437, 444 [1996]). Upon that showing, the burden shifts to defendant to demonstrate factual issues to defeat plaintiff's motion and require a trial (*National Bank of N. Am. v Alizio*, 103 AD2d 690, 691 [1st Dept 1984]).

In the instant action, while the subject Agreement, in addition to requiring Defendants to make payments, may also obligate the Defendants to keep books of accounts and to provide reports of progress of certain construction work to the Plaintiff, this Court finds that the Agreement to Assign is an agreement for money only, with unconditional terms of repayment. Additionally, Plaintiff has unrefuted evidence of the Defendants' failure to pay. While there are other terms in the Agreement, the

EXHIBIT 39

instrument's eligibility doesn't depend upon the occurrence (or nonoccurrence) of any unrelated future event." (*Kerin v Kaufman*, 296 AD2d 336, 338 [1st Dept 2002]).

Accordingly it is

ORDERED that the motion for summary judgment in lieu of complaint is granted and the Clerk is directed to enter judgment in favor of plaintiff and against defendants, CF 135 Flat LLC, CF 135 West Member LLC, and the Chetrit Group LLC, jointly and severally, in the amount of $5,250,000.00, with interest at the statutory rate from the date of November 2, 2014, as calculated by the Clerk, together with costs and disbursements as taxed by the Clerk.

Dated: _____2/3/15_____                    _____
                                            J.S.C.

Check one: _✓_ FINAL DISPOSITION     ___ NON-FINAL DISPOSITION

                                    DONNA M. MILLS, J.S.C.

EXHIBIT 39

FILED: NEW YORK COUNTY CLERK 03/30/2015 03:31 PM

NYSCEF DOC. NO. 47

INDEX NO. 653462/2014

RECEIVED NYSCEF: 03/30/2015

.

# EXHIBIT 2

EXHIBIT 39

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

TRIADOU SPV S.A.,                               INDEX #: 653462/2014

                              Plaintiff,        JUDGMENT

               -against-

CF 135 FLAT LLC, CF 135 WEST MEMBER LLC,
and THE CHETRIT GROUP LLC,

                              Defendants.

        Plaintiff, TRIADOU SPV S.A., having brought an action, by summons and

motion for summary judgment in lieu of complaint, against the Defendants, CF

135 FLAT LLC, CF 135 WEST MEMBER LLC, and THE CHETRIT GROUP LLC,

pursuant to the CPLR § 3213 seeking a judgment against the Defendants on the

grounds that Defendants have failed to pay upon an instrument for the payment

of money only which is now due and payable, and this Court having granted

Plaintiff's motion for summary judgment in lieu of complaint by the

Decision/Order of the Court dated February 3, 2015, and the Court having

awarded a money judgment against Defendants, jointly and severally, in the

amount of $5,250,000.00, with interest thereon from November 2, 2014, and the

Plaintiff's costs and disbursements having been duly taxed by the Clerk in the

sum of _____.

        NOW, on motion of Rosabianca & Associates, PLLC, Plaintiff's attorneys,

it is

        ADJUDGED, that Plaintiff, TRIADOU SPV S.A., with an address of

40 Wall Street, 30th Floor, New York, NY, 10005, recover of Defendant

CF 135 FLAT LLC, with an address of 512 Seventh Avenue, 15th Floor, New

EXHIBIT 39

York, New York 10018; Defendant CF 135 WEST MEMBER LLC, with an address of 512 Seventh Avenue, 15th Floor, New York, New York 10018; and of Defendant THE CHETRIT GROUP LLC, with an address of 512 Seventh Avenue, 15th Floor, New York, New York 10018; jointly and severally, in the sum of $5,250,000.00 with interest thereon at nine (9%) percent per annum from November 2, 2014, in the sum of $ _____, together with costs and disbursements as taxed in the sum of $_____, making in all the sum of $_____, and that the Plaintiff shall have execution therefore.

Judgment signed this _____ day of _____ 2015.

_____

EXHIBIT 39

FILED: NEW YORK COUNTY CLERK 03/30/2015 03:31 PM
INDEX NO. 653462/2014
NYSCEF DOC. NO. 48
RECEIVED NYSCEF: 03/30/2015

# EXHIBIT 3

EXHIBIT 39

# MOSES & SINGER LLP

The Chrysler Building
405 Lexington Avenue, NY, NY 10174-1299
Tel: 212.554.7800    Fax: 212.554.7700
www.mosessinger.com

Robert Wolf
Direct: 212.554.7825  Fax: 212.554.7700
rwolf@mosessinger.com

March 24, 2015

**By Hand and e-mail (jochetrit@aol.com)**
Mr. Joseph Chetrit
The Chetrit Group
512 Seventh Ave., 15th Fl.
New York, New York 10018

### Re: Nicolas Bourg v. Triadou SPV SA and Iliyas Khrapunov

Dear Mr. Chetrit:

This firm represents the interests of Nicolas Bourg, who was the Director of Triadou SPV S.A. ("Triadou") until late last year.  Mr. Bourg is owed a substantial amount of money by Triadou and/or persons and entities that are associated with Triadou, including Iliyas Khrapunov.  CH 135 Flat LLC, CF 135 West Member LLC and The Chetrit Group LLC (the "Defendants") are defendants in an action brought by Triadou that is pending in the New York State Supreme Court (the "New York Action").  We are aware that the Court has already ruled that each of the Defendants is jointly and severally liable to Triadou in the amount of $5,250,000 plus statutory interest from November 2, 2014 based on the Defendants' failure to pay the first of four installments that are owed to Triadou.  We also aware that Triadou has commenced a second action seeking to recover the second installment from the Defendants.

We have reason to believe that if the Defendants cause any payments to be made to Triadou, Triadou will immediately transfer the funds to another Khrapunov controlled entity outside the jurisdiction of New York, preventing Mr. Bourg from collecting the amounts he is owed – amounts that far exceed the amounts at stake in the New York Actions.

To prevent Triadou and Khrapunov from absconding with money that is owed to Mr. Bourg, we are prepared to immediately intervene in the pending and any future New York Actions and to request an attachment of any funds that may come into the hands of Triadou and an injunction restraining the payment of any funds to Triadou.  The Defendants will be named as a necessary party to that action.

To avoid the need for immediate intervention in the New York Actions, we propose that the parties to the New York Action enter into a standstill agreement with Mr. Bourg under which, for thirty (30) days: (i) any payments made by the Defendants on account of its obligations to Triadou will be paid, if at all, into an escrow account maintained by Rosabianca & Associates, PLLC or other acceptable escrow agent ("Escrow Agent"); (ii) the Escrow Agent will not disburse any funds received from or on behalf of the Defendants; (iii) Triadou and Mr. Bourg will negotiate in good faith to resolve Mr. Bourg's claims as outlined in this letter.  The thirty (30) day

EXHIBIT 39

# MOSES & SINGER LLP

Mr. Joseph Chetrit
March 24, 2015
Page 2

period should provide the parties time to resolve the amount of compensation to which Mr. Bourg is entitled, without the need for emergency litigation.

We would like to arrange a meeting for later today to discuss this matter with you and/or your counsel and counsel for Triadou. I will call you shortly to discuss this further. Be advised that if we learn that any installments not currently due to Triadou are paid nonetheless, we will view that as an attempt to aid and abet a fraudulent conveyance by Triadou, and will seek to hold the Defendants liable therefor.

In light of the claims asserted in this matter, you are under an obligation to preserve evidence that may be relevant to those claims and/or any defenses that the Defendants may have. To that end, I am enclosing a separate letter detailing those obligations.

Very truly yours,

Robert S. Wolf

1063482v1  014140.0100

EXHIBIT 39

FILED: NEW YORK COUNTY CLERK 03/30/2015 03:31 PM

NYSCEF DOC. NO. 49

INDEX NO. 653462/2014

RECEIVED NYSCEF: 03/30/2015

# EXHIBIT 4

EXHIBIT 39

2015 NY Slip Op 02012

**IN THE MATTER OF LUIGI ROSABIANCA, AN ATTORNEY AND COUNSELOR-AT-LAW: DEPARTMENTAL DISCIPLINARY COMMITTEE FOR THE FIRST JUDICIAL DEPARTMENT, Petitioner,**
**LUIGI ROSABIANCA, Respondent.**

M-5952.

Appellate Division of the Supreme Court of New York, First Department.

Decided March 12, 2015.

Jorge Dopico, Chief Counsel, Departmental Disciplinary Committee, New York (Orlando Reyes, of counsel), for petitioner.

Respondent pro se.

Before: Tom, J.P., Acosta, Saxe, Moskowitz, and Feinman, JJ.

Disciplinary proceedings instituted by the Departmental Disciplinary Committee for the First Judicial Department. Respondent, Luigi Rosabianca, was admitted to the Bar of the State of New York at a Term of the Appellate Division of the Supreme Court for the Second Judicial Department on December 13, 2000.

Respondent suspended from the practice of law in the State of New York, effective the date hereof, until such time as disciplinary matters pending before the Committee have been concluded, and until further order of this Court.

Opinion

PER CURIAM.

Respondent Luigi Rosabianca was admitted to the practice of law in the State of New York by the Second Judicial Department on December 13, 2000. At all times relevant to this proceeding, respondent maintained an office for the practice of law within the First Judicial Department.

EXHIBIT 39

The Departmental Disciplinary Committee seeks an order under (22 NYCRR) § 603.4(e)(1)(i) and (iii) immediately suspending respondent from the practice of law until further order of this Court based on respondent's failure to cooperate with the Committee's investigation of four complaints, and upon evidence that he misappropriated client funds.

In October 2011, the Committee received a complaint from one of respondent's clients. According to the complaint, respondent had represented the client in the purchase of a condominium apartment but had failed, despite repeated requests, to provide the client with an accounting of the escrow funds respondent was to have disbursed in connection with the May 2011 purchase. The client further alleged that funds to which he was entitled remained in escrow. In December 2011, respondent answered the complaint, and in January 2012, respondent remitted $8,349.55 to the client — an amount that respondent claimed represented a full refund of his legal fee. Thereafter, the client informed the Committee that he wished to withdraw his complaint as all the issues regarding the accounting had been cleared to his satisfaction. Nonetheless, the Committee continued its investigation. Based on its audit of respondent's IOLA account records for the period January 2011 through January 2012, the Committee contends that respondent intentionally converted or misappropriated the client's funds on multiple occasions. In addition, the IOLA accounts showed a number of other irregularities.

The Committee further alleges that respondent has failed to cooperate with its investigation of this client's matter. In support of that allegation, the Committee notes that in January 2013, it sent respondent a letter requesting that he supply information regarding IOLA account transactions for the period at issue. Specifically, the Committee requested that respondent insert the names of check payees and identify client matters where that information was missing; when it did not receive the information, the Committee reiterated its request in June 2013. To date, respondent has not provided this information.

In November 2011, the Lawyers' Fund for Client Protection (the Fund) notified the Committee that a check for $25,000 drawn against respondent's IOLA account had been dishonored due to insufficient funds. The Committee opened a sua sponte complaint and requested that respondent submit a written explanation as to why the check had been dishonored. The Committee also requested that respondent produce specified escrow account records for the six-month period immediately preceding the check at issue (May to October 2011), which he was required to maintain under the Rules of Professional Conduct (22 NYCRR 1200.0) rule 1.15(d)(1). However, respondent failed to comply with the Committee's request.

EXHIBIT 39

In February 2013, an officer with Emigrant Mortgage Company (EMC) filed a complaint with the Committee alleging that in May 2008, respondent obtained a mortgage loan from EMC in the amount of $1.76 million to refinance a prior mortgage. The loan was collateralized by two units of real property, one owned by respondent and the other owned by his parents. Respondent acted as his own attorney, as counsel for his parents, and as title closer and agent. As title closer and agent, respondent was responsible for recording both of EMC's mortgages for which service he received a portion of the loan funds. EMC alleged that respondent failed to record both mortgages and obtained a $500,000 mortgage against the properties from another lender; as a result, EMC stated, it was forced into the position of a subordinate mortgagee.

Between March and June 2013, the Committee repeatedly requested that respondent submit a written answer to EMC's complaint, but he failed to do so. On October 15, 2013, respondent appeared for a deposition, and during that proceeding, agreed to promptly provide the Committee with a written answer to EMC's complaint. However, he failed to do so.

In March 2014, another of respondent's clients filed a complaint with the Committee alleging that in September 2013, he had retained respondent to represent him in the sale of his apartment and that after the closing, respondent failed to promptly remit the sale proceeds to him. The client further alleged that respondent failed to provide him with a full accounting as to the manner in which the funds respondent held in escrow were disbursed. The Committee requested that respondent submit a written answer to the client's complaint, but respondent failed to do so.

On May 15, 2014, respondent, pro se, appeared for a continuation of his deposition, acknowledging that he had not provided the Committee with the material he promised to produce at his prior deposition. Respondent explained that he had been under the belief that he was not obliged to produce the material until he received a copy of the transcript of his October 15, 2013 deposition, which he claimed the Committee had forwarded to him by email only on May 6, 2014. Respondent acknowledged, however, that a letter from the Committee dated December 13, 2013, which referenced the transcript as an enclosure and which he claimed not to have received, was correctly addressed to his office. In addition, respondent claimed that he had been too busy to answer the March 2014 complaint. Respondent agreed to provide answers to outstanding complaints, as well as the requested IOLA account information and records that the Committee sought, by specified deadlines regardless of when he received the transcript of his May 15, 2014 deposition.

EXHIBIT 39

Nonetheless, respondent did not comply with the agreed upon deadlines and, to date, has not submitted answers to the outstanding complaints. Nor has he produced the IOLA account information and records sought by the Committee in connection with its prior investigations. Moreover, respondent was served with the Committee's current interim suspension motion, but he has not submitted a response.

The record sufficiently establishes that respondent has willfully failed to fully cooperate with the Committee's investigation by failing to answer three complaints and failing to provide the Committee with requested IOLA account records and information (*Matter of Engram*, 75 AD3d 137 [1st Dept 2010]). Moreover, the IOLA records obtained by the Committee reveal that respondent has mishandled and misappropriated IOLA funds (*see e.g. Matter of Babalola*,121 AD3d 181 [1st Dept 2014]; *Matter of Linder*, 112 AD3d 152 [1st Dept 2013]).

Accordingly, the Committee's motion should be granted and respondent suspended from the practice of law, effective immediately, pursuant to 22 NYCRR 603.4(e)(1)(i) and (iii), until such time as disciplinary matters pending before the Committee have been concluded, and until further order of this Court.

All concur.

Order filed.

EXHIBIT 39

FILED: NEW YORK COUNTY CLERK 03/30/2015 03:31 PM

NYSCEF DOC. NO. 50

INDEX NO. 653462/2014

RECEIVED NYSCEF: 03/30/2015

# EXHIBIT 5

EXHIBIT 39



ROSABIANCA
& ASSOCIATES, PLLC
Attorneys and Counselors At Law

**NOTICE OF DEFAULT**

January 20, 2015

**VIA EMAIL and FEDEX**

Josh Graff, Esq.
Sukenik Segal & Graff, P.C.
404 5th Avenue, 5th Floor
New York, NY 10018
jgraff@ssglaw.com

Meyer Chetrit
Manager
CF 135 Flat LLC
c/o The Chetrit Group, LLC
512 Seventh Avenue, 15th Floor
New York, NY 10018

Meyer Chetrit
Manager
CF 135 West Member LLC
c/o The Chetrit Group, LLC
512 Seventh Avenue, 15th Floor
New York, NY 10018

Meyer Chetrit
Manager
The Chetrit Group, LLC
512 Seventh Avenue, 15th Floor
New York, NY 10018

 **Re:** **Notice of Default and Demand To Cure**
   **Second Installment**
   **Agreement to Assign and Guaranty dated August 4, 2014**

Dear Mr. Graff and Mr. Chetrit:

 As you are aware, the law firm of the undersigned represents Triadou SPV S.A. in connection with the matter above referenced.

 According to Article 1(d) of the Agreement to Assign executed by and between CF 135 Flat LLC and Triadou SPV S.A. on August 4, 2014 (the "Agreement"), the sum of Five Million Two Hundred Fifty Thousand ($5,250,000.00) Dollars was due to be paid by CF 135

40 Wall Street, 30th Floor
New York, New York 10005
T   212.269.7722
F   212.269.7799

EXHIBIT 39

Flat LLC to Triadou SPV S.A. on or before January 1, 2015. A copy of the Agreement is attached hereto for your reference. No payment has been made to date.

Pursuant to the Guaranty made by CF 135 Flat LLC, CF 135 West Member LLC and The Chetrit Group, LLC (collectively, the "Guarantors") on August 4, 2014, the Guarantors guaranteed complete payment of all installment payments due under the Agreement. As you are aware, the Guarantors' liability is primary and Triadou SPV S.A. does not need to commence an action against CF 135 Flat LLC prior to proceeding directly against the Guarantors. A copy of the Guaranty is also attached hereto for your reference.

Therefore, the undersigned hereby demands that payment from the Guarantors of the amount of Five Million Two Hundred Fifty Thousand ($5,250,000.00) Dollars be sent no later than 5:00 pm on January 23, 2015 by wire transfer to the following bank account:

**SDG CAPITAL S.A.:**

| | |
|---|---|
| Beneficiary's Name: | Compagnie Privée de Conseils et d'Investissements SA |
| Beneficiary Reference: | REF. 0300740, SDG CAPITAL SA |
| Beneficiary's Bank: | Bank Vontobel AG, St. Alban-Anlage 58, 4052 Basel |
| SWIFT: | VONTCHZZ |
| Clearing: | 8757 |
| IBAN USD: | CH93 0875 7000 0122 7336 2 |

In the event that the Guarantors fail to do so, the undersigned will be left with no choice but to commence immediate litigation against all Guarantors to recover the monies due, including all court costs, statutory interests and attorneys' fees.

This letter shall not be construed as a waiver of Triadou SPV S.A.'s legal rights or remedies, all of which are hereby expressly reserved.

Your prompt response to this matter is urged. Please be guided accordingly.

Sincerely,

ROSABIANCA & ASSOCIATES, PLLC

By: _____
Diane Artal, Esq.
David Van Leeuwen, Esq.

Cc:    Joseph Chetrit (jochetrit@aol.com)
Enclosures.

EXHIBIT 39

FILED: NEW YORK COUNTY CLERK 03/30/2015 03:31 PM
NYSCEF DOC. NO. 51

INDEX NO. 653462/2014
RECEIVED NYSCEF: 03/30/2015

# EXHIBIT 6

EXHIBIT 39

# PEYROT & ASSOCIATES P.C.

## NOTICE TO COMPLY

March 25, 2015

**VIA EMAIL and FEDEX**

Josh Graff, Esq.
Sukenik Segal & Graff, P.C.
404 5th Avenue, 5th Floor
New York, NY 10018
jgraff@ssglaw.com

Meyer Chetrit
Manager
CF 135 Flat LLC
c/o The Chetrit Group, LLC
512 Seventh Avenue, 15th Floor
New York, NY 10018

Meyer Chetrit
Manager
CF 135 West Member LLC
c/o The Chetrit Group, LLC
512 Seventh Avenue, 15th Floor
New York, NY 10018

Meyer Chetrit
Manager
The Chetrit Group, LLC
512 Seventh Avenue, 15th Floor
New York, NY 10018

> Re:  **Notice of Default and Demand To Cure**
> **Second Installment**
> **Agreement to Assign and Guaranty dated August 4, 2014**

Dear Mr. Graff and Mr. Chetrit:

As you are aware, the law firm of the undersigned represents Triadou SPV S.A. in connection with the matter above referenced.

According to Article 1(e) of the Agreement to Assign executed by and between CF 135 Flat LLC and Triadou SPV S.A. on August 4, 2014 (the "Agreement"), the sum of Five Million Two Hundred Fifty Thousand ($5,250,000.00) Dollars was due to be paid

62 William Street, 9th floor
New York, NY 10005
917 921 0626
www.peyrotlaw.com



EXHIBIT 39

# PEYROT & ASSOCIATES PC

by CF 135 Flat LLC to Triadou SPV S.A. on or before April 1, 2015. A copy of the Agreement is attached hereto for your reference. No payment has been made to date.

Pursuant to the Guaranty made by CF 135 Flat LLC, CF 135 West Member LLC and The Chetrit Group, LLC (collectively, the "Guarantors") on August 4, 2014, the Guarantors guaranteed complete payment of all installment payments due under the Agreement. As you are aware, the Guarantors' liability is primary and Triadou SPV S.A. does not need to commence an action against CF 135 Flat LLC prior to proceeding directly against the Guarantors. A copy of the Guaranty is also attached hereto for your reference.

Therefore, the undersigned hereby demands that payment from the Guarantors of the amount of Five Million Two Hundred Fifty Thousand ($5,250,000.00) Dollars be sent no later than 5:00 pm on March 31, 2015 by wire transfer to the following bank account:

**SDG CAPITAL S.A.:**

| | |
|---|---|
| Beneficiary Name: | Compagnie Privée de Conseils et d'Investissements SA |
| Payment Reference: | REF. 0300740, SDG CAPITAL SA |
| Beneficiary's Bank: | CORNER BANCA SA, LUGANO |
| SWIFT: | CBLUCH22 |
| IBAN USD: | CH77 0849 0000 1233 3900 2 |

In the event that the Guarantors fail to do so, the undersigned will be left with no choice but to commence immediate litigation against all Guarantors to recover the monies due, including all court costs, statutory interests and attorneys' fees.

This letter shall not be construed as a waiver of Triadou SPV S.A.'s legal rights or remedies, all of which are hereby expressly reserved.

Your prompt response to this matter is urged. Please be guided accordingly.

Sincerely,

PEYROT & ASSOCIATES, PC.

By: _____
David Van Leeuwen, Esq.
Priscilla Djirackor, Esq.

Cc:     Joseph Chetrit (jochetrit@aol.com)

Enclosures.

62 William Street, 9th floor
New York, NY 10005
917 921 0626
www.peyrotlaw.com

EXHIBIT 39

FILED: NEW YORK COUNTY CLERK 03/30/2015 03:31 PM

NYSCEF DOC. NO. 52

INDEX NO. 653462/2014

RECEIVED NYSCEF: 03/30/2015

# EXHIBIT 7

EXHIBIT 39

# SUKENIK, SEGAL & GRAFF, P.C.

ATTORNEYS AND COUNSELORS AT LAW

404 FIFTH AVENUE, FIFTH FLOOR
NEW YORK, N.Y. 10018-2204

212-725-9300 PHONE
212-481-5520 FAX

March 26, 2015

Via email david.vanleeuwen@Peyrotlaw.com
and Regular Mail

David VanLeeuwen, Esq.
Peyrot & Associates, PC
62 William Street, 9 Fl.
New York, New York 10005

Re: Triadou SPV S.A. ("Triadou")

Dear Mr. VanLeeuwen:

I am writing to you in response to your March 25, 2015 letter to my partner, Josh Graff, and to Meyer Chetrit. We represent CF 135 Flat LLC, CF 135 West Member LLC and The Chetrit Group, LLC. Both my clients and I are troubled by your letter for many reasons. Although you claim that your law firm represents Triadou, we note that until recently, that entity was represented by another law firm. Because Triadou is not a New York or American entity, we demand that you provide evidence that your firm does in fact represent Triadou.

Additionally, in your letter you ask that certain funds be transferred by wire by my clients to SDG Capital S.A. ("SDG"). We see no reason to make any transfer to such entity as there is no evidence whatsoever that anything is owed by any of my clients to SDG.

Additionally, we are further troubled by the fact that we recently learned that Triadou's previous attorney, Luigi Rosabianca, has been suspended from the practice of law because of allegations concerning improper treatment of escrow funds. As you can imagine, both my clients and I are concerned that any monies paid by my clients to anyone claiming that it represents Triadou may be subject to a claim that it is an improper disbursement.

Further, my clients have been notified by Moses & Singer LLP that its client, Nicholas Bourg, is seeking to attach funds allegedly owed by my clients to Triadou and that an action will be commenced shortly by Moses & Singer LLP on behalf of Mr. Bourg to restrain any payments to Triadou.

Because of the seriousness of these matters, I ask that you consider the points I have raised herein and respond immediately.

Respectfully yours,

SUKENIK, SEGAL & GRAFF, P.C.

David C. Segal

DCS/mc
Cc: Mr. Myer Chetrit

F:\WP\PAMELA\CHETRIT\Triadou\VanLeeuwen3'26'15.docx

EXHIBIT 39

Book Details : Nazarbayev-Our Friend the Dictator



COLUMBIA
UNIVERSITY
PRESS

Search

BOOKS ▼        DISTRIBUTED            ▼     REFERENCE ▼        CONTACT        ABOUT

PRESSES

## Nazarbayev-Our Friend the Dict

### Kazakhstan's Difficult Path to Democracy

Viktor Khrapunov. Translated by Nicki Challinger

ibidem Press

MAIN     REVIEWS     CONTENTS     EXCERPT     LINKS

"Like David, I am battling against a Goliath that has alr
means and powerful allies. I don't think I can win, I just
No dictatorship lasts forever, and if my contribution can
bring about its downfall, then I will have achieved what
man waging this unequal war is Viktor Khrapunov. He
Almaty, Kazakhstan's largest city, and the country's En
he was forced into exile. From Switzerland, where he r
family, he brings charges against the rule of Nursultan
will soon reach its twenty-fifth year.Nazarbayev, initially
young, dynamic president, has become a reckless and
dictator over the years. From the abusive privatization
mineral resources and thriving corruption to personal in
stone-cold elimination of political opponents--Khrapunc
criminal wheeling and dealing of this self-styled 'ruler o
how it is. Based on Khrapunov's insider knowledge fron
global power, his story is also a revelation of Western
brutal dictatorial regime. This gripping autobiographical
reader understand how Kazakhstan has developed pol
collapse of the Soviet Union to the modern day, and he
into a democratic state.

### ABOUT THE AUTHOR

Viktor Khrapunov has been involved in Kazakh politics
mayor of Almaty, Kazakhstan's largest city, from 1997
forced to leave the country in November 2007. He has
Switzerland ever since.






**PUB DATE:** OCTOBER 2015
**ISBN:** 9783838208077

176 Pages
**FORMAT:** Paperback

EXHIBIT 40

Book Details : Nazarbayev-Our Friend the Dictator

**LIST PRICE:** $26.00 / £18.00

ADD TO CART

**PUB DATE:** OCTOBER 2015
**ISBN:** 9783838268071

176 Pages
**FORMAT:** E-book

**LIST PRICE:** $15.99 / £11.00

GET THE E-BOOK ...

SUBJECTS

Biography and Memoir

JOB OPPORTUNITIES    FAQ    PRIVACY NOTICE    CONTACT

EXHIBIT 40

# EXHIBIT 41

# FILED UNDER SEAL

Biography | Viktor Khrapunov

Viktor Khrapunov
Biography
Activity
Publications
Gallery
Links
Contact
PY
FR
EN
DE

# Viktor Khrapunov: Biography

Viktor Viatcheslavovitch Khrapunov was born to ethnically Russian parents on November 24, 1948 in Predgornoje, a small town in the Far East of Kazakhstan, which at the time had about ten thousand inhabitants (today there are about 5,000). He is the third of eight children.



His father, Viacheslav Alekseevich Khrapunov, wounded in the Second World War, was born on February 21, 1913 in Perm (Russia) and died on January 24, 1980. His mother, Anastassia Nikolaevna Khrapunova, was born on September 3, 1923 in Predgornoje, the same town where she died on July 1, 2006.



EXHIBIT 42

Biography | Viktor Khrapunov

From 1956 to 1964, Viktor Khrapunov did his required schooling in Predgornoje.



In 1964, his parents directed him to vocational training. He passed the entrance exam for the Technical School in Ust-Kamenogorsk, a city of 100,000 inhabitants (300,000 today) located about forty kilometers from Predgornoje.



Except for a two year break (1968 and 1969) to do his military service, Viktor Khrapunov lived there until June 1970, when he received his degree as Heating Systems Technician.

EXHIBIT 42

Biography | Viktor Khrapunov



His high marks let him choose (which was rare at the time) among the positions offered by the Ministry of Energy of Kazakhstan, where he would begin his professional career. He decided on a position at the Powerhouse in the capital of Almaty, located 1100 km from his home region.

Viktor Khrapunov started at the Powerhouse in 1970 as a simple Service Technician, and he would spend several years at this plant, which dealt with supplying hot water (for consumption and heating) to the inhabitants (one million at the time) of what was then the country's capital. After being appointed Chief Supervisor, he was trained as a metrologist at the Academy of Normalization and Metrology in Almaty (graduated in 1973), allowing him access to the position of Mechanic Specialist, responsible for the maintenance of machinery for measuring and monitoring (15 people).

In 1971, Viktor Khrapunov began taking evening classes at the Polytechnic School in Almaty (Institute of Energy). In 1977, he graduated in Electrical Engineering.



From 1975 to 1977, he was promoted to new responsibilities within the Almaty Powerhouse: as Methods Engineer, he was responsible for supplying spare parts for the plant's technical equipment from 200 subcontractors located mainly in Russia.

In 1977, at the age of 29, having obtained his degree in Electrical Engineering, he reached a new milestone at the Almaty Powerhouse: he was appointed vice-director of the Boiler Workshop, one of the four key departments of the plant, with 120 workers operating non-stop, machinery worth hundreds of millions of dollars.

EXHIBIT 42

Biography | Viktor Khrapunov



In 1979, he was promoted to director of another major department in the plant (the Turbine Workshop, 170 employees), thus becoming the youngest working executive. He kept this position until 1985. During the night of February 4 to 5, 1984, the plant underwent major damage from a broken water pipe under pressure. During the emergency response to contain the leak, Viktor Khrapunov sustained 2nd and 3rd degree burns over 42% of his body from water boiling at 150 degrees. He was carried out on a stretcher and hospitalized for 40 days, fell into a state of near death, and his wounds took nine months to heal. Two other people were wounded that night, including one worker who was killed.

In May 1985, Viktor left the Almaty plant. The Minister of Energy appointed him technical director (Chief Engineer) of the Thermal Network in Almaty, a facility employing 1000 people, responsible for producing and distributing energy within the city. This job put him in permanent contact with the leaders of the capital and relevant ministerial authorities.

Viktor Khrapunov's political career began in October 1986. He left his job permanently as engineer to enter into the administration of the Kazakh capital. The Communist Party chose him to head Leninsky, a district of the city of Almaty (90,000 inhabitants, 90,000 employees).

In August 1989, at the age of 42, without ever having occupied any function within the political hierarchy, Viktor Khrapunov was elected Second Secretary of the Communist Party of the City of Almaty. In this position, he used his industrial skills to serve the city by creating a resource management center for the City of Almaty (industrial and food production, housing, etc.).

In 1990, after three years of training, the Academy of the Communist Party in Almaty granted Viktor Khrapunov the degree of Political Scientist (with honors).



In March 1991, during the last throes of the Soviet Republic of Kazakhstan, a reshuffle took place at the head of the city of Almaty: the mayor of Almaty (Zamanbek Nurkadilov) was appointed First Secretary of the Communist Party of Almaty, and Viktor Khrapunov took his place as Head of Administration of the city. In December 1991, after the country's Declaration of Independence, the

EXHIBIT 42

Biography | Viktor Khrapunov

Communist Party was banned from the territory of Kazakhstan. Three months later, in February 1992, a new reshuffle took place: Zamanbek Nurkadilov took back the head position of Almaty and Viktor Khrapunov took a position at his side as First Deputy Mayor. He kept this position until March 1995.

In March 1995, Viktor Khrapunov was appointed Minister of Energy and Mines. In March 1997, following an important reform in the government, the Ministry of Energy was broadened to include, in addition to Mines, two former ministries (geology; oil and gas). From this ministerial office, he returned to his engineering past.



In the mid-1980s, he was in charge of the production and distribution of energy in the city of Almaty. Ten years later, he assumed a similar responsibility, but this time for the whole country. When he became director of the Ministry of Energy, the country was on the verge of suffocating. The old habits of the Soviet regime still held fast. It was, in particular, very difficult to get industrial consumers to pay their energy bills. Due to lack of resources, the Ministry of Energy was forced to ration out electricity in the entire country, a measure which affected both those who paid their bills and those who did not. On May 30, 1996, Viktor Khrapunov had a comprehensive reform of the energy sector (except oil and gas) passed by the government. This reform provided particularly for a new division of responsibilities between central and local authorities for supplying electrical and thermal energy: the Ministry was responsible for supplying energy on the national scale, whereas regional leaders were responsible in their administered territories. This way, local authorities were encouraged to not leave unpunished those industries that did not pay their bills. The reform also provided for applying market laws in the energy sector through competition between small units of coal energy production and some companies distributing electrical energy. The country's four biggest hydro-electric plants (60% of all energy produced in Kazakhstan) still had to remain in the hands of the government. The reform of May 30, 1996, however, would not be respected. The President intervened so that the country's main plants would fall into the hands of his family, directly or through straw men. This resulted in a considerable loss for the country. Operations led by Nazarbayev to privatize the largest energy resources in the country would barely reach a few million dollars, whereas the plants' real value represented billions of dollars. A system of propagation was put into place, at the expense of the Kazakh people, who saw billions of dollars of potential revenue slip into the pockets of the presidential clan.

## 1997-2004 Mayor of Almaty.

On June 15, 1997, Nursultan Nazarbayev summoned Viktor Khrapunov. After thanking him for his three years of work accomplished as head of the Ministry of Energy, he suggested that he become mayor of the nation's capital. As is the practice in a country where everything is decided by the dictatorial president, Viktor Khrapunov began his new job the very next day. He inherited a city in ruins. City coffers were empty. Tax fraud was everywhere. The industrial sector had come to a halt after the collapse of the Soviet Union. The economy was left idling. Electricity and gas were being rationed. The population was angry with city authorities who were powerless to deal with their problems. To make things even gloomier, the city was stripped of its status as a capital in December 1997.

As soon as Viktor Khrapunov started, he surrounded himself by a team of specialists with whom he would analyze the situation and devise a 35-point recovery plan. The first emergency measures were financed by loans. Simultaneously, the mayor and his team made the strategic decision to focus on economic growth to replenish the city's funding. The strategy proved to pay off. In 1997, the city had 7,400 SMEs; in 2004, when Viktor Khrapunov left office, there were 148,000. This dazzling rise was the basis of the city's recovery. Taxes paid by these companies ensured a regular increase of the city's budget, which more than doubled in seven years, to reach $360 million in 2004. Within a few years, Almaty raised its head, cleaned up its finances, and emerged from its crisis. It became

EXHIBIT 42

Biography | Viktor Khrapunov

the biggest contributor to the national budget. In 2004, this contribution reached the record amount of $1.65 billion. The success was possible not with oil or natural resources, but rather only through the vitality of Almaty SMEs.

In December 2004, when he had to leave office as mayor of Almaty, Viktor Khrapunov could be proud of the work he had done. In seven years, the city had changed completely. The quality of life there had been considerably improved. Throughout all these years, he had been tirelessly committed to the service of the inhabitants of the city, and it showed: Viktor Khrapunov was a popular, appreciated and respected mayor. His work and commitment earned him official recognition as well. From 2000 to 2005, for six years in a row, he was named "Person of the Year" in the category of best mayors. In 2002, he was named "Statesman of the Year". In 2005, he was voted "Best Mayor of the Year" in the category of "Introducing New Technologies". To this glowing record, an important point should be added: when he left office as mayor of Almaty, the city was still owner of its entire infrastructure. In a country where the presidential clan considered public property as private merchandise at his disposal for getting rich at the blatant expense of the population, this fact deserves to be acknowledged with emphasis. During his term as mayor of Almaty, Viktor Khrapunov regularly had to deal with Nazarbayev family members requiring him to sign some document or another or take this and that action for the benefit of their personal wealth. He consistently opposed.



On November 26, 1997, Viktor Khrapunov defended his doctoral thesis on the economic reforms of the City of Almaty in transition towards a market economy, and was awarded the title of doctor (PhD candidate) by the Scientific Council of the National Academy of Administration of Almaty. Over the following years, he wrote his capacitation thesis by expounding on the same subject. On October 4, 2000, he defended his second thesis before the Scientific Council of the same Academy, to receive his title as Doctor of Economics.



On December 8, 2004, President Nazarbayev called Viktor Khrapunov. He expressed his deep concern for eastern Kazakhstan, the region suffering the worst from economic and industrial problems. The President flattered the Mayor of Almaty by saying that only an experienced crisis manager such as himself, a political heavyweight, a man with a spotless reputation, a tireless reformer who would never shrink before any hardship could improve the situation of this Province. The Mayor of Almaty was undecided. The President

EXHIBIT 42

Biography | Viktor Khrapunov

insisted, telling him that his term would not go beyond one year. Viktor Khrapunov understood that he had no choice. The next day, he was appointed governor of Eastern Kazakhstan. On paper, it was a promotion. In reality, the goal of this transfer was to make the troublemaker Viktor Khrapunov run around in circles where he could do no harm. With him gone, Almaty was delivered defenseless to the appetite of Nazarbayev family. Within months, the city sold off its infrastructure to the lowest bidders. Those who were working in exile of the former mayor could rejoice.

From December 2004 to January 2007, after 35 years in Almaty, Viktor Khrapunov found himself back in his home province. When he took on his new job, the region was last in every official classification that allowed for comparison between large cities and provinces. The governor got down to work: he handled crises, invested in energy infrastructure, removed the bureaucracy tied to creating businesses, promoted the building of new housing, stimulated the rebirth of the food industry, etc. As an advantage of his location at the far reaches of the country, he had the freedom to act and reform for the good of the people.



Results quickly emerged for the people of the Province. Their daily lives improved. His work earned him official recognition. After one year there, the region climbed back into 3rd position in the same classification. Simultaneously, Almaty, which had been in first position, fell to 7th place. After his second year in the province, the region took second ranking. While the President's lack of interest in this Province left room for the Governor to maneuver, throughout this period, the Governor still had to face pressure from Dariga Nazarbayeva, the President's daughter, who considered this area as her territory.



Tensions with the President's daughter went back to the years he spent as mayor of Almaty. Viktor Khrapunov refused to stuff the ballot boxes as requested by Dariga, preventing her newly-created party to take all the seats of the city in the 2004 elections. Dariga took this very badly. This was the time when she began to publicly state that Viktor Khrapunov was her worst enemy. In Eastern Kazakhstan as well, Viktor Khrapunov refused to submit to the will of Dariga Nazarbayeva, who wanted to appoint her men and plunder all the natural resources still available (for example, the gold mines) – in other words, those that had not yet been grabbed by her father. Viktor Khrapunov objected to this. For years, he felt that his uncompromising attitude towards everyone, including members of the presidential family, was accepted and respected by the President himself. During his years in Eastern Kazakhstan, he felt the winds were changing. He understood that history would repeat itself and that, as in Almaty, he would never be left to do what he wanted. This intuition was confirmed in January 2007. The President called him unexpectectedly to offer him the job of Minister of

EXHIBIT 42

Biography | Viktor Khrapunov

Emergency Situations. Viktor Khrapunov refused. He argued that he was already a Minister, and that the job offered to him was of limited scope and without interest. He reminded the President also that, given what had happened to the first two people who took this job (Nurkadilov was assassinated ; Kulmashonov, after a shuffle, was forever excluded from politics in the country), he did not consider this Ministry as a promotion… He finally explained that the recovery program in the region of Eastern Kazakhstan was very promising, and that he wanted to stay there another three years to ensure its sustainability. But the President imposed his will: Viktor Khrapunov resisted as long as he could, but once again, he understood that he had no other choice but to submit and leave his seat as Governor.

In January 2007, Viktor Khrapunov left Eastern Kazakhstan to move back to the capital, where the President appointed him Minister of Emergency Situations. With some specialists, Viktor Khrapunov sifted through the existing system of prevention and resolution of emergency situations (natural and man-made disasters). He met with his Russian counterpart in Moscow ; he was inspired by systems in place in Belarus and Azerbaijan. In the summer of 2007, he had a new, improved plan approved by the government, one that was adapted to the size of the country and the many challenges it faced.



During his brief stint at the head of this Ministry, Viktor Khrapunov had to handle three major crises: in the spring, rising water resulting from the thaw of the river Syr-Darya; in the summer (July 15, 2007), the derailment in Ukraine of a Kazakh train transporting yellow phosphorus which caught fire and was very slowly consumed; again in the summer (September 6, 2007), the decontamination of a wide perimeter in the region of Karaganda following a failed launching of the rocket "Proton" carrying a Japanese satellite.

On October 29, 2007, Viktor Khrapunov delivered his letter of resignation to Nursultan Nazarbayev. On November 1, 2007, he met with the President, who allowed him to leave the country to seek medical treatment abroad. A few days later, Viktor Khrapunov arrived in Switzerland, where he has remained ever since.

<mark>In 1998, Viktor Khrapunov married his second wife Leila Kalibekovna Khrapunova, born in 1958. He has five children and seven grandchildren.</mark>

## Academic titles

2007: Lecturer at the Technical University of Eastern Kazakhstan.  Teaching on the economic and political development of Kazakhstan.  Director of research.
Member of the International Academy of Energy (Degree 95 on January 24, 1995).
Member of the International Academy of Engineering, based in Almaty (Degree 92 on June 27, 2003).
Member of the Academy of Security, Defense and Law Enforcement (Degree 8011 on October 19, 2005).

## Elected Offices

From 1973 to 1978: President of the Council of Young Specialists of the Almaty Thermal Powerhouse.
From 1975 to 1977: Secretary of the Komsomol Committee of the Almay Thermal Powerhouse.
From 1986 to 1989: Board Member of the Communist Party Committee of the Leninsky District of the City of Almaty.
From 1989 to 1991 : Member of the Municipal Committee of the Communist Party of the City of Almaty.
From 1989 to 1991 : Member of the Communist Party Committee of the Region of Almaty.
From 1989 to 1991: Member of the Central Committee of the Communist Party.
From 1991 to 1994: Deputy of the Supreme Soviet of Deputies of the People of Kazakhstan (Member of Kazakh Parliament).
From 1986 to 1997 : several times, Deputy of the Communal and Municipal Council of People's Deputies.

EXHIBIT 42

Biography | Viktor Khrapunov

## Distinctions

Since 1983, Viktor Khrapunov's name has been on the board of honor of the Almaty Thermal Powerhouse.
In 1994, he was named Best Workshop Head in the City of Almaty.
From 1995 to 2007, he received several medals.
In 2000, he was awarded the Parasat Order.
From 2000 to 2005, six years in a row, Viktor Khrapunov was designated "Personality of the Year" in the category of the best mayors.
In 2002, he was designated "Statesman of the Year".
In 2004, he was decorated by the Patriarch of all Russias Alexis II of the Order of the Holy Prince Daniel.
Decorated by the Order of the National Olympic Committee.
In 2005, he received the Order of First President of the Republic of Kazakhstan, as well as the Order of Peter the Great.  In the same year, he was elected "Best Akim (mayor) of the Year" in the category "Introduction of New Technologies".

## Honorary Titles

Honorary Citizen of the City of Almaty.
Honorary Citizen of the Region of Almaty.
Honorary Citizen of the City of Turkestan.
Honorary Professor at the National Technical University of Kazakhstan (April 14, 1998).
Honorary Doctorate Degree in Law from the Academy at the Ministry of Interior of the Republic of Kazakhstan (September 30, 1999).
Honorary Doctorate in Economics from the State University of Almaty Abay (June 7, 2000).
Honorary Professor of the National Academy of Legal Sciences of Kazakhstan (October 11, 2000).
Badge of Merit for the development of Physical Education and Sports (September 27, 2005).
Eminent Sports Personality of the Republic of Kazakhstan (August 11, 2005).

© viktor-khrapunov.com

EXHIBIT 42

My husband | Family | Leila Khrapunova

# Leila Khrapunova

Biography
Family
Activity
Photoalbum
Publications
Interview
Press
Facebook
Contact
DE
FR
RУ

# Family

My father
My mother
My sisters
My husband
My children

**Viktor Vyacheslavovich Khrapunov** was born on November 24, 1948 in Predgornoje, Globokovkhiy Region, Eastern Kazakhstan to Russian parents. His father, Vyacheslav Alekseyevich Khrapunov (1913-1980), disabled after the Second World War, and his mother, Anastasia Nikolaevna Khrapunova (1923-2006) were both civil servants.

As a doctor of economics, a political scientist, an electrical engineer, and honorary citizen both of the City of Almaty and of the province of Eastern Kazakhstan, Viktor Khrapunov actively participated in his country's program of national reform. His career as an exemplary employee in a thermal power plant for fifteen years under the Soviet regime earned him the recognition of his peers and of the party that would assign him political responsibilities. At the time of the proclamation of independence of the Republic of Kazakhstan in 1991, his political engagement intensified and he became the driving force behind great reforms. He would successively hold the key positions of First

EXHIBIT 43

My husband | Family | Leila Khrapunova

Deputy Mayor of Almaty, Minister of Energy of Kazakhstan, and then Mayor of the City of Almaty (the political, then economic and cultural capital of the country). The presidential party, Nour-Otan, would lead him to positions of Governor and Minister, outside the city. In 2007, Viktor Khrapunov ended his political career for health reasons. He has lived in Switzerland since then, and has continued his commitment to his country by promoting dialogue and democracy.

**Website of Viktor Khrapunov.**

EXHIBIT 43